IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORPORAL TIMOTHY SHOCKLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-478---- |
| | ) | |
| GOVERNOR RUTH ANN MINNER, | ) | |
| individually; and COLONEL THOMAS F. | ) | |
| MACLEISH in his official capacity as the | ) | |
| Superintendent, Delaware State Police; and | ) | |
| DIVISION OF STATE POLICE, | ) | |
| DEPARTMENT OF SAFETY AND | ) | |
| HOMELAND SECURITY, STATE OF | ) | |
| DELAWARE. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF
## THEIR MOTION TO DISMISS

Barry M. Willoughby, Esquire (Bar I.D. 1016)
William W. Bowser, Esquire (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6666; 6601
Facsimile: (302) 576-3345; 3282
bwilloughby@ycst.com; wbowser@ycst.com
Attorneys for Defendant Governor Ruth Ann Minner

Ralph K. Durstein, III (I.D. #912)
Deputy Attorney General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
Telephone:  (302) 577-8510
Facsimile:  (302) 577-6499
Ralph.durstein@state.de.us
Attorneys for Colonel Thomas F. MacLeish and
Division of State Police, Department of Safety and
Homeland Security, State of Delaware

DATED:  June 21, 2007

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

NATURE AND STAGE OF THE PROCEEDINGS ........................................ 1

SUMMARY OF THE ARGUMENT ............................................................ 2

STATEMENT OF FACTS ........................................................................ 3

ARGUMENT ........................................................................................ 4

I.    PLAINTIFF'S AMENDED COMPLAINT WAS NOT TIMELY FILED
      AND, THEREFORE, SHOULD BE DISMISSED AS BARRED BY THE
      STATUTE OF LIMITATIONS ........................................................... 4

II.   PLAINTIFF'S CLAIM ACCRUED,  AT THE LATEST,  ON
      DECEMBER 31, 2003, WHEN HE CEASED TO BE ELIGIBLE FOR
      PROMOTION ................................................................................ 5

      A.    The Statute of Limitations for Shockley's Section 1983 Claim Is
            Two Years ........................................................................... 5

      B.    Shockley's Claim Accrued When He First Knew of the Adverse
            Action, Regardless of When He Discovered the Alleged Motives
            for the Action ...................................................................... 6

      C.    Shockley Knew He Had Not Been Promoted When the 2001
            Eligibility List Expired ......................................................... 7

            1.    The Vast Body of Case Law From This and Other Circuits
                  Supports Dismissal of Shockley's Claims .......................... 8

            2.    The Supreme Court's Recent Decision Emphasizes the
                  Policy Arguments that Support Dismissal of Shockley's
                  Claims .................................................................... 11

CONCLUSION .................................................................................. 13

# TABLE OF AUTHORITIES

**Cases**

Bishop v. N.J.,
  144 Fed. Appx. 236 (3d Cir. 2005)............................................................. 11

Bouman v. Block,
  940 F.2d 1211 (9th Cir. 1991)............................................................8, 11

Bronze Shields, Inc. v. N.J. Dep't of Civil Serv.,
  667 F.2d 1074 (3d Cir. 1980) ................................................................. 10

Bullen v. DeBretteville,
  239 F.2d 824 (9th Cir. 1956), cert. denied, 353 U.S. 947 (1957)................................ 4

Celestine v. Petroleos de Venezuela,
  266 F.3d 343 (5th Cir. 2001) ................................................................... 6

Conley v. Gibson,
  355 U.S. 41 (1957)................................................................................ 3

Cuffy v. Getty Refining and Mkt'g Co.,
  648 F. Supp. 892 (D. Del. 1986) .............................................................. 5

D.P. Enter., Inc. v. Bucks County Cmty. Coll.,
  725 F.2d 943 (3d Cir. 1984)..................................................................... 3

Del. State Coll. v. Ricks,
  449 U.S. 250 (1980)............................................................................... 8

Evans v. N.Y.C.,
  No. 00-4197 (BSJ), 2003 U.S. Dist. LEXIS 18281
  (S.D.N.Y. Oct. 14, 2003) ....................................................................... 8

Genty v. Resolution Trust Corp.,
  937 F.2d 899 (3d Cir. 1991).................................................................... 6

Hanani v. N.J. Dep't of Envtl. Protection,
  205 Fed. Appx. 71 (3d Cir. 2006)............................................................. 9

Harris v. N.Y.,
  186 F.3d 243 (2d Cir. 1999)...........................................................8, 11, 13

Holley v. Schreibeck,
  758 F. Supp. 283 (E.D. Pa. 1991).............................................................. 4

Hood v. N.J. Dep't of Civil Serv.,
  680 F.2d 955 (3d Cir. 1982).................................................................. 10

Lake v. Arnold,
    232 F.2d 360 (3d Cir. 2000)........................................................................... 5

Ledbetter v. Goodyear Tire & Rubber Co., Inc.,
    No. 05-1074, 2007 U.S. LEXIS 6295,
    (May 29, 2007) ......................................................................................9, 12

Montgomery v. DeSimone,
    159 F.3d 120 (3d Cir. 1998)........................................................................ 6

Moody v. Sussex Corr. Inst.,
    No. 01-374-SLR, 2002 U.S. Dist. LEXIS  4714
    (D. Del. Mar. 11, 2002)............................................................................... 5

Moorehead v. N.Y.C. Transit Auth.,
    385 F. Supp. 2d 248 (S.D.N.Y. 2005).......................................................... 7

Morse v. Lower Merion Sch. Dist.,
    132 F.3d 902 (3d Cir. 1997)........................................................................ 3

Mosley v. Bay Ship Mgm't, Inc.,
    No. 00-2306 (JCL), 2000 U.S. Dist. LEXIS 20251
    (D.N.J. Dec. 27, 2000) ............................................................................... 4

Oshiver v. Levin, Fishbein, Sedran & Berman,
    38 F.3d 1380 (3d Cir. 1994)....................................................................... 7

Pen. Ben. Guar. Corp. v. White Consol. Indus.,
    998 F.2d 1192 (3d Cir. 1993)..................................................................... 4

Riley v. Taylor,
    No. 06-01-GMS, 2006 U.S. Dist. LEXIS 88661
    (D. Del. Dec. 7, 2006)................................................................................ 5

Sandutch v. Muroski,
    684 F.2d 252 (3d Cir. 1982)....................................................................... 6

Smith v. Del.,
    No. 99-440-JJF, 2001 U.S. Dist. LEXIS 10594
    (D. Del. July 24, 2002)............................................................................... 5

Tatreau v. City of L.A.,
    No. 03-56638, 2005 U.S. App. LEXIS 14058
    (9th Cir. July 11, 2005) ..........................................................................9, 11

Toth v. Gates Rubber Co.,
    31 F. Supp. 2d 1249 (D. Colo. 1998)........................................................ 14

Wilson v. Garcia,
   471 U.S. 261 (1985)..................................................................................................... 5

**Rules**

10 Del. C. § 8119 ............................................................................................................... 5

Fed. R. Civ. P. 12(b)(6)..................................................................................................... 4

Fed. R. Civ. P. 15(c) ......................................................................................................... 5

DB02:6017203.2                                                                                           065896.1001

## NATURE AND STAGE OF THE PROCEEDINGS

This action was commenced on August 8, 2006, when Plaintiff Timothy D.

Shockley, a Corporal in the Delaware State Police ("DSP"), filed his original Complaint.

(D.I. 1). In his Complaint, Plaintiff alleged that Defendants failed to promote him

because of his gender in violation of 42 U.S.C. § 1983 ("Section 1983"). (D.I. 1).

Defendants filed their Answer to the Complaint on January 18, 2007. (D.I. 11). In their

Answer, Defendants denied Plaintiff's allegations in full and asserted several affirmative

defenses, including a statute of limitations defense. (D.I. 11 at 7-8). The Answer also

denied several statements that Defendants contended were factually inaccurate. (D.I. 11).

Plaintiff responded with a Motion for Leave to File an Amended Complaint on

May 3, 2007. (D.I. 15). Plaintiff admitted that the original Complaint did contain

"several factual inaccuracies" and proposed an amended version of the Complaint. (D.I.

15 at 2).

Defendants agreed to stipulate to the filing of the Amended Complaint, provided

that they reserved their right to dispute relation back pursuant to Rule 15(c). (D.I. 16).

The parties filed the Stipulation on May 25, 2007. (D.I. 16. at ¶ 3). Defendants also

preserved their right to assert a statute of limitations defense. (D.I. 16 at ¶ 4). The parties

agreed that the Amended Complaint does not revive any previously expired statute of

limitations. (D.I. 16 at ¶ 4).

In lieu of an Answer to the Amended Complaint, Defendants have filed a Motion

to Dismiss in which they assert that the Amended Complaint was untimely filed and is,

therefore time-barred by the applicable statute of limitations. (D.I. 18). This is

Defendants' Opening Brief in support of that Motion.

## SUMMARY OF THE ARGUMENT

Plaintiff's Amended Complaint should be dismissed for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On the face of the pleadings, it is clear that:

1.      Plaintiff's claims are governed by a two-year statute of limitations.

2.      Plaintiff's cause of action accrued in September 2003 when, he alleges, his promotion was vetoed.

3.      Even assuming that Plaintiff did not learn of the "secret veto" until 2005, he knew that he would not be promoted, at the latest, on December 31, 2003, when the eligibility list expired.

4.      Plaintiff's cause of action accrued when he received notice that he had been denied the promotion.

5.      At the latest, Plaintiff's claims expired on December 31, 2005, two years after he learned of the adverse action.

6.      Plaintiff's Complaint, filed on August 4, 2006, was filed outside the statute of limitations period and, therefore, should be dismissed.

DB02:6017203.2                                                                                                065896.1001

### STATEMENT OF FACTS

Plaintiff Timothy D. Shockley contends that Defendants wrongfully failed to promote him to the rank of Sergeant in the Delaware State Police ("DSP"). (D.I. 16). Specifically, Shockley asserts that he should have been promoted to the position of Non-Commissioned Officer In Charge ("NCOIC"), of the Governor's protection unit, known as the Executive Protection Unit ("EPU"). (D.I. 16). He contends that the Superintendent of the DSP, Colonel L. Aaron Chaffinch, selected him for promotion but that the Governor vetoed his promotion at a meeting in September 2003 because of his gender. (D.I. 16). Shockley's claim is based on this alleged veto. (D.I. 16).

In June 2001, the availability of internal promotions was announced. To qualify for promotion, applicants were required to take a written exam. The candidates were ranked according to their test scores and placed on an "eligibility list." Candidates were ranked on the list in "bands" according to their exam scores. Candidates in the highest band would be selected for promotion first. Only candidates who were placed on the eligibility list could be promoted.

The test was administered and the eligibility list was published (the "2001 Eligibility List"). The 2001 Eligibility List was set to expire on December 31, 2003. (D.I. 16 at ¶17). Shockley did not test into any of the first three bands. (D.I. 16 at ¶9). Additional bands were published later as the candidates in the first three bands were selected for promotion. (D.I. 16 at ¶9). Shockley's name was included on the D Band list when it was published on June 17, 2003. (D.I. 16 at ¶17). When the 2001 Eligibility List expired, as planned, on December 31, 2003, Shockley was one of nine candidates who had not been promoted from the D Band list. (D.I. 16 at ¶17).

**ARGUMENT**

I.   **PLAINTIFF'S AMENDED COMPLAINT WAS NOT TIMELY FILED AND, THEREFORE, SHOULD BE DISMISSED AS BARRED BY THE STATUTE OF LIMITATIONS**

Federal Rule of Civil Procedure 12(b)(6) provides that the legal sufficiency of a complaint may be challenged by demonstrating the plaintiff's failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); Conley v. Gibson, 355 U.S. 41, 45-46 (1957). When considering a motion to dismiss, the court accepts "as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom," viewing them "in the light most favorable to the plaintiff." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).

Although a court will accept the plaintiff's factual allegations as true, a motion to dismiss should be granted when "it appears to a certainty that no relief could be granted under any set of facts which could be proved." Morse, 132 F.3d at 906 (quoting D.P. Enter., Inc. v. Bucks County Cmty. Coll., 725 F.2d 943 (3d Cir. 1984)). In particular, a court should not consider or regard as true "conclusory allegations of law, unsubstantiated conclusions, and/or unwarranted factual inferences." Morse, 132 F.3d at 906.

Moreover, in deciding a motion to dismiss, the Court may consider the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon these documents. Mosley v. Bay Ship Mgm't, Inc., No. 00-2306 (JCL), 2000 U.S. Dist. LEXIS 20251, at *10 (D.N.J. Dec. 27, 2000) (citing Pen. Ben. Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993), cert. denied, 510 U.S. 1042 (1984). Here, only the Amended Complaint, and

not the original Complaint, may be considered.  Plaintiff's Amended Complaint

completely superseded the original Complaint, which is now "treated as non-existent"

and "no longer performs any function as a pleading."  Holley v. Schreibeck, 758 F. Supp.

283, 284 (E.D. Pa. 1991); Bullen v. DeBretteville, 239 F.2d 824, 833 (9th Cir. 1956),

cert. denied, 353 U.S. 947 (1957).  Therefore, only Plaintiff's corrected Amended

Complaint is relevant to the present analysis.  (D.I. 16).  For the limited purposes of this

Motion only, Defendants assume that the Amended Complaint relates back to the original

Complaint and is, therefore, deemed to have been filed on August 4, 2006.  See Fed. R.

Civ. P. 15(c).

## II.    PLAINTIFF'S CLAIM ACCRUED,  AT THE LATEST,  ON DECEMBER 31, 2003, WHEN HE CEASED TO BE ELIGIBLE FOR PROMOTION

### A.    The Statute of Limitations for Shockley's Section 1983 Claim Is Two Years

Plaintiff's claim, brought pursuant to Section 1983, is governed by a two-year

statute of limitations.[1]  Section 1983 claims "not filed within the two-year statute of

limitations period are time-barred and must be dismissed."  Riley v. Taylor, No. 06-01-

GMS, 2006 U.S. Dist. LEXIS 88661, at *10 (D. Del. Dec. 7, 2006) (citing Smith v. Del.,

No. 99-440-JJF, 2001 U.S. Dist. LEXIS 10594 (D. Del. July 24, 2002)).  Thus, to avoid

dismissal, Plaintiff's Amended Complaint must allege that he was subjected to a

discriminatory act on or after August 4, 2004.  Shockley alleges that he was subject to

only one adverse action—that he was not promoted.  The decision not to promote him

---

[1] Section 1983 is a "borrowing statute," which borrows its statute of limitations from state personal injury actions.  Wilson v. Garcia, 471 U.S. 261 (1985); Lake v. Arnold, 232 F.2d 360, 368 (3d Cir. 2000); Cuffy v. Getty Refining and Mkt'g Co., 648 F. Supp. 892, 807 (D. Del. 1986).  In Delaware, the statute of limitations for personal injury actions is two years. See 10 Del. C. § 8119 (cited by Moody v. Sussex Corr. Inst., No. 01-374-SLR, 2002 U.S. Dist. LEXIS  4714, at *6 (D. Del. Mar. 11, 2002)).

occurred in September 2003.  Plaintiff knew of the decision no later than December 31, 2003.  The Amended Complaint does not allege any wrongful action that occurred within the statute of limitations.

> **B.** **Shockley's Claim Accrued When He First Knew of the Adverse Action, Regardless of When He Discovered the Alleged Motives for the Action**

A Section 1983 civil action accrues when the plaintiff "knew or should have known about the injury which gives rise to the [] cause of action."  Montgomery v. DeSimone, 159 F.3d 120, 126 (3d Cir. 1998); Genty v. Resolution Trust Corp., 937 F.2d 899, 919 (3d Cir. 1991); Sandutch v. Muroski, 684 F.2d 252, 254 (3d Cir. 1982) (per curiam); Cuffy, 648 F. Supp. at 808.  The plaintiff is deemed to have learned of his injury at the time that the adverse employment action is taken.  Celestine v. Petroleos de Venezuela, 266 F.3d 343 (5th Cir. 2001) (holding that an employee is put on notice that his rights have been violated at the time the adverse employment action occurs).  Shockley contends that the alleged adverse action occurred in September 2003 when the Governor "vetoed" his promotion (the "2003 Decision").

Shockley attempts to avoid dismissal by alleging several new facts in his Amended Complaint.  In Paragraph 15, for example, Shockley contends, for the first time, that Defendants intentionally concealed the 2003 Decision not to promote him.  (D.I. 16 at ¶15).  Shockley claims that he had not "discovered, learned of, or even suspected" that he had not been promoted "because of his gender" until April or May 2005.  (D.I. 16 at ¶27).  With these new facts, Shockley attempts to divert attention away from the relevant date—when he first learned of the adverse action in 2003.

This misguided attempt does not save Shockley's claims from dismissal. Accrual is triggered by awareness of the *injury*, not awareness of the unlawfulness of the act. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386 (3d Cir. 1994) (holding that the cause of action accrued on the date the plaintiff learned of her termination rather than the date upon which she learned that her position had been filled by a male applicant). Shockley's cause of action accrued upon discovery of the failure to promote rather than discovery of the alleged motives for the failure to promote. See Moorehead v. N.Y.C. Transit Auth., 385 F. Supp. 2d 248 (S.D.N.Y. 2005) (finding that the limitations period for failure to promote commenced when the employee learned that he had not been selected for any of the available positions, rather than when he learned that one of the positions had been filled). Once Shockley became aware of the allegedly adverse action, his cause of action accrued and the statute of limitations began to run.

### C.    Shockley Knew He Had Not Been Promoted When the 2001 Eligibility List Expired

At the latest, Shockley knew that he had not been promoted when the 2001 Eligibility List expired on December 31, 2003. See Harris v. N.Y., 186 F.3d 243, 247-48 (2d Cir. 1999). Until then, Shockley was still eligible for promotion. Once the list expired, however, Shockley could no longer be selected for promotion. He is then deemed to have known that the adverse action occurred. Shockley's knowledge of the adverse action triggered the statute of limitations. Evans v. N.Y.C., No. 00-4197 (BSJ), 2003 U.S. Dist. LEXIS 18281, at *12-13 (S.D.N.Y. Oct. 14, 2003) (holding that the limitations period started to run when the promotion eligibility list expired).

1.     **The Vast Body of Case Law From This and Other Circuits Supports Dismissal of Shockley's Claims**

The case law from this and other circuits confirms that, in a failure-to-promote claim, the plaintiff is deemed to know "that []he suffered an injury" once he becomes ineligible for promotion.  <u>Bouman v. Block</u>, 940 F.2d 1211, 1221 (9th Cir. 1991).  In <u>Delaware State College v. Ricks</u>, the plaintiff-faculty member knew that he had been denied tenure but did not file suit until his contract was not renewed a year later.  449 U.S. 250, 259-60 (1980) (rationale affirmed in <u>Ledbetter v. Goodyear Tire & Rubber Co., Inc.</u>, No. 05-1074, 2007 U.S. LEXIS 6295 (May 29, 2007)).  The date on which the plaintiff's contract was not renewed and his employment ended was irrelevant to a statute of limitations analysis.  <u>Id.</u>  Instead, the Supreme Court held, the limitations period began to run when the decision was made to deny tenure.  <u>Id.</u>  The limitations period began to run at the time of the adverse action.  Here, the adverse action occurred on December 31, 2003, when Shockley's opportunity for promotion was denied.[1]

The identity of the person who received the desired promotion is also irrelevant to a statute-of-limitations analysis.  The cause of action did not accrue when Shockley learned that a female trooper had been promoted into the NCOIC position. Instead, the limitations period began to run when the decision to deny the promotion was finalized upon the expiration of the 2001 Eligibility List.  <u>Tatreau v. City of L.A.</u>, No. 03-56638, 2005 U.S. App. LEXIS 14058 (9th Cir. July 11, 2005) (holding that failure-to-promote claims accrue on the date the eligibility for promotion expires, not on the date of the last promotion from the eligibility list).

---

[1] Shockley does not dispute this assertion.  In fact, he amended his Complaint, in part, to add this detail.  (D.I. 16 at ¶17).

8

The Third Circuit faced this issue in <u>Hanani v. New Jersey Department of Environmental Protection</u>, which was also a failure-to-promote claim brought under Section 1983.  205 Fed. Appx. 71, *78 (3d Cir. 2006).  Hanani applied for an internally-posted promotion but her supervisor rejected her application.  As a result, her name was not included on the final eligibility roster.  <u>Id.</u> at *74.  The plaintiff argued that her claims accrued on the date that other employees, whose applications had not been rejected and whose names had been placed on the roster, were selected for promotion <u>Id.</u> at *76.

The Third Circuit rejected her argument, noting that it "is clearly not the law of this circuit."  <u>Id.</u>  The court found that the proper date of accrual was "*the day she was denied promotion* rather than the day that others were promoted."  <u>Id.</u> at *78 (emphasis supplied).  She was denied a promotion when she learned that her name was not on the eligibility roster.  She knew that she could not be promoted unless she was on the list.  <u>Id.</u> at *76; <u>see also</u> <u>Hood v. N.J. Dep't of Civil Serv.</u>, 680 F.2d 955, 959 (3d Cir. 1982) (noting that the limitations period started to run after the list expired or after the last person from that list was promoted).  The court held the claim accrued when the plaintiff learned that her application had been rejected.  <u>Id.</u> Application of the court's holding to the present matter makes clear that Shockley's claim accrued on December 31, 2003, when he became ineligible for promotion.

The Third Circuit reached the same conclusion in an earlier decision.  <u>Bronze Shields, Inc. v. N.J. Dep't of Civil Serv.</u>, 667 F.2d 1074, 1083-84 (3d Cir. 1980).  In that case, the plaintiff failed the service exam and was not listed on the eligibility roster.  <u>Id.</u> The court held that the statute of limitations began to run when the plaintiff saw the eligibility roster and knew that she would not be promoted.  <u>Id.</u>; <u>see also</u> <u>Bishop v. N.J.,</u>

144 Fed. Appx. 236, at *9 (3d Cir. 2005) (applying the <u>Bronze Shields</u> holding by analogy and affirming the rationale).

Several decisions from other circuits further support this application of the statute of limitations in a failure-to-promote case. For example, the Second Circuit was faced with a strikingly similar set of facts in <u>Harris v. New York</u>, 186 F.3d at 247-48. In <u>Harris</u>, the plaintiff-police officer took the Civil Service Exam, seeking a promotion to sergeant. <u>Id.</u> He qualified for placement on the eligibility lis, which was valid for four years. <u>Id.</u> At the end of the fourth year, the list expired and the plaintiff was no longer eligible for promotion. <u>Id.</u>

The Second Circuit held that the claim accrued when the plaintiff knew or had reason to know of the injury serving as the basis for his claim. <u>Id.</u> The claimed injury was the failure to promote him to the desired position. He knew that he would not be promoted when the eligibility list expired. Therefore, the statute of limitations began to run upon expiration of the eligibility list. <u>Id.</u>

In <u>Bouman v. Block</u>, the Ninth Circuit rejected the employer's argument that the statute of limitations started to run on the date the eligibility exam was administered, not when the eligibility list expired. 940 F.2d 1211, 1221. Instead, the court held, the "appropriate date from which to mark time for statute of limitations purposes" is the date the eligibility list expired <u>Id.</u> Similarly, in <u>Tatreau v. City of Los Angeles</u>, the Ninth Circuit expressly rejected the argument that the triggering event was the last promotion from the eligibility list. 2005 U.S. App. LEXIS 14058. Instead, for purposes of the statute of limitations, the proper focus is on the *plaintiff's* eligibility for promotion. Again, the statute of limitations began to run upon expiration of the eligibility list.

10

2.    **The Supreme Court's Recent Decision Emphasizes the Policy Arguments that Support Dismissal of Shockley's Claims**

In <u>Ledbetter v. Goodyear Tire & Rubber Company, Inc.</u>, decided on May 29, 2007, the United States Supreme Court emphasized the important policy arguments that should be considered in a statute of limitations analysis. 2007 U.S. LEXIS 6295. The Court noted that, in a statute of limitations analysis, the preferred practice is "strict adherence to the procedural requirements." <u>Id.</u> at *27 ("[W]e have repeatedly rejected suggestions that we extend or truncate Congress' deadlines."). This strict interpretation policy is supported by the fact that Congress provided "obviously quite short deadlines" to file a charge of discrimination with the EEOC. <u>Id.</u> at *23. This filing deadline "protects employers from the burden of defending claims arising from employment decisions that are long past" and reflects Congress' "strong preference for the prompt resolution of employment discrimination allegations through voluntary conciliation and cooperation." <u>Id.</u> at *23-24 (internal citations omitted).

The preservation of evidence, an important purpose behind any statute of limitations, is even more relevant in an employment discrimination claim, which requires the "subtle determination" of intent. <u>Id.</u> at *25. Evidence relating to intent "may fade quickly with time . . . and much if not all of the evidence is circumstantial." <u>Id.</u> at *24-25. The passage of time "may seriously diminish the ability of the parties and the factfinder to reconstruct what actually happened." <u>Id.</u> at *25. Therefore, the Court concluded, the statute of limitations is triggered upon notice of the adverse action, which "will almost always be documented and will typically not even be in dispute," and not upon discovery of intent. <u>Id.</u> at *24.

Shockley contends that the discriminatory act occurred in September 2003 when the Governor "vetoed" his promotion. It was in September 2003, then, that Shockley's injuries occurred. Assuming that he knew of the decision, his cause of action would have accrued at that time. The 2003 Decision is well outside the reach of the two-year statute of limitations, which reaches back only to August 4, 2004.

To avoid dismissal, Shockley claims that the 2003 Decision remained a secret until Chaffinch "came clean" in 2005 and another trooper was promoted to the desired position. Shockley asks the Court to use this date as the trigger for the statute of limitations. He claims that he could not have learned about the "secret meeting" or the veto until Chaffinch's alleged confession. He goes so far as to say that he had no idea that the promotion decision had been made or that he had not been selected because of his gender until 2005.

The dates in 2005 are irrelevant to a statute of limitations analysis. The date when Shockley could have learned of the "secret meeting," the alleged veto or the promotion of other troopers is of no import to the present question. Shockley knew of the alleged discriminatory act (that he had not been promoted), long before he knew of the circumstances surrounding the act (that he was not promoted for unlawful reasons). Shockley knew that he would not be promoted when the 2001 Eligibility List expired on December 31, 2003. Harris, 186 F.3d at 247-48; see also Toth v. Gates Rubber Co., 31 F. Supp. 2d 1249 (D. Colo. 1998) (same). Shockley's claim was filed after the statute of limitations expired and, therefore, should be dismissed as time-barred.

## CONCLUSION

For the reasons set forth in the brief above, Defendants respectfully request that

Plaintiff's Complaint be dismissed in its entirety.


Respectfully submitted,


YOUNG CONAWAY STARGATT & TAYLOR, LLP


/s/ Barry M. Willoughby
_____
Barry M. Willoughby, Esquire (Bar I.D. 1016)
William W. Bowser, Esquire (Bar I.D. 2239)
The Brandywine Building, 17th Floor
1000 West Street, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6666; 6601
Facsimile: (302) 576-3345; 3282
bwilloughby@ycst.com; wbowser@ycst.com
Attorneys for Defendant Governor Ruth Ann Minner


STATE OF DELAWARE, DEPARTMENT OF JUSTICE

/s/ Ralph K. Durstein
_____
Ralph K. Durstein, III (I.D. #912)
Deputy Attorney General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801
Telephone:  (302) 577-8510
Facsimile:  (302) 577-6499
Ralph.durstein@state.de.us
Attorneys for Colonel Thomas F. MacLeish and Division
of State Police, Department of Safety and Homeland
Security, State of Delaware


DATED:  June 21, 2007


13

# EXHIBIT

# 1

LEXSEE

KENNETH EVANS, Plaintiff, v. THE CITY OF NEW YORK, Defendant.

00 Civ. 4197 (BSJ)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2003 U.S. Dist. LEXIS 18281

October 9, 2003, Decided
October 14, 2003, Filed

**DISPOSITION:** [*1] Defendant's motion for summary judgment dismissing complaint granted in part and denied in part.

**COUNSEL:** For Kenneth Evans, PLAINTIFF: Vincent I EKE-Nweke, Law Office of Vincent Eke-Nweke, PC, Brooklyn, NY USA.

For The City of New York, DEFENDANT: Isaac Klepfish, Michael D Hess, Corporation Counsel of the City of NY, New York, NY USA.

**JUDGES:** BARBARA S. JONES, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** BARBARA S. JONES

**OPINION**

OPINION AND ORDER

Plaintiff Kenneth Evans brings this action against his former employer. The plaintiff, who is African American, alleges that the defendant, City of New York, (the "City"), discriminated against him on the basis of his race and retaliated against him for complaining about defendant's discriminatory acts, both in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. 2000e, et seq., the New York Human Rights Law, N.Y. Exec. Law 296, and the New York City Civil Rights Law ("City Law"). Plaintiff additionally alleges that the defendant subjected him to a hostile working environment. The defendant moves [*2] for summary judgment pursuant to Fed. R. Civ. P. 56.

I. Background

Plaintiff began his employment with the Enforcement Division of the Department of Sanitation ("DOS") in October 1989 as a community coordinator. (Compl. P 13). The job description provides that a community coordinator "under general direction, with wide latitude for independent initiative and judgment, performs very responsible work in the supervision, planning, implementation, coordination, monitoring and/or evaluation of community development programs." (Burke Aff. Ex. A).

In January, 1992, plaintiff filed a complaint of discrimination against the defendant with the New York State Division of Human Rights alleging that the defendant violated his civil rights by discriminating against him on the basis of his race and age. (Compl. P 17). Specifically, the complaint alleged that the Assistant Director of Enforcement, Roy Pentangelo, "attempted to destroy [plaintiff's] credibility" and was conspiring with other white employees to have him terminated. (Klepfish Decl. Ex. A). After investigating, the Division of Human Rights dismissed the complaint, finding that "there was no [*3] verifiable evidence to support [plaintiff's] allegation that he was treated differently because of his age and race/color or that discriminatory remarks were made against [plaintiff]." (Klepfish Decl. Ex. B).

In April 1993, plaintiff applied for a position as a staff analyst with the defendant, and took and passed the staff analyst test as required for that position. (Compl. P 22). "Staff analyst" is a civil service title in the "competitive class" which entitles its holder to statutory retention rights, such as tenure. It does not refer to a

specific position within any particular agency of the City. As such, various positions within the City's agencies have the title "staff analyst". Plaintiff's position as a community coordinator was in the non-competitive class, which did not entitle plaintiff to statutory rights. Plaintiff received a score of 100 on this exam and was placed on a list of candidates eligible for a position as "staff analyst".

In 1995, Ellen Doubraski, who has since become the Director of Human Resources of DOS, and who was Deputy Personnel Director for DOS at the time, called the various bureaus within DOS to determine whether they wished to recommend employees [*4] for appointment to staff analyst. (Doubraski Aff. P 11). Plaintiff's bureau did not recommend him for appointment, although it is unclear which particular member of plaintiff's bureau made this decision. At the time, plaintiff was supervised by Pansy Mullings, an African American woman. Neither Michael Burke nor James Moss, plaintiff's supervisors during the events involved in this action, worked with or supervised plaintiff during this time. (Burke Decl. P 2).

Plaintiff was treated favorably with respect to working conditions as a community coordinator in the Enforcement Division during the period of time that he was supervised by Pansy Mullings. However, he alleges that in 1996, Michael Burke became Deputy Director of Enforcement for DOS and became plaintiff's immediate supervisor. Burke reported to James Moss, Director of the Enforcement Unit.

Plaintiff contends that the change in supervisory personnel caused a significant shift in the way he was treated at work. Specifically, plaintiff contends that soon after Moss became Director of Enforcement in October 1996, he began to discriminate and retaliate against plaintiff for filing the discrimination complaint in 1992, by closely [*5] monitoring plaintiff and subjecting him to closer scrutiny than other employees, forcing plaintiff to perform demeaning, "out of title" work, harassing and insulting plaintiff, and making racist remarks. Plaintiff further alleges that his immediate supervisor, Burke, made racist remarks in retaliation for his filing of a discrimination complaint.

On October 18, 1996, plaintiff contends that he was effectively "demoted" from a community coordinator to a telephone coordinator. Plaintiff claims that he was forced to perform clerical work, including sorting through telephone bills chargeable to DOS employees, collect money from staff to cover their personal calls, as well as

collect telephone bills from each division of DOS to resolve problems with respect to the bills. (Compl. P 30). Plaintiff further alleges that he was ridiculed by his co-workers because he was required to do these "inferior" tasks. (Pl.'s Ex. 5 at 25). Additionally, plaintiff contends that he complained to Burke regarding his co-workers' ridicule, specifically complaining that they referred to him as a "telephone repairer," which plaintiff claims amused Burke. (Pl.'s Ex. 5 at 26).

In November 1996, plaintiff filed [*6] a grievance pursuant to the applicable collective bargaining agreement asserting that the telephone coordinator duties constituted out-of-title work. Plaintiff's grievance was denied at steps one and two but was upheld at step three, and on September 17, 1997, the City's Office of Labor Relations directed DOS to immediately discontinue the out-of-title work being assigned to plaintiff and reassign him to appropriate duties. (Compl. P 33).

On September 23, 1997, plaintiff filed a charge of discrimination with the EEOC. Specifically, plaintiff alleged that defendant retaliated against him for filing the 1992 complaint by assigning him out of title work, denying him promotions and providing negative job references. (Klepfish Decl. Ex. C). The EEOC determined that the claim did not have merit and issued plaintiff a right to sue letter on March 6, 2000. (Compl. P 8).

Moss and Burke sought to comply with the Labor Relations Board's directive by establishing a new unit, the Recycling Unit, to deal with issues raised by recycling in public buildings. A community outreach position was developed for plaintiff in conjunction with the recycling program. (Def.'s 56.1 Statement PP 48-50). As a [*7] result, on November 5, 1997, DOS designated plaintiff as enforcement recycling coordinator.

In December 1998, plaintiff was designated Project Manager of Public School Recycling Enforcement. As a result of this designation plaintiff was entitled to an in-title promotion to special project coordinator and a salary increase. (Compl. P 39). Plaintiff received a 12% salary increase, effective June 19, 2000.

On November 16, 2000, plaintiff's supervisor, Burke, ordered plaintiff to go to the medical clinic for an evaluation after several co-workers complained of plaintiff's alleged "erratic behavior," "angry verbal mannerisms," and "inappropriate conduct.". (Burke Reply

Aff. P 2). Plaintiff did not go to the clinic and Burke suspended him without pay. On November 28, 2000, plaintiff was declared "absent without official leave". (Burke Reply Aff. Ex. B). [1] Plaintiff was reinstated on or about April 25, 2002. (Burke Reply Aff. P 4).

> 1 plaintiff did not include any claims with respect to this suspension in his complaint.

[*8] II. Legal Standard

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The initial burden falls on the moving party who is required to "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

A court is generally required to draw all reasonable inferences and resolve all ambiguities in favor of the party opposing summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) (citations omitted). If the moving party meets its burden, [*9] the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). However, the non-moving party may not rely on "conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York,* 996 F.2d 522, 535 (2d Cir. 1993).

III. Discussion

A. Timeliness of Plaintiff's Claims of Discrimination and Retaliation Based on his Alleged "Demotion" to "Telephone Coordinator"

Plaintiff claims that he was "demoted" on October 18, 1996 when he was re-assigned from the position of community coordinator to the position of telephone coordinator. (Compl. P 27). Defendant contends that the plaintiff's discriminatory and retaliatory demotion claims

are time barred because the plaintiff did not file his EEOC complaint within 300 days of the alleged demotion. The Court agrees.

The Second Circuit has held that a charge of discrimination must be filed within 300 days of the date the allegedly discriminatory employment practice occurs. *See Butts v. City of New York Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir. 1993) [*10] (superceded on other grounds). If a plaintiff fails to do so, the claim is time barred. *See Butts,* 990 F.2d at 1401. This applies to claims of retaliation as well. *See AMTRAK v. Morgan,* 536 U.S. 101, 105, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002) (a plaintiff is precluded from "recovering for discrete acts of discrimination or retaliation that occur outside the statutory time period.").

The plaintiff filed his second complaint alleging retaliatory and discriminatory demotion to telephone coordinator on September 24, 1997. (Pl.'s and Def.'s 56.1 Statements P 51). Consequently, any allegedly discriminatory or retaliatory discrete events occurring prior to November 29, 1996 are time-barred and must be dismissed. *See Butts,* 990 F.2d at 1401. The alleged demotion occurred on October 18, 1996. Consequently, plaintiff's discriminatory and retaliatory demotion claims are time-barred.

Furthermore, plaintiff's argument that the "continuing violation" exception applies to toll the statute of limitations with respect to his demotion claims is without merit. That exception provides that when an employer engages in a "'continuous practice and policy of discrimination [*11] ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir. 1994) (quoting *Gomes v. Avco Corp.,* 964 F.2d 1330, 1333 (2d Cir. 1992)). However, "discrete incidents of discrimination that are unrelated to an identifiable policy or practice ... 'will not ordinarily amount to a continuing violation,' unless such incidents are specifically related and are allowed to continue unremedied for 'so long as to amount to a discriminatory policy or practice.'" *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 907 (2d Cir. 1997) (quoting *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 713 (2d Cir. 1996)). The Supreme Court has stated that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *AMTRAK v. Morgan,* 536 U.S. 101,

113, 153 L. Ed. 2d 106, 122 S. Ct. 2061 (2002).

Here, the alleged demotion to telephone coordinator was a discrete act. *See Crosland v. City of New York,* 140 F. Supp. 2d 300, 308 (S.D.N.Y. 2000) [*12] ("It is well-established that transfers, demotions, failure to compensate adequately, and failure to promote are all discrete acts which do not constitute a continuing violation."). Consequently, the continuing violation exception is unavailable with respect to plaintiff's discriminatory demotion claims and these claims are time barred.

B. Timeliness of Plaintiff's Retaliatory and Discriminatory Failure to Promote Claims

The defendant also argues that plaintiff's discriminatory and retaliatory failure to promote claims are time barred. Plaintiff, however, contends that because he could have been hired from the list of employees eligible for promotion to staff analyst from September 14, 1994 (the date the list was created) through September 14, 1998 (the date the list expired), he was continuously denied a promotion throughout this entire period, and thus his claim is timely. Specifically, plaintiff alleges that DOS failed to promote him to staff analyst once he appeared on the civil service list in September 1994 and refused to permit any other city agency to appoint him to staff analyst. (Compl. PP 23-25). The Court agrees with plaintiff that this claim is timely.

The Second Circuit [*13] has held that in the context of an "eligible list" pursuant to the New York Civil Service Law, the 300 day period of limitations does not begin to accrue until the last day when the employee could have been hired from that "eligible list". *See Harris v. City of New York,* 186 F.3d 243, 248 (2d Cir. 1999) (stating that plaintiff had 300 days from the date the eligibility list expired to file his EEOC charge); *see also Braham v. State Ins. Fund,* 97 Civ. 7121, 1999 U.S. Dist. LEXIS 180, at *6-7 (S.D.N.Y. Jan. 14, 1999). Plaintiff could have been hired to the position of staff analyst until September, 1998. Consequently, plaintiff's failure to promote claim is timely. Defendant's argument that plaintiff fails to make out a prima facie case will be discussed later in this opinion.

C. Hostile Work Environment Claim

The defendant contends that plaintiff is precluded from asserting a hostile work environment claim because plaintiff did not assert a hostile work environment claim in his EEOC charge and that claim is not reasonably related to his EEOC charge. The Court disagrees.

In order to exhaust his administrative remedies, a plaintiff is required to file [*14] his Title VII claims with the EEO office. The Second Circuit has made clear that this requirement is not a jurisdictional one. *See Terry v. Ashcroft,* 336 F.3d 128, 150-51 (2d Cir. 2003). A plaintiff is deemed to have exhausted his administrative remedies when his claims are "included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Butts v. City of New York Dep't of Hous. Pres. & Dev.,* 990 F.2d 1397, 1401 (2d Cir. 1993) (superceded on other grounds). A claim of discrimination is reasonably related to a charge filed with the EEOC if (1) the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; or (2) the claim alleges retaliation by the employer against an employee for filing an EEOC charge; or (3) the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge. *Butts,* 990 F.2d at 1402-3.

Although the Court agrees with defendant that plaintiff did not allege a hostile work environment [*15] claim in his 1997 EEOC charge, the Court finds that plaintiff satisfies at least the second *Butts* exception. Specifically, plaintiff claims that he was subjected to a hostile work environment in retaliation for filing a complaint alleging discrimination in 1992. This is sufficient to exhaust plaintiff's administrative remedies. *See Terry v. Ashcroft,* 336 F.3d 128, 151 (2d Cir. 2003) (holding that plaintiff had exhausted his administrative remedies under the second *Butts* exception where plaintiff had filed EEO complaints in 1992 and 1993, and plaintiff alleged that he was retaliated against for filing those complaints several years later); *White v. Browner,* 99 Civ. 4777, 2000 U.S. Dist LEXIS 13976, at * 12-13 (S.D.N.Y. Sept. 27, 2000) (holding that plaintiff's claim that the hostile work environment she faced was retaliatory survived motion to dismiss despite that plaintiff had not filed a formal administrative complaint with respect to this claim because it satisfied the second *Butts* exception.) Moreover, there is no requirement that the investigation be ongoing to fall under this exception. *See Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1209 (2d Cir. 1993). [*16] Consequently, the Court finds that

plaintiff has exhausted his administrative remedies with respect to his retaliatory hostile work environment claim and the Court will address whether plaintiff has met his prima facie burden on this claim.

In order to succeed on a hostile work environment claim, a plaintiff must show "(1) that the 'workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment ...'". *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir. 1999). However, the Second Circuit has consistently cautioned that the standard for establishing a hostile work environment should not be set too high, stating that "while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Terry v. Ashcroft,* 336 F.3d 128, 148 (2d Cir. 2003) (internal quotations and citation omitted).

In *Harris v. Forklift Systems,* 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993), [*17] the Supreme Court established a non-exclusive list of factors to consider when determining whether conduct in a workplace is "severe or pervasive" so as to support a Title VII hostile work environment claim. These factors include (1) the frequency of the conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 75 (2d Cir. 2001).

Plaintiff submitted an affidavit stating that Burke, his supervisor, made racist remarks in retaliation for his filing of a discrimination complaint, including that Burke informed him that

> he heard I like to file race discrimination complaints; that the "black princess" (meaning Mullings) was no longer at DOS to help [plaintiff]; that he was going to reassign [plaintiff] and give [plaintiff] new duties; that [plaintiff] should be thankful that [he] still had a job because [he] would probably have lost [his] job if [he] had been in a state other than New York during the time [he] filed a [*18] discrimination complaint; that DOS failed

to appoint [him] to the position of a Staff Analyst because of the discrimination complaint [he] filed in 1992; that [he] should look for a job outside DOS and that [Burke was] prepared to give [plaintiff] a good recommendation to enable [him] to get such a job.

(Evans Aff. P 20, Ex. 5). Plaintiff also testified at his deposition that Burke made several "racial comments" including statements about an African American college student who was shot by state troopers in New Jersey. Specifically, plaintiff contends that Burke said "he could understand why a police officer when they see three black kids in a new van, a minivan, he could understand why the cop would either think they got [sic] drugs or they are carrying weapons or they stole the vehicle." (Evans Dep. at 103-107, 151-154).

Although the Court notes that a continuing pattern of hostile or abusive behavior is usually required to establish a hostile work environment, the Court finds that a reasonable juror could find that, in view of the totality of the circumstances, plaintiff was subjected to a hostile work environment in retaliation for filing a discrimination [*19] complaint. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000) ("Determining whether workplace harassment was severe or pervasive enough to be actionable depends on the totality of the circumstances.") Consequently, the Court denies the defendant's motion for summary judgment with respect to this claim.

D. Plaintiff's Claims for Race Discrimination and Retaliation

1. Legal Standard

The Second Circuit analyzes both discrimination claims and retaliation claims under the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). *See Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir. 1995) (discrimination); *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 94 (2d Cir. 2001) (retaliation). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination or retaliation under Title VII, the Human Rights Law and the City Law. [2] *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).

2    The same standards have been held to apply whether a claim is brought under Title VII or New York State and City law. *See, e.g., Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n.4 (2d Cir. 1995); *Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, 360 (2d Cir. 1993); *Bampoe v. Coach Stores, Inc.,* 93 F. Supp. 2d 360, 372 (S.D.N.Y. 1999).

[*20]  If a plaintiff establishes a prima facie case of discrimination or retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981) (discrimination); *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567 (2d Cir. 2000) (retaliation). Once the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff has the opportunity to show that the proffered reason was not the true reason for the adverse employment action. *Burdine,* 450 U.S. at 253 (discrimination); *Slattery,* 248 F.3d at 93 (retaliation).

Plaintiff alleges that he suffered the following adverse employment actions, which he contends occurred because of his race and in retaliation for filing the 1992 discrimination complaint and, for those events occurring after he filed his 1997 complaint, in retaliation for filing that complaint: failure to be promoted to staff analyst, "demotion" to telephone coordinator, designation as enforcement recycling manager [*21] in November 1997, delay in obtaining a 12% merit raise following plaintiff's designation as Project Manager of Public School Recycling, and receipt of negative job evaluations.

Although the Court will address each of plaintiff's allegations separately, there are some general principles that apply to each of plaintiff's claims. To establish a prima facie case of employment discrimination, a plaintiff must show (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that the adverse employment decision occurred under circumstances giving rise to an inference of discrimination. *See Quaratino,* 71 F.3d at 64.

A prima facie case of retaliation requires a plaintiff to show "'1 participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir. 1998) (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1309 (2d Cir. 1995)).

The defendant contends that it is entitled to summary judgment [*22] with respect to both plaintiff's discrimination claims and his retaliation claims. The Court agrees.

### 2. Plaintiff's Failure to Promote Claim

To establish a prima facie case of discriminatory or retaliatory failure to promote, a plaintiff is required to "allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 710 (2d Cir. 1998).

Plaintiff cannot establish a prima facie case for failure to promote, either for discriminatory or for retaliatory reasons. Plaintiff provides evidence that in 1995, fifty-seven candidates were promoted to the title of staff analyst as "no cost" [3] actions and nine candidates were promoted to the title of staff analyst and received a salary increase. However, plaintiff does not allege that anyone engaged in any discrimination or retaliation against him at that time. Indeed, plaintiff concedes that from the time he filed his complaint in 1992 until August 1996 when Pansy Mullings no longer supervised him, he was not subjected to any discrimination or retaliation. [*23]  (Evans Dep. at 44).

3    A "no cost action" is an employment action that does not affect the salary an employee is earning, and thus does not require approval from the City's Office of Management and Budget ("OMB") and the Mayor's Office. (Doubraski Aff. P 7).

Moreover, plaintiff fails to identify any open staff analyst positions during the period of time that he alleges he was subjected to discrimination and retaliation. [4] Instead, plaintiff merely alleges that while he was on the list of employees eligible for the position of staff analyst, he "heard" from some unnamed person "at Beaver Street" that DOS hired six new staff analysts. (Evan's Dep. at 69). However, a party responding to a motion for summary judgment supported by affidavits must present specific evidence in support of his contention that there is a genuine dispute as to a material fact in the case. *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir. 2000).

Conclusory statements, mere conjecture, hearsay or speculation by the party resisting [*24] summary judgment cannot defeat the motion. *Bickerstaff v. Vassar College,* 196 F.3d 435, 452 (2d Cir. 1999).

> 4  The only specific position plaintiff identifies as being available is Burke's position, filled in 1995. However, the Court has already held that all events occurring prior to November 1996 are time barred. And, even if the Court were to consider this incident, there is no evidence that plaintiff did not receive this position for a discriminatory or retaliatory reason. Pansy Mullings was plaintiff's supervisor at that time, and plaintiff does not allege that he was subjected to any discrimination or retaliation when she was his supervisor. Additionally, it is undisputed that Burke was promoted to the title of staff analyst as a "no cost action". Moreover, although plaintiff mentions that another community coordinator at the Enforcement Division, Myles McPartland, received a promotion to a "higher level," there is no evidence in the record regarding whether this position was as a staff analyst, whether plaintiff was qualified for the position, or whether plaintiff applied for the position.

[*25] Because plaintiff has only provided conclusory allegations with respect to his failure to promote claim, the Court finds that plaintiff has failed to meet his prima facie burden of establishing that a question of material fact exists regarding whether DOS failed to promote him for discriminatory or retaliatory reasons.

Furthermore, the Court finds that plaintiff has not presented any evidence that would lead a reasonable juror to conclude that anyone at DOS played a role in plaintiff's failure to receive a staff analyst position for which he interviewed at other administrative agencies. Although plaintiff contends that "some of the other agencies of the defendant who interviewed with plaintiff advised [him] that they were prepared to appoint plaintiff but that DOS refused to grant the necessary permission or approval such agencies needed to make such appointment," plaintiff's deposition testimony is to the contrary. (Pl.'s 56.1 Statement P 30). Plaintiff conceded that his only evidence that DOS interfered with his being hired at another agency was the fact that he was on the list, he interviewed with these agencies, they "mentioned

DOS" and he was not hired. (Evans Dep. at 82).  [*26] [5]

> 5  Specifically, plaintiff testified:
>
> > Q: That was your own inference that DOS was doing something preventing you from getting a staff analyst-
> >
> > A: From being promoted, yes.
> >
> > Q: For someplace else?
> >
> > A: Yes.
> >
> > Q: You have no personal knowledge of that?
> >
> > A: I have personal knowledge. The fact that I was on the list and went for these interviews and DOS was always mentioned during the interviews and I, you know, they never gave them the authorization to pick me up for DOS and I never got a second interview or the job and remained on the list.
>
> Pl.'s Ex. 3 at 82).

Moreover, Ellen Doubraski, Director of Human Resources for DOS, stated that DOS approval is not required before plaintiff could be hired for a position as staff analyst by another agency. (Doubraski Aff. P 14). Further, Doubraski stated that DOS does not prevent any employee from being hired by another agency that wishes to do so. (Doubraski Aff. P 14). Additionally, plaintiff conceded at his deposition that he had no evidence to suggest [*27] that DOS's approval was required before he could be hired by another agency. (Evans Dep. at 81). Instead, the plaintiff's own testimony is consistent with Doubraski's assertion that if DOS's personnel office was called at all with respect to plaintiff's interviews at other agencies, it was as a courtesy to ensure that DOS did not currently plan to appoint plaintiff to a staff analyst position within DOS. (Doubraski Dep. at 38). Indeed, plaintiff testified that only after each agency established that DOS did not wish to take such action would plaintiff's interview begin. (Evans Dep. at 81). In sum, the Court finds that plaintiff has failed to present evidence of a material fact in dispute regarding whether

DOS prevented him from being promoted to staff analyst at another agency.

### 3. Plaintiff's Assignment to Enforcement Recycling Coordinator

Plaintiff also contends that his assignment to enforcement recycling coordinator in 1997 was discriminatory and retaliatory. The Court finds that plaintiff has failed to establish a prima facie case with respect to this transfer because plaintiff cannot establish that this assignment constituted a material adverse employment action.

A plaintiff [*28] is subjected to an adverse employment action where he endures a "materially adverse change" in the terms and conditions of employment. *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000) (citing *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 446 (2d Cir. 1999)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya,* 202 F.3d at 640 (internal quotations and citation omitted).

Although adverse employment actions are not limited to job termination or the reduction of wages and benefits, "not every unpleasant matter short of discharge or demotion" gives rise to a legitimate claim under Title VII. *Richardson,* 180 F.3d at 446 (citations omitted). In *Galabya,* the Court found that the plaintiff failed to show that his transfer was "to an assignment that was materially less prestigious, materially less suited to his skills and [*29] expertise, or materially less conducive to career advancement," and upheld the district court's grant of summary judgment in favor of the employer. *Galabya,* 202 F.3d at 641.

There is no dispute that plaintiff received neither a reduction in salary nor a material change in benefits as a result of his new assignment. Moreover, a comparison of plaintiff's job responsibilities as community coordinator in 1996 and his job responsibilities following his assignment to enforcement recycling coordinator reveal that the two positions were extremely similar. As community coordinator, plaintiff acted as the liason between the Enforcement Division and the community, dealt with community issues, attended meetings at all levels of city government, attended community based meetings, including meetings with religious organizations and non-profit organizations, conducted seminars, educated the community, and asked questions and dealt with complaints that were filed against the Enforcement Division for issuing summonses. (Evans Dep. at 33).

As Recycling Enforcement Coordinator, plaintiff met with community boards, met with other city agencies, and met with public officials and attended [*30] community meetings, although plaintiff contends that his duties occurred on a more limited scale because he was limited to issues affecting public school recycling. (Evans Dep. at 126-28). The Court notes however that plaintiff's new position was still considered that of "community coordinator". The Court finds that no reasonable juror could find that plaintiff's change in title and minor change in job responsibilities constituted a material change.

Moreover, even if the Court found that plaintiff established a prima facie case that the assignment to Recycling Enforcement Coordinator was discriminatory or retaliatory, the defendant has provided a legitimate business reason for plaintiff's new assignment. Burke testified that there was no longer a need for plaintiff to perform his old duties because Moss made the business decision that uniformed officers should perform such duties. As a result, they sought to create a new position for plaintiff that would be appropriate for a community coordinator. (Burke Dep. at 10). To this end, Burke and Moss established the position of enforcement recycling coordinator. [6] (Burke Dep. at 88).

> 6   Burke also testified that it took a number of months for the new position to be created for Evans, during which period Evans complained that he did not have work to do. (Burke Dep. at 86).

[*31] Finally, plaintiff does not present any evidence that this justification is pretextual. Indeed, plaintiff concedes that "there was a need" for such a position. (Evans Dep. at 100). [7] Consequently, the Court grants the defendant's motion for summary judgment with respect to this claim.

> 7   Furthermore, plaintiff never suggested that his duties constituted out-of-title work. Plaintiff's only complaint was that he did not wish to issue summonses, and the evidence presented establishes that the defendant respected plaintiff's

wishes in this regard. (Burke Dep. at 106, 110).

### 4. Delay in Raise

Plaintiff next claims that he was discriminated against and retaliated against when he was denied a timely salary increase after he became the Project Manager of Public School Recycling.

The Court disagrees.

The evidence provided establishes that on July 20, 1999, Burke and Steven Congelosi, who became the Director of the Enforcement Unit, recommended to the First Deputy Commissioner of DOS that plaintiff receive a 12% [*32] raise, the maximum available. (Burke Aff. P 12). In January 2000, the First Deputy Commissioner signed documents recommending that plaintiff receive the raise. These documents were forwarded to Doubraski at the DOS personnel office. (Doubraski Aff. P 15). On February 29, 2000, the recommendation was submitted to OMB and the Mayor's Office for approval. (Doubraski Aff. P 17). In March 2000, OMB approved the raise and on June 14, 2000 the Mayor's Office approved the raise, which became effective June 19, 2000. (Doubraski Aff. P 17).

Plaintiff contends that the delay was excessive and suggests that the delay was due to discrimination and retaliation. However, plaintiff fails to provide any evidence that the delay occurred because of anything other than the normal administrative delay involved in this type of action. Plaintiff suggests in his deposition that "3 or 4 other people got raises earlier," however he neither names these individuals nor provides the circumstances of their raises. Consequently, the Court finds that the plaintiff has failed to present evidence that the delay involved in his raise was discriminatory or retaliatory, and the Court dismisses this claim.

### 5. Plaintiff's [*33] Performance Evaluations

Finally, plaintiff contends that he was retaliated and discriminated against when his supervisor, Burke, evaluated plaintiff's performance negatively. The Court disagrees. First, Burke's evaluations of plaintiff all consisted of ratings of "superior" and "outstanding".

(Burke Aff. Ex. D). These ratings can hardly be characterized as "negative." Moreover, positive evaluations that are not as positive as previous performance evaluations do not constitute adverse employment actions. *See Simmons v. New York City Health & Hosp. Corp.*, 99 CV 3181, 2001 U.S. Dist. LEXIS 4640, *21 (E.D.N.Y. Mar. 30, 2001) (holding that "plaintiff's subjective perception that she received poorer performance reviews" when her rating went from "superior" to "satisfactory" was insufficient to establish an adverse employment action for purposes of stating a prima facie case), *aff'd*, 2002 U.S. App. LEXIS 7711 (2d Cir. Apr. 1, 2002). Furthermore, "negative evaluations alone, without any accompanying adverse consequence are not adverse employment actions." *Pellei v. Int'l Planned Parenthood Federation/Western Hemishpere Region, Inc.*, 96 Civ. 7014, 1999 U.S. Dist. LEXIS 15338, [*34] at *33 (S.D.N.Y. Sept. 30, 1999) (citing cases).

Plaintiff does not allege that he suffered any particular consequence as a result of his performance evaluations. Accordingly, the plaintiff has failed to establish a prima facie case with respect to this claim.

### CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment is granted in part and denied in part. Specifically, all of plaintiff's claims are dismissed with the exception of plaintiff's claim for a hostile work environment. The parties are directed to submit a joint pre-trial order by November 10, 2003. Proposed voir dire, jury instructions and trial exhibits shall be due on or before December 1, 2003. A final pre-trial conference will be held on December 8, 2003 at 3:00 P.M. The trial will begin on December 9, 2003 at 9:00 A.M.

**SO ORDERED:**

**BARBARA S. JONES**

**UNITED STATES DISTRICT JUDGE**

Dated: October 9, 2003

EXHIBIT

2

LEXSEE

**LILLY M. LEDBETTER, PETITIONER v. THE GOODYEAR TIRE & RUBBER COMPANY, INC.**

**No. 05-1074**

**SUPREME COURT OF THE UNITED STATES**

**127 S. Ct. 2162; 2007 U.S. LEXIS 6295; 75 U.S.L.W. 4359; 20 Fla. L. Weekly Fed. S 295**

**November 27, 2006, Argued**
**May 29, 2007, Decided**

**NOTICE:** [*1]
The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT. Ledbetter v. Goodyear Tire & Rubber Co., Inc., 421 F.3d 1169, 2005 U.S. App. LEXIS 18026 (11th Cir. Ala., 2005)

**DISPOSITION:** Affirmed.

Expert Commentary  ( $ )
*Peter Lareau on Ledbetter v. Goodyear Tire & Rubber Co.*
The Supreme Court again addressed an issue that has plagued it in the past--whether and in what circumstances a Title VII plaintiff may state a claim for relief based on present day harm suffered as the result of the lingering effects of discriminatory acts that occurred outside of Title VII's limitations period. This Expert Commentary undertakes a detailed examination of the majority opinion in the case, followed by a summary review of the dissent's position, concluding with a suggestion that the issue may find its way to the halls of Congress. Click on the Expert Commentary link above to see an analysis of this case by Peter Lareau, author of "NLRA: Law and Practice."

**SYLLABUS:** During most of the time that petitioner Ledbetter was employed by respondent Goodyear, salaried employees at the plant where she worked were given or denied raises based on performance evaluations.

Ledbetter submitted a questionnaire to the Equal Employment Opportunity Commission (EEOC) in March 1998 and a formal EEOC charge in July 1998. After her November 1998 retirement, she filed suit, asserting, among other things, a sex discrimination claim under Title VII of the Civil Rights Act of 1964. The District Court allowed her Title VII pay discrimination claim to proceed to trial. There, Ledbetter alleged that several supervisors [*2] had in the past given her poor evaluations because of her sex; that as a result, her pay had not increased as much as it would have if she had been evaluated fairly; that those past pay decisions affected the amount of her pay throughout her employment; and that by the end of her employment, she was earning significantly less than her male colleagues. Goodyear maintained that the evaluations had been nondiscriminatory, but the jury found for Ledbetter, awarding backpay and damages. On appeal, Goodyear contended that the pay discrimination claim was time barred with regard to all pay decisions made before September 26, 1997 -- 180 days before Ledbetter filed her EEOC questionnaire -- and that no discriminatory act relating to her pay occurred after that date. The Eleventh Circuit reversed, holding that a Title VII pay discrimination claim cannot be based on allegedly discriminatory events that occurred before the last pay decision that affected the employee's pay during the EEOC charging period, and concluding that there was insufficient evidence to prove that Goodyear had acted with discriminatory intent in making the only two pay decisions during that period, denials of raises in [*3] 1997 and 1998.

127 S. Ct. 2162; 2007 U.S. LEXIS 6295, *3;
75 U.S.L.W. 4359; 20 Fla. L. Weekly Fed. S 295

*Held:* Because the later effects of past discrimination do not restart the clock for filing an EEOC charge, Ledbetter's claim is untimely. Pp. 4-24.

(a) An individual wishing to bring a Title VII lawsuit must first file an EEOC charge within, as relevant here, 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-2(a)(1). In addressing the issue of an EEOC charge's timeliness, this Court has stressed the need to identify with care the specific employment practice at issue. Ledbetter's arguments -- that the paychecks that she received during the charging period and the 1998 raise denial each violated Title VII and triggered a new EEOC charging period -- fail because they would require the Court in effect to jettison the defining element of the disparate-treatment claim on which her Title VII recovery was based, discriminatory intent. *United Air Lines, Inc.* v. *Evans*, 431 U.S. 553, 97 S. Ct. 1885, 52 L. Ed. 2d 571, *Delaware State College* v. *Ricks*, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431, *Lorance* v. *AT&T Technologies, Inc.*, 490 U.S. 900, 109 S. Ct. 2261, 104 L. Ed. 2d 961, and *National Railroad Passenger Corporation* v. *Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 [*4] clearly instruct that the EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination. But if an employer engages in a series of separately actionable intentionally discriminatory acts, then a fresh violation takes place when each act is committed. Ledbetter makes no claim that intentionally discriminatory conduct occurred during the charging period or that discriminatory decisions occurring before that period were not communicated to her. She argues simply that Goodyear's nondiscriminatory conduct during the charging period gave present effect to discriminatory conduct outside of that period. But current effects alone cannot breathe life into prior, uncharged discrimination. Ledbetter should have filed an EEOC charge within 180 days after each allegedly discriminatory employment decision was made and communicated to her. Her attempt to shift forward the intent associated with prior discriminatory acts to the 1998 pay decision is unsound, for it would shift intent [*5] away from the act that consummated the discriminatory employment practice to a later act not performed with bias or discriminatory motive, imposing liability in the absence of the requisite intent. Her argument would also distort Title VII's "integrated, multistep enforcement procedure." *Occidental Life Ins. Co. of Cal.* v. *EEOC*, 432 U.S. 355, 359, 97 S. Ct. 2447, 53 L. Ed. 2d 402. The short EEOC filing deadline reflects Congress' strong preference for the prompt resolution of employment discrimination allegations through voluntary conciliation and cooperation. *Id.*, at 367-368, 97 S. Ct. 2447, 53 L. Ed. 2d 402. Nothing in Title VII supports treating the intent element of Ledbetter's disparate-treatment claim any differently from the employment practice element of the claim. Pp. 4-13.

(b) *Bazemore* v. *Friday*, 478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 315 *(per curiam)*, which concerned a disparate-treatment pay claim, is entirely consistent with *Evans*, *Ricks*, *Lorance*, and *Morgan*. *Bazemore*'s rule is that an employer violates Title VII and triggers a new EEOC charging period whenever the employer issues paychecks using a discriminatory pay structure. It is not, as Ledbetter contends, a "paycheck accrual rule" [*6] under which each paycheck, even if not accompanied by discriminatory intent, triggers a new EEOC charging period during which the complainant may properly challenge any prior discriminatory conduct that impacted that paycheck's amount, no matter how long ago the discrimination occurred. Because Ledbetter has not adduced evidence that Goodyear initially adopted its performance-based pay system in order to discriminate based on sex or that it later applied this system to her within the charging period with discriminatory animus, *Bazemore* is of no help to her. Pp. 13-21.

(c) Ledbetter's "paycheck accrual rule" is also not supported by either analogies to the statutory regimes of the Equal Pay Act of 1963, the Fair Labor Standards Act of 1938, or the National Labor Relations Act, or policy arguments for giving special treatment to pay claims. Pp. 21-24.

421 F.3d 1169, affirmed.

**JUDGES:** ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS, SOUTER, and BREYER, JJ., joined.

**OPINION BY:** ALITO

**OPINION:**

127 S. Ct. 2162; 2007 U.S. LEXIS 6295, *6;
75 U.S.L.W. 4359; 20 Fla. L. Weekly Fed. S 295

JUSTICE ALITO delivered the opinion of the Court.

This [*7] case calls upon us to apply established precedent in a slightly different context. We have previously held that the time for filing a charge of employment discrimination with the Equal Employment Opportunity Commission (EEOC) begins when the discriminatory act occurs. We have explained that this rule applies to any "discrete act" of discrimination, including discrimination in "termination, failure to promote, denial of transfer, [and] refusal to hire." *National Railroad Passenger Corporation* v. *Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Because a pay-setting decision is a "discrete act," it follows that the period for filing an EEOC charge begins when the act occurs. Petitioner, having abandoned her claim under the Equal Pay Act, asks us to deviate from our prior decisions in order to permit her to assert her claim under Title VII. Petitioner also contends that discrimination in pay is different from other types of employment discrimination and thus should be governed by a different rule. But because a pay-setting decision is a discrete act that occurs at a particular point in time, these arguments must be rejected. We therefore affirm the judgment of the Court of Appeals. [*8]

I

Petitioner Lilly Ledbetter (Ledbetter) worked for respondent Goodyear Tire and Rubber Company (Goodyear) at its Gadsden, Alabama, plant from 1979 until 1998. During much of this time, salaried employees at the plant were given or denied raises based on their supervisors' evaluation of their performance. In March 1998, Ledbetter submitted a questionnaire to the EEOC alleging certain acts of sex discrimination, and in July of that year she filed a formal EEOC charge. After taking early retirement in November 1998, Ledbetter commenced this action, in which she asserted, among other claims, a Title VII pay discrimination claim and a claim under the Equal Pay Act of 1963 (EPA), 29 U.S.C. § 206(d).

The District Court granted summary judgment in favor of Goodyear on several of Ledbetter's claims, including her Equal Pay Act claim, but allowed others, including her Title VII pay discrimination claim, to proceed to trial. In support of this latter claim, Ledbetter introduced evidence that during the course of her employment several supervisors had given her poor evaluations because of her sex, that as a result of these evaluations her pay was not increased as much [*9] as it would have been if she had been evaluated fairly, and that these past pay decisions continued to affect the amount of her pay throughout her employment. Toward the end of her time with Goodyear, she was being paid significantly less than any of her male colleagues. Goodyear maintained that the evaluations had been nondiscriminatory, but the jury found for Ledbetter and awarded her backpay and damages.

On appeal, Goodyear contended that Ledbetter's pay discrimination claim was time barred with respect to all pay decisions made prior to September 26, 1997 -- that is, 180 days before the filing of her EEOC questionnaire. n1 And Goodyear argued that no discriminatory act relating to Ledbetter's pay occurred after that date.

> n1 The parties assume that the EEOC charging period runs backwards from the date of the questionnaire, even though Ledbetter's discriminatory pay claim was not added until the July 1998 formal charge. 421 F.3d 1169, 1178 (CA11 2005). We likewise assume for the sake of argument that the filing of the questionnaire, rather than the formal charge, is the appropriate date.

[*10]

The Court of Appeals for the Eleventh Circuit reversed, holding that a Title VII pay discrimination claim cannot be based on any pay decision that occurred prior to the last pay decision that affected the employee's pay during the EEOC charging period. 421 F.3d 1169, 1182-1183 (2005). The Court of Appeals then concluded that there was insufficient evidence to prove that Goodyear had acted with discriminatory intent in making the only two pay decisions that occurred within that time span, namely, a decision made in 1997 to deny Ledbetter a raise and a similar decision made in 1998. *Id.*, at 1186-1187.

Ledbetter filed a petition for a writ of certiorari but did not seek review of the Court of Appeals' holdings regarding the sufficiency of the evidence in relation to the 1997 and 1998 pay decisions. Rather, she sought review of the following question:

> "Whether and under what circumstances a plaintiff may bring an action under Title

VII of the Civil Rights Act of 1964 alleging illegal pay discrimination when the disparate pay is received during the statutory limitations period, but is the result of intentionally discriminatory pay decisions that [*11] occurred outside the limitations period." Pet. for Cert. i.

In light of disagreement among the Courts of Appeals as to the proper application of the limitations period in Title VII disparate-treatment pay cases, compare 421 F.3d 1169, with *Forsyth* v. *Federation Employment & Guidance Serv.*, 409 F.3d 565 (CA2 2005); *Shea* v. *Rice*, 366 U.S. App. D.C. 178, 409 F.3d 448 (CADC 2005), we granted certiorari, 548 U.S. __ (2006).

II

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice" to discriminate "against any individual with respect to his compensation . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). An individual wishing to challenge an employment practice under this provision must first file a charge with the EEOC. § 2000e-5(e)(1). Such a charge must be filed within a specified period (either 180 or 300 days, depending on the State) "after the alleged unlawful employment practice occurred," *ibid.*, and if the employee does not submit a timely EEOC charge, the employee may not challenge that practice in court, § 2000e-5(f)(1).

In addressing the issue [*12] whether an EEOC charge was filed on time, we have stressed the need to identify with care the specific employment practice that is at issue. *Morgan*, 536 U.S., at 110-111, 122 S. Ct. 2061, 153 L. Ed. 2d 106. Ledbetter points to two different employment practices as possible candidates. Primarily, she urges us to focus on the paychecks that were issued to her during the EEOC charging period (the 180-day period preceding the filing of her EEOC questionnaire), each of which, she contends, was a separate act of discrimination. Alternatively, Ledbetter directs us to the 1998 decision denying her a raise, and she argues that this decision was "unlawful because it carried forward intentionally discriminatory disparities from prior years." Reply Brief for Petitioner 20. Both of these arguments fail because they would require us in effect to jettison the defining element of the legal claim on which her Title VII recovery was based.

Ledbetter asserted disparate treatment, the central element of which is discriminatory intent. See *Chardon* v. *Fernandez*, 454 U.S. 6, 8, 102 S. Ct. 28, 70 L. Ed. 2d 6 (1981) *(per curiam); Teamsters* v. *United States*, 431 U.S. 324, 335, n. 15, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977); *Watson* v. *Fort Worth Bank & Trust*, 487 U.S. 977, 1002, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1998) [*13] (Blackmun, J., joined by Brennan, and Marshall, JJ., concurring in part and concurring in judgment) ("[A] disparate-treatment challenge focuses exclusively on the intent of the employer"). However, Ledbetter does not assert that the relevant Goodyear decisionmakers acted with actual discriminatory intent either when they issued her checks during the EEOC charging period or when they denied her a raise in 1998. Rather, she argues that the paychecks were unlawful because they would have been larger if she had been evaluated in a nondiscriminatory manner *prior to* the EEOC charging period. Brief for Petitioner 22. Similarly, she maintains that the 1998 decision was unlawful because it "carried forward" the effects of prior, uncharged discrimination decisions. Reply Brief for Petitioner 20. In essence, she suggests that it is sufficient that discriminatory acts that occurred prior to the charging period had continuing effects during that period. Brief for Petitioner 13 ("Each paycheck that offers a woman less pay than a similarly situated man because of her sex is a separate violation of Title VII with its own limitations period, regardless of whether the paycheck simply implements [*14] a prior discriminatory decision made outside the limitations period"); see also Reply Brief for Petitioner 20. This argument is squarely foreclosed by our precedents.

In *United Air Lines, Inc.* v. *Evans*, 431 U.S. 553, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977), we rejected an argument that is basically the same as Ledbetter's. Evans was forced to resign because the airline refused to employ married flight attendants, but she did not file an EEOC charge regarding her termination. Some years later, the airline rehired her but treated her as a new employee for seniority purposes. *Id.*, at 554-555, 97 S. Ct. 1885, 52 L. Ed. 2d 571. Evans then sued, arguing that, while any suit based on the original discrimination was time barred, the airline's refusal to give her credit for her prior service gave "present effect to [its] past illegal act and thereby perpetuated the consequences of forbidden discrimination." *Id.*, at 557, 97 S. Ct. 1885, 52 L. Ed. 2d 571.

We agreed with Evans that the airline's "seniority

system [did] indeed have a continuing impact on her pay and fringe benefits," *id.*, at 558, 97 S. Ct. 1885, 52 L. Ed. 2d 571, but we noted that "the critical question [was] whether any present *violation* existed." *Ibid.* (emphasis in original). [*15] We concluded that the continuing effects of the precharging period discrimination did not make out a present violation. As JUSTICE STEVENS wrote for the Court:

"United was entitled to treat [Evans' termination] as lawful after respondent failed to file a charge of discrimination within the 90 days then allowed by § 706(d). A discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present legal consequences." *Ibid.*

It would be difficult to speak to the point more directly.

Equally instructive is *Delaware State College* v. *Ricks*, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980), which concerned a college librarian, Ricks, who alleged that he had been discharged because of race. In March 1974, Ricks was denied tenure, but he was given a final, nonrenewable one-year contract that expired on June 30, 1975. *Id.*, at 252-253, 101 S. Ct. 498, 66 L. Ed. 2d 431. Ricks delayed filing a charge with the EEOC until April 1975, *id.*, at 254, 101 S. Ct. 498, 66 L. Ed. 2d 431, but he argued that the EEOC charging period ran from the date of his actual termination rather than from the date when tenure was denied. In rejecting this argument, we [*16] recognized that "one of the *effects* of the denial of tenure," namely, his ultimate termination, "did not occur until later." *Id.*, at 258, 101 S. Ct. 498, 66 L. Ed. 2d 431 (emphasis in original). But because Ricks failed to identify any specific discriminatory act "that continued until, or occurred at the time of, the actual termination of his employment," *id.*, at 257, 101 S. Ct. 498, 66 L. Ed. 2d 431, we held that the EEOC charging period ran from "the time the tenure decision was made and communicated to Ricks," *id.*, at 258, 101 S. Ct. 498, 66 L. Ed. 2d 431.

This same approach dictated the outcome in *Lorance* v. *AT&T Technologies, Inc.*, 490 U.S. 900, 109 S. Ct. 2261, 104 L. Ed. 2d 961 (1989), which grew out of a change in the way in which seniority was calculated

under a collective-bargaining agreement. Before 1979, all employees at the plant in question accrued seniority based simply on years of employment at the plant. In 1979, a new agreement made seniority for workers in the more highly paid (and traditionally male) position of "tester" depend on time spent in that position alone and not in other positions in the plant. Several years later, when female testers were laid off due to low seniority as calculated under the new provision, they [*17] filed an EEOC charge alleging that the 1979 scheme had been adopted with discriminatory intent, namely, to protect incumbent male testers when women with substantial plant seniority began to move into the traditionally male tester positions. *Id.*, at 902-903, 109 S. Ct. 2261, 104 L. Ed. 2d 961.

We held that the plaintiffs' EEOC charge was not timely because it was not filed within the specified period after the adoption in 1979 of the new seniority rule. We noted that the plaintiffs had not alleged that the new seniority rule treated men and women differently or that the rule had been applied in a discriminatory manner. Rather, their complaint was that the rule was adopted originally with discriminatory intent. *Id.*, at 905, 109 S. Ct. 2261, 104 L. Ed. 2d 961. And as in *Evans* and *Ricks*, we held that the EEOC charging period ran from the time when the discrete act of alleged intentional discrimination occurred, not from the date when the effects of this practice were felt. 490 U.S., at 907-908, 109 S. Ct. 2261, 104 L. Ed. 2d 961. We stated:

"Because the claimed invalidity of the facially nondiscriminatory and neutrally applied tester seniority system is wholly dependent on the alleged illegality of signing the underlying agreement, [*18] it is the date of that signing which governs the limitations period." *Id.*, at 911, 109 S. Ct. 2261, 104 L. Ed. 2d 961. n2

n2 After *Lorance*, Congress amended Title VII to cover the specific situation involved in that case. See 42 U.S.C. § 2000e-5(e)(2) (allowing for Title VII liability arising from an intentionally discriminatory seniority system both at the time of its adoption and at the time of its application). The dissent attaches great significance to this amendment, suggesting that it shows that *Lorance* was wrongly reasoned as an initial matter. *Post*, at

127 S. Ct. 2162; 2007 U.S. LEXIS 6295, *18;
75 U.S.L.W. 4359; 20 Fla. L. Weekly Fed. S 295

10-12 (opinion of GINSBURG, J.). However, the very legislative history cited by the dissent explains that this amendment and the other 1991 Title VII amendments "'*expanded* the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination.'" *Post*, at 11 (emphasis added). For present purposes, what is most important about the amendment in question is that it applied only to the adoption of a discriminatory seniority system, not to other types of employment discrimination. *Evans* and *Ricks*, upon which *Lorance* relied, 490 U.S., at 906-908, 109 S. Ct. 2261, 104 L. Ed. 2d 961, and which employed identical reasoning, were left in place, and these decisions are more than sufficient to support our holding today.

[*19]

Our most recent decision in this area confirms this understanding. In *Morgan*, we explained that the statutory term "employment practice" generally refers to "a discrete act or single 'occurrence'" that takes place at a particular point in time. 536 U.S., at 110-111, 122 S. Ct. 2061, 153 L. Ed. 2d 106. We pointed to "termination, failure to promote, denial of transfer, [and] refusal to hire" as examples of such "discrete" acts, and we held that a Title VII plaintiff "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period." *Id.*, at 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106.

The instruction provided by *Evans*, *Ricks*, *Lorance*, and *Morgan* is clear. The EEOC charging period is triggered when a discrete unlawful practice takes place. A new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination. But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed. See *Morgan*, *supra,* at 113, 122 S. Ct. 2061, 153 L. Ed. 2d 10.

Ledbetter's arguments here [*20] -- that the paychecks that she received during the charging period and the 1998 raise denial each violated Title VII and triggered a new EEOC charging period -- cannot be reconciled with *Evans*, *Ricks*, *Lorance*, and *Morgan*. Ledbetter, as noted, makes no claim that intentionally discriminatory conduct occurred during the charging

period or that discriminatory decisions that occurred prior to that period were not communicated to her. Instead, she argues simply that Goodyear's conduct during the charging period gave present effect to discriminatory conduct outside of that period. Brief for Petitioner 13. But current effects alone cannot breathe life into prior, uncharged discrimination; as we held in *Evans*, such effects in themselves have "no present legal consequences." 431 U.S., at 558, 97 S. Ct. 1885, 52 L. Ed. 2d 571. Ledbetter should have filed an EEOC charge within 180 days after each allegedly discriminatory pay decision was made and communicated to her. She did not do so, and the paychecks that were issued to her during the 180 days prior to the filing of her EEOC charge do not provide a basis for overcoming that prior failure.

In an effort to circumvent the need to prove discriminatory [*21] intent during the charging period, Ledbetter relies on the intent associated with other decisions made by other persons at other times. Reply Brief for Petitioner 6 ("Intentional discrimination . . . occurs when . . . differential treatment takes place, even if the intent to engage in that conduct for a discriminatory purpose was made previously").

Ledbetter's attempt to take the intent associated with the prior pay decisions and shift it to the 1998 pay decision is unsound. It would shift intent from one act (the act that consummates the discriminatory employment practice) to a later act that was not performed with bias or discriminatory motive. The effect of this shift would be to impose liability in the absence of the requisite intent.

Our cases recognize this point. In *Evans*, for example, we did not take the airline's discriminatory intent in 1968, when it discharged the plaintiff because of her sex, and attach that intent to its later act of neutrally applying its seniority rules. Similarly, in *Ricks*, we did not take the discriminatory intent that the college allegedly possessed when it denied Ricks tenure and attach that intent to its subsequent act of terminating his [*22] employment when his nonrenewable contract ran out. On the contrary, we held that "the only alleged discrimination occurred -- and the filing limitations periods therefore commenced -- at the time the tenure decision was made and communicated to Ricks." 449 U.S., at 258, 101 S. Ct. 498, 66 L. Ed. 2d 431.

Not only would Ledbetter's argument effectively eliminate the defining element of her disparate-treatment claim, but it would distort Title VII's "integrated,

multistep enforcement procedure." *Occidental Life Ins. Co. of Cal.* v. *EEOC*, 432 U.S. 355, 359, 97 S. Ct. 2447, 53 L. Ed. 2d 402 (1977). We have previously noted the legislative compromises that preceded the enactment of Title VII, *Mohasco Corp.* v. *Silver*, 447 U.S. 807, 819-821, 100 S. Ct. 2486, 65 L. Ed. 2d 532 (1980); *EEOC* v. *Commercial Office Products Co.*, 486 U.S. 107, 126, 108 S. Ct. 1666, 100 L. Ed. 2d 96 (1988) (STEVENS, J., joined by Rehnquist, C. J., and SCALIA, J., dissenting). Respectful of the legislative process that crafted this scheme, we must "give effect to the statute as enacted," *Mohasco, supra,* at 819, and we have repeatedly rejected suggestions that we extend or truncate Congress' deadlines. See, *e.g.*, *Electrical Workers* v. *Robbins & Myers, Inc.*, 429 U.S. 229, 236-240, 97 S. Ct. 441, 50 L. Ed. 2d 427 (1976) [*23] (union grievance procedures do not toll EEOC filing deadline); *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 47-49, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974) (arbitral decisions do not foreclose access to court following a timely filed EEOC complaint).

Statutes of limitations serve a policy of repose. *American Pipe & Constr. Co.* v. *Utah*, 414 U.S. 538, 554-555, 94 S. Ct. 756, 38 L. Ed. 2d 713 (1974). They

> "represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them.'" *United States* v. *Kubrick*, 444 U.S. 111, 117, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979) (quoting *Railroad Telegraphers* v. *Railway Express Agency, Inc.*, 321 U.S. 342, 349, 64 S. Ct. 582, 88 L. Ed. 788 (1944)).

The EEOC filing deadline "protects employers from the burden of defending claims arising from employment decisions that are long past." *Ricks, supra,* at 256-257, 101 S. Ct. 498, 66 L. Ed. 2d 431 . Certainly, the 180-day EEOC charging deadline, 42 U.S.C. § 2000e-5(e)(1), is short by any measure, but "by choosing what are obviously quite short deadlines, [*24] Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." *Mohasco, supra,* at 825, 100 S. Ct. 2486, 65 L. Ed. 2d 532. This short deadline reflects Congress' strong preference for the prompt resolution of employment discrimination allegations through voluntary conciliation and cooperation. *Occidental Life Ins., supra,* at 367-368, 97 S. Ct. 2447, 53 L. Ed. 2d 402; *Alexander, supra,* at 44, 94 S. Ct. 1011, 39 L. Ed. 2d 147.

A disparate-treatment claim comprises two elements: an employment practice, and discriminatory intent. Nothing in Title VII supports treating the intent element of Ledbetter's claim any differently from the employment practice element. n3 If anything, concerns regarding stale claims weigh more heavily with respect to proof of the intent associated with employment practices than with the practices themselves. For example, in a case such as this in which the plaintiff's claim concerns the denial of raises, the employer's challenged acts (the decisions not to increase the employee's pay at the times in question) will almost always be documented and will typically not even be in dispute. By contrast, the employer's intent is almost always disputed, and evidence relating [*25] to intent may fade quickly with time. In most disparate-treatment cases, much if not all of the evidence of intent is circumstantial. Thus, the critical issue in a case involving a long-past performance evaluation will often be whether the evaluation was so far off the mark that a sufficient inference of discriminatory intent can be drawn. See *Watson*, 487 U.S., at 1004, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (Blackmun, J., joined by Brennan and Marshall, JJ., concurring in part and concurring in judgment) (noting that in a disparate-treatment claim, the *McDonnell Douglas* factors establish discrimination by inference). See also, *e.g.*, *Zhuang* v. *Datacard Corp.*, 414 F.3d 849 (CA8 2005) (rejecting inference of discrimination from performance evaluations); *Cooper* v. *Southern Co.*, 390 F.3d 695, 732-733 (CA11 2004) (same). This can be a subtle determination, and the passage of time may seriously diminish the ability of the parties and the factfinder to reconstruct what actually happened. n4

> n3 Of course, there may be instances where the elements forming a cause of action span more than 180 days. Say, for instance, an employer forms an illegal discriminatory intent towards an employee but does not act on it until 181 days later. The charging period would not begin to run until the employment practice was executed on day 181 because until that point the employee had no cause of action. The act and intent had not yet

been joined. Here, by contrast, Ledbetter's cause of action was fully formed and present at the time that the discriminatory employment actions were taken against her, at which point she could have, and should have, sued.

[*26]

n4 The dissent dismisses this concern, *post*, at 15-16, but this case illustrates the problems created by tardy lawsuits. Ledbetter's claims of sex discrimination turned principally on the misconduct of a single Goodyear supervisor, who, Ledbetter testified, retaliated against her when she rejected his sexual advances during the early 1980's, and did so again in the mid-1990's when he falsified deficiency reports about her work. His misconduct, Ledbetter argues, was "a principal basis for [her] performance evaluation in 1997." Brief for Petitioner 6; see also *id.*, at 5-6, 8, 11 (stressing the same supervisor's misconduct). Yet, by the time of trial, this supervisor had died and therefore could not testify. A timely charge might have permitted his evidence to be weighed contemporaneously.

Ledbetter contends that employers would be protected by the equitable doctrine of laches, but Congress plainly did not think that laches was sufficient in this context. Indeed, Congress took a diametrically different approach, including in Title VII a provision allowing only a few months in most cases [*27] to file a charge with the EEOC. 42 U.S.C. § 2000e-5(e)(1).

Ultimately, "experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Mohasco*, 447 U.S., at 826, 100 S. Ct. 2486, 65 L. Ed. 2d 532. By operation of §§ 2000e-5(e)(1) and 2000e-5(f)(1), a Title VII "claim is time barred if it is not filed within these time limits." *Morgan*, 536 U.S., at 109, 122 S. Ct. 2061, 153 L. Ed. 2d 106; *Electrical Workers*, 429 U.S., at 236, 97 S. Ct. 441, 50 L. Ed. 2d 427. We therefore reject the suggestion that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period. Ledbetter's claim is, for this reason, untimely.

III

A

In advancing her two theories Ledbetter does not seriously contest the logic of *Evans*, *Ricks*, *Lorance*, and *Morgan* as set out above, but rather argues that our decision in *Bazemore* v. *Friday*, 478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986) *(per curiam)*, requires different treatment of her claim because it relates to pay. [*28] Ledbetter focuses specifically on our statement that "each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII." *Id.*, at 395, 106 S. Ct. 3000, 92 L. Ed. 2d 315. She argues that in *Bazemore* we adopted a "paycheck accrual rule" under which each paycheck, even if not accompanied by discriminatory intent, triggers a new EEOC charging period during which the complainant may properly challenge any prior discriminatory conduct that impacted the amount of that paycheck, no matter how long ago the discrimination occurred. On this reading, *Bazemore* dispensed with the need to prove actual discriminatory intent in pay cases and, without giving any hint that it was doing so, repudiated the very different approach taken previously in *Evans* and *Ricks*. Ledbetter's interpretation is unsound.

*Bazemore* concerned a disparate-treatment pay claim brought against the North Carolina Agricultural Extension Service (Service). 478 U.S., at 389-390, 106 S. Ct. 3000, 92 L. Ed. 2d 315. Service employees were originally segregated into "a white branch" and "a 'Negro branch,'" with the latter receiving less pay, but in 1965 the two branches were merged. *Id.*, at 390-391, 106 S. Ct. 3000, 92 L. Ed. 2d 315.. [*29] After Title VII was extended to public employees in 1972, black employees brought suit claiming that pay disparities attributable to the old dual pay scale persisted. *Id.*, at 391, 106 S. Ct. 3000, 92 L. Ed. 2d 315. The Court of Appeals rejected this claim, which it interpreted to be that the "'discriminatory difference in salaries should have been affirmatively eliminated.'" *Id.*, at 395.

This Court reversed in a *per curiam* opinion, 478 U.S., at 386-388, 106 S. Ct. 3000, 92 L. Ed. 2d 315, but all of the Members of the Court joined Justice Brennan's separate opinion, see *id.*, at 388, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (opinion concurring in part). Justice Brennan wrote:

"The error of the Court of Appeals with

respect to salary disparities created prior to 1972 and perpetuated thereafter is too obvious to warrant extended discussion: that the Extension Service discriminated with respect to salaries *prior* to the time it was covered by Title VII does not excuse perpetuating that discrimination *after* the Extension Service became covered by Title VII. To hold otherwise would have the effect of exempting from liability those employers who were historically the greatest offenders of the rights of blacks. A pattern [*30] or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, became a violation upon Title VII's effective date, and to the extent an employer continued to engage in that act or practice, it is liable under that statute. While recovery may not be permitted for pre-1972 acts of discrimination, to the extent that this discrimination was perpetuated after 1972, liability may be imposed." *Id.*, at 395, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (emphasis in original).

Far from adopting the approach that Ledbetter advances here, this passage made a point that was "too obvious to warrant extended discussion," *ibid.;* namely, that when an employer adopts a facially discriminatory pay structure that puts some employees on a lower scale because of race, the employer engages in intentional discrimination whenever it issues a check to one of these disfavored employees. An employer that adopts and intentionally retains such a pay structure can surely be regarded as intending to discriminate on the basis of race as long as the structure is used.

*Bazemore* thus is entirely consistent with our prior precedents, as Justice Brennan's opinion took [*31] care to point out. Noting that *Evans* turned on whether "'any *present violation* existed,'" Justice Brennan stated that the *Bazemore* plaintiffs were alleging that the defendants "had not from the date of the Act forward made all their employment decisions in a wholly nondiscriminatory way," 478 U.S., at 396-397, n. 6, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (emphasis in original; internal quotation marks and brackets omitted)--which is to say that they had engaged in fresh discrimination. Justice Brennan

added that the Court's "holding in no sense gave legal effect to the pre-1972 actions, but, consistent with *Evans . . .* focused on the present salary structure, which is illegal if it *is a mere continuation of the pre-1965 discriminatory pay structure*." *Id.*, at 397, n. 6, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (emphasis added).

The sentence in Justice Brennan's opinion on which Ledbetter chiefly relies comes directly after the passage quoted above, and makes a similarly obvious point:

"Each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior to the effective date of Title VII." *Id.*, at 395, 106 S. Ct. 3000, 92 L. Ed. 2d 315. [*32] n5

In other words, a freestanding violation may always be charged within its own charging period regardless of its connection to other violations. We repeated this same point more recently in *Morgan:* "The existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." 536 U.S., at 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106. n6 Neither of these opinions stands for the proposition that an action not comprising an employment practice and alleged discriminatory intent is separately chargeable, just because it is related to some past act of discrimination.

n5 That the focus in *Bazemore* was on a current violation, not the carrying forward of a past act of discrimination, was made clearly by the side opinion in the Court of Appeals:

"The majority holds, in effect, that because the pattern of discriminatory salaries here challenged originated before applicable provisions of the Civil Rights Act made their payment illegal, any 'lingering effects' of that earlier pattern cannot (presumably on an indefinitely maintained basis) be considered in assessing a challenge to post-act continuation of that pattern.

"*Hazelwood* and *Evans* indeed made it clear that an employer cannot be found liable, or

sanctioned with remedy, for employment decisions made before they were declared illegal or as to which the claimant has lost any right of action by lapse of time. For this reason it is generally true that, as the catch-phrase has it, Title VII imposed 'no obligation to catch-up,' i.e., affirmatively to remedy present effects of pre-Act discrimination, whether in composing a work force or otherwise. But those cases cannot be thought to insulate employment decisions that presently are illegal on the basis that at one time *comparable* decisions were legal when made by the particular employer. It is therefore one thing to say that an employer who upon the effective date of Title VII finds itself with a racially unbalanced work-force need not act affirmatively to redress the balance; and quite another to say that it may also continue to make discriminatory hiring decisions because it was by that means that its present work force was composed. It may not, in short, under the *Hazelwood/Evans* principle continue practices now violative simply because at one time they were not." *Bazemore* v. *Friday*, 751 F.2d 662, 695-696 (CA4 1984) (Phillips, J., concurring in part and dissenting in part) (emphasis in original; footnotes omitted).

[*33]

n6 The briefs filed with this Court in *Bazemore* v. *Friday*, 478 U.S. 385, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986) *(per curiam)*, further elucidate the point. The petitioners described the Service's conduct as "the continued use of a racially explicit base wage." Brief for Petitioner Bazemore et al. in *Bazemore* v. *Friday*, O. T. 1985, No. 85-93, p. 33. The United States' brief also properly distinguished the commission of a discrete discriminatory act with continuing adverse results from the intentional carrying forward of a discriminatory pay system. Brief for Federal Petitioners in *Bazemore* v. *Friday*, O. T. 1984, Nos. 85-93 and 85-428, p. 17. This case involves the former, not the latter.

Ledbetter attempts to eliminate the obvious inconsistencies between her interpretation of *Bazemore* and the *Evans/Ricks/Lorance/Morgan* line of cases on the ground that none of the latter cases involved pay raises, but the logic of our prior cases is fully applicable to pay cases. To take *Evans* as an example, the employee there was unlawfully terminated; this caused her to lose seniority; and [*34] the loss of seniority affected her wages, among other things. 431 U.S., at 555, n. 5, 97 S. Ct. 1885, 52 L. Ed. 2d 571 ("Seniority determines a flight attendant's wages; the duration and timing of vacations; rights to retention in the event of layoffs and rights to re-employment thereafter; and rights to preferential selection of flight assignments"). The relationship between past discrimination and adverse present effects was the same in *Evans* as it is here. Thus, the argument that Ledbetter urges us to accept here would necessarily have commanded a different outcome in *Evans*.

*Bazemore* stands for the proposition that an employer violates Title VII and triggers a new EEOC charging period whenever the employer issues paychecks using a discriminatory pay structure. But a new Title VII violation does not occur and a new charging period is not triggered when an employer issues paychecks pursuant to a system that is "facially nondiscriminatory and neutrally applied." *Lorance*, 490 U.S., at 911, 109 S. Ct. 2261, 104 L. Ed. 2d 961. The fact that precharging period discrimination adversely affects the calculation of a neutral factor (like seniority) that is used in determining future pay does not mean that each new paycheck [*35] constitutes a new violation and restarts the EEOC charging period.

Because Ledbetter has not adduced evidence that Goodyear initially adopted its performance-based pay system in order to discriminate on the basis of sex or that it later applied this system to her within the charging period with any discriminatory animus, *Bazemore* is of no help to her. Rather, all Ledbetter has alleged is that Goodyear's agents discriminated against her individually in the past and that this discrimination reduced the amount of later paychecks. Because Ledbetter did not file timely EEOC charges relating to her employer's discriminatory pay decisions in the past, she cannot maintain a suit based on that past discrimination at this time.

B

The dissent also argues that pay claims are different. Its principal argument is that a pay discrimination claim is like a hostile work environment claim because both types of claims are "'based on the cumulative effect of

individual acts,'" *post*, at 6-7, but this analogy overlooks the critical conceptual distinction between these two types of claims. And although the dissent relies heavily on *Morgan*, the dissent's argument is fundamentally inconsistent [*36] with *Morgan*'s reasoning.

*Morgan* distinguished between "discrete" acts of discrimination and a hostile work environment. A discrete act of discrimination is an act that in itself "constitutes a separate actionable 'unlawful employment practice'" and that is temporally distinct. *Morgan*, 536 U.S., at 114, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106. As examples we identified "termination, failure to promote, denial of transfer, or refusal to hire." *Id.*, at 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106. A hostile work environment, on the other hand, typically comprises a succession of harassing acts, each of which "may not be actionable on its own." In addition, a hostile work environment claim "cannot be said to occur on any particular day." *Id.*, at 115-116, 122 S. Ct. 2061, 153 L. Ed. 2d 106. In other words, the actionable wrong is the environment, not the individual acts that, taken together, create the environment. n7

> n7 Moreover, the proposed hostile salary environment claim would go far beyond *Morgan*'s limits. *Morgan* still required at least some of the discriminatorily-motivated acts predicate to a hostile work environment claim to occur within the charging period. 536 U.S., at 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 ("Provided that *an act contributing to the claim occurs within the filing period*, the entire time period of the hostile environment may be considered by a court" (emphasis added)). But the dissent would permit claims where no one acted in any way with an improper motive during the charging period. *Post*, at 7, 16.

[*37]

Contrary to the dissent's assertion, *post*, at 6-7, what Ledbetter alleged was not a single wrong consisting of a succession of acts. Instead, she alleged a series of discrete discriminatory acts, see Brief for Petitioner 13, 15 (arguing that payment of each paycheck constituted a separate violation of Title VII), each of which *was* independently identifiable and actionable, and *Morgan* is perfectly clear that when an employee alleges "serial violations," *i.e.*, a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation. 536 U.S., at 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106.

While this fundamental misinterpretation of *Morgan* is alone sufficient to show that the dissent's approach must be rejected, it should also be noted that the dissent is coy as to whether it would apply the same rule to all pay discrimination claims or whether it would limit the rule to cases like Ledbetter's, in which multiple discriminatory pay decisions are alleged. The dissent relies on the fact that Ledbetter was allegedly subjected to a series of discriminatory pay decisions over a period of time, and the dissent suggests that she did not realize for some time [*38] that she had been victimized. But not all pay cases share these characteristics.

If, as seems likely, the dissent would apply the same rule in all pay cases, then, if a single discriminatory pay decision made 20 years ago continued to affect an employee's pay today, the dissent would presumably hold that the employee could file a timely EEOC charge today. And the dissent would presumably allow this even if the employee had full knowledge of all the circumstances relating to the 20-year-old decision at the time it was made. n8 The dissent, it appears, proposes that we adopt a special rule for pay cases based on the particular characteristics of one case that is certainly not representative of all pay cases and may not even be typical. We refuse to take that approach.

> n8 The dissent admits as much, responding only that an employer could resort to equitable doctrines such as laches. *Post*, at 16. But first, as we have noted, Congress has already determined that defense to be insufficient. *Supra*, at 13. Second, it is far from clear that a suit filed under the dissent's theory, alleging that a paycheck paid recently within the charging period was itself a freestanding violation of Title VII because it reflected the effects of 20-year-old discrimination, would even be barred by laches.

[*39]

IV

In addition to the arguments previously discussed, Ledbetter relies largely on analogies to other statutory regimes and on extrastatutory policy arguments to

127 S. Ct. 2162; 2007 U.S. LEXIS 6295, *39;
75 U.S.L.W. 4359; 20 Fla. L. Weekly Fed. S 295

support her "paycheck accrual rule."

A

Ledbetter places significant weight on the EPA, which was enacted contemporaneously with Title VII and prohibits paying unequal wages for equal work because of sex. 29 U.S.C. § 206(d). Stating that "the lower courts routinely hear [EPA] claims challenging pay disparities that first arose outside the limitations period," Ledbetter suggests that we should hold that Title VII is violated each time an employee receives a paycheck that reflects past discrimination. Brief for Petitioner 34-35.

The simple answer to this argument is that the EPA and Title VII are not the same. In particular, the EPA does not require the filing of a charge with the EEOC or proof of intentional discrimination. See § 206(d)(1) (asking only whether the alleged inequality resulted from "any other factor other than sex"). Ledbetter originally asserted an EPA claim, but that claim was dismissed by the District Court and is not before us. If Ledbetter had pursued her EPA claim, she would [*40] not face the Title VII obstacles that she now confronts. n9

> n9 The Magistrate Judge recommended dismissal of Ledbetter's EPA claim on the ground that Goodyear had demonstrated that the pay disparity resulted from Ledbetter's consistently weak performance, not her sex. App. to Pet. for Cert. 71a-77a. The Magistrate Judge also recommended dismissing the Title VII disparate-pay claim on the same basis. Id., at 65a-69a. Ledbetter objected to the Magistrate Judge's disposition of the Title VII and EPA claims, arguing that the Magistrate Judge had improperly resolved a disputed factual issue. See Plaintiff's Objections to Magistrate Judge's Report and Recommendation, 1 Record in No. 03-15246-G (CA11), Doc. 32. The District Court sustained this objection as to the "disparate pay" claim, but without specifically mentioning the EPA claim, which had been dismissed by the Magistrate Judge on the same basis. See App. to Pet. for Cert. 43a-44a. While the record is not entirely clear, it appears that at this point Ledbetter elected to abandon her EPA claim, proceeding to trial with only the Title VII disparate-pay claim, thus giving rise to the dispute the Court must now resolve.

[*41]

Ledbetter's appeal to the Fair Labor Standards Act of 1938 (FLSA) is equally unavailing. Stating that it is "well established that the statute of limitations for violations of the minimum wage and overtime provisions of the [FLSA] runs anew with each paycheck," Brief for Petitioner 35, Ledbetter urges that the same should be true in a Title VII pay case. Again, however, Ledbetter's argument overlooks the fact that an FLSA minimum wage or overtime claim does not require proof of a specific intent to discriminate. See 29 U.S.C. § 207 (establishing overtime rules); cf. § 255(a) (establishing 2-year statute of limitations for FLSA claims, except for claims of a "willful violation," which may be commenced within 3 years).

Ledbetter is on firmer ground in suggesting that we look to cases arising under the National Labor Relations Act (NLRA) since the NLRA provided a model for Title VII's remedial provisions and, like Title VII, requires the filing of a timely administrative charge (with the National Labor Relations Board) before suit may be maintained. Lorance, 490 U.S., at 909, 109 S. Ct. 2261, 104 L. Ed. 2d 961; Ford Motor Co. v. EEOC, 458 U.S. 219, 226, n. 8, 102 S. Ct. 3057, 73 L. Ed. 2d 721 (1982). [*42] Cf. 29 U.S.C. § 160(b) ("No complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board").

Ledbetter argues that the NLRA's 6-month statute of limitations begins anew for each paycheck reflecting a prior violation of the statute, but our precedents suggest otherwise. In Machinists v. NLRB, 362 U.S. 411, 416-417, 80 S. Ct. 822, 4 L. Ed. 2d 832 (1960), we held that "where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice[,] the use of the earlier unfair labor practice [merely] serves to cloak with illegality that which was otherwise lawful." This interpretation corresponds closely to our analysis in Evans and Ricks and supports our holding in the present case.

B

Ledbetter, finally, makes a variety of policy arguments in favor of giving the alleged victims of pay discrimination more time before they are required to file a charge with the EEOC. Among other things, she claims

that pay discrimination is harder to detect than other forms of employment discrimination. n10

n10 We have previously declined to address whether Title VII suits are amenable to a discovery rule. *National Railroad Passenger Corporation* v. *Morgan*, 536 U.S. 101, 114, n. 7, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Because Ledbetter does not argue that such a rule would change the outcome in her case, we have no occasion to address this issue.

[*43]

We are not in a position to evaluate Ledbetter's policy arguments, and it is not our prerogative to change the way in which Title VII balances the interests of aggrieved employees against the interest in encouraging the "prompt processing of all charges of employment discrimination," *Mohasco*, 447 U.S., at 825, 100 S. Ct. 2486, 65 L. Ed. 2d 532, and the interest in repose.

Ledbetter's policy arguments for giving special treatment to pay claims find no support in the statute and are inconsistent with our precedents. n11 We apply the statute as written, and this means that any unlawful employment practice, including those involving compensation, must be presented to the EEOC within the period prescribed by statute.

n11 Ledbetter argues that the EEOC's endorsement of her approach in its Compliance Manual and in administrative adjudications merits deference. But we have previously declined to extend *Chevron* deference to the Compliance Manual, *Morgan, supra*, at 111, n. 6, 122 S. Ct. 2061, 153 L. Ed. 2d 106, and similarly decline to defer to the EEOC's adjudicatory positions. The EEOC's views in question are based on its misreading of *Bazemore*. See, *e.g.*, *Amft* v. *Mineta*, No. 07A40116, 2006 EEOPUB LEXIS 1472, 2006 WL 985183, *5 (EEOC Office of Fed. Operations, Apr. 6, 2006) 2006 EEOPUB LEXIS 1472; *Albritton* v. *Postmaster General*, No. 01A44063, 2004 EEOPUB LEXIS 6972, 2004 WL 2983682, *2 (EEOC Office of Fed. Operations, Dec. 17, 2004). Agencies have no special claim to deference in their interpretation of our decisions. *Reno* v. *Bossier Parish School*

*Bd.*, 528 U.S. 320, 336, n. 5, 120 S. Ct. 866, 145 L. Ed. 2d 845 (2000). Nor do we see reasonable ambiguity in the statute itself, which makes no distinction between compensation and other sorts of claims and which clearly requires that discrete employment actions alleged to be unlawful be motivated "because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

[*44]

* * *

For these reasons, the judgment of the Court of Appeals for the Eleventh Circuit is affirmed.

*It is so ordered.*

**DISSENT BY:** GINSBURG

**DISSENT:**

JUSTICE GINSBURG, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE BREYER join, dissenting.

Lilly Ledbetter was a supervisor at Goodyear Tire and Rubber's plant in Gadsden, Alabama, from 1979 until her retirement in 1998. For most of those years, she worked as an area manager, a position largely occupied by men. Initially, Ledbetter's salary was in line with the salaries of men performing substantially similar work. Over time, however, her pay slipped in comparison to the pay of male area managers with equal or less seniority. By the end of 1997, Ledbetter was the only woman working as an area manager and the pay discrepancy between Ledbetter and her 15 male counterparts was stark: Ledbetter was paid $ 3,727 per month; the lowest paid male area manager received $ 4,286 per month, the highest paid, $ 5,236. See 421 F.3d 1169, 1174 (CA11 2005); Brief for Petitioner 4.

Ledbetter launched charges of discrimination before the Equal Employment Opportunity Commission (EEOC) in March 1998. Her formal administrative complaint specified [*45] that, in violation of Title VII, Goodyear paid her a discriminatorily low salary because of her sex. See 42 U.S.C. § 2000e-2(a)(1) (rendering it unlawful for an employer "to discriminate against any individual with respect to [her] compensation . . . because of such individual's . . . sex"). That charge was eventually tried to

a jury, which found it "more likely than not that [Goodyear] paid [Ledbetter] an unequal salary because of her sex." App. 102. In accord with the jury's liability determination, the District Court entered judgment for Ledbetter for backpay and damages, plus counsel fees and costs.

The Court of Appeals for the Eleventh Circuit reversed. Relying on Goodyear's system of annual merit-based raises, the court held that Ledbetter's claim, in relevant part, was time barred. 421 F.3d at 1171, 1182-1183. Title VII provides that a charge of discrimination "shall be filed within [180] days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). n1Ledbetter charged, and proved at trial, that within the 180-day period, her pay was substantially less than the pay of men [*46] doing the same work. Further, she introduced evidence sufficient to establish that discrimination against female managers at the Gadsden plant, not performance inadequacies on her part, accounted for the pay differential. See, e.g., App. 36-47, 51-68, 82-87, 90-98, 112-113. That evidence was unavailing, the Eleventh Circuit held, and the Court today agrees, because it was incumbent on Ledbetter to file charges year-by-year, each time Goodyear failed to increase her salary commensurate with the salaries of male peers. Any annual pay decision not contested immediately (within 180 days), the Court affirms, becomes grandfathered, a *fait accompli* beyond the province of Title VII ever to repair.

> n1 If the complainant has first instituted proceedings with a state or local agency, the filing period is extended to 300 days or 30 days after the denial of relief by the agency. 42 U.S.C. § 2000e-5(e)(1). Because the 180-day period applies to Ledbetter's case, that figure will be used throughout. See *ante*, at 3, 4.

[*47]

The Court's insistence on immediate contest overlooks common characteristics of pay discrimination. Pay disparities often occur, as they did in Ledbetter's case, in small increments; cause to suspect that discrimination is at work develops only over time. Comparative pay information, moreover, is often hidden from the employee's view. Employers may keep under wraps the pay differentials maintained among supervisors, no less the reasons for those differentials.

Small initial discrepancies may not be seen as meet for a federal case, particularly when the employee, trying to succeed in a nontraditional environment, is averse to making waves.

Pay disparities are thus significantly different from adverse actions "such as termination, failure to promote, . . . or refusal to hire," all involving fully communicated discrete acts, "easy to identify" as discriminatory. See *National Railroad Passenger Corporation* v. *Morgan*, 536 U.S. 101, 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). It is only when the disparity becomes apparent and sizable, *e.g.*, through future raises calculated as a percentage of current salaries, that an employee in Ledbetter's situation is likely to comprehend her plight and, therefore, [*48] to complain. Her initial readiness to give her employer the benefit of the doubt should not preclude her from later challenging the then current and continuing payment of a wage depressed on account of her sex.

On questions of time under Title VII, we have identified as the critical inquiries: "What constitutes an 'unlawful employment practice' and when has that practice 'occurred'?" *Id.*, at 110, 122 S. Ct. 2061, 153 L. Ed. 2d 106. Our precedent suggests, and lower courts have overwhelmingly held, that the unlawful practice is the *current payment* of salaries infected by gender-based (or race-based) discrimination -- a practice that occurs whenever a paycheck delivers less to a woman than to a similarly situated man. See *Bazemore* v. *Friday*, 478 U.S. 385, 395, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (1986) (Brennan, J., joined by all other Members of the Court, concurring in part).

I

Title VII proscribes as an "unlawful employment practice" discrimination "against any individual with respect to his compensation . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An individual seeking to challenge an employment practice under this [*49] proscription must file a charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred." § 2000e-5(e)(1). See *ante*, at 4; *supra*, at 2, n. 1.

Ledbetter's petition presents a question important to the sound application of Title VII: What activity qualifies as an unlawful employment practice in cases of

discrimination with respect to compensation. One answer identifies the pay-setting decision, and that decision alone, as the unlawful practice. Under this view, each particular salary-setting decision is discrete from prior and subsequent decisions, and must be challenged within 180 days on pain of forfeiture. Another response counts both the pay-setting decision and the actual payment of a discriminatory wage as unlawful practices. Under this approach, each payment of a wage or salary infected by sex-based discrimination constitutes an unlawful employment practice; prior decisions, outside the 180-day charge-filing period, are not themselves actionable, but they are relevant in determining the lawfulness of conduct within the period. The Court adopts the first view, see *ante*, at 1, 4, 9, but the second is more faithful to precedent, more in [*50] tune with the realities of the workplace, and more respectful of Title VII's remedial purpose.

A

In *Bazemore*, we unanimously held that an employer, the North Carolina Agricultural Extension Service, committed an unlawful employment practice each time it paid black employees less than similarly situated white employees. 478 U.S., at 395, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (opinion of Brennan, J.). Before 1965, the Extension Service was divided into two branches: a white branch and a "Negro branch." *Id.*, at 390, 106 S. Ct. 3000, 92 L. Ed. 2d 315. Employees in the "Negro branch" were paid less than their white counterparts. In response to the Civil Rights Act of 1964, which included Title VII, the State merged the two branches into a single organization, made adjustments to reduce the salary disparity, and began giving annual raises based on nondiscriminatory factors. *Id.*, at 390-391, 394-395, 106 S. Ct. 3000, 92 L. Ed. 2d 315. Nonetheless, "some pre-existing salary disparities continued to linger on." *Id.*, at 394, 106 S. Ct. 3000, 92 L. Ed. 2d 315 (internal quotation marks omitted). We rejected the Court of Appeals' conclusion that the plaintiffs could not prevail because the lingering disparities were simply a continuing effect of a decision lawfully made [*51] prior to the effective date of Title VII. See *id.*, at 395-396, 106 S. Ct. 3000, 92 L. Ed. 2d 315. Rather, we reasoned, "each week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII." *Id.*, at 395, 106 S. Ct. 3000, 92 L. Ed. 2d 315. Paychecks perpetuating past discrimination, we thus recognized, are actionable not simply because they are "related" to a decision made

outside the charge-filing period, cf. *ante*, at 17, but because they discriminate anew each time they issue, see *Bazemore*, 478 U.S., at 395-396, 106 S. Ct. 3000, 92 L. Ed. 2d 315, and n. 6; *Morgan*, 536 U.S., at 111-112, 122 S. Ct. 2061, 153 L. Ed. 2d 106.

Subsequently, in *Morgan*, we set apart, for purposes of Title VII's timely filing requirement, unlawful employment actions of two kinds: "discrete acts" that are "easy to identify" as discriminatory, and acts that recur and are cumulative in impact. See *id.*, at 110, 113-115, 122 S. Ct. 2061, 153 L. Ed. 2d 106. "[A] discrete act such as termination, failure to promote, denial of transfer, or refusal to hire," *id.*, at 114, 122 S. Ct. 2061, 153 L. Ed. 2d 106, we explained, "'occurs' on the day that it 'happens.' A party, therefore, must file a charge within . . . 180 . . . days of the date of the act or lose the [*52] ability to recover for it." *Id.*, at 110, 122 S. Ct. 2061, 153 L. Ed. 2d 106; see *id.*, at 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 ("Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act.").

"Different in kind from discrete acts," we made clear, are "claims . . . based on the cumulative effect of individual acts." *Id.*, at 115, 122 S. Ct. 2061, 153 L. Ed. 2d 106. The *Morgan* decision placed hostile work environment claims in that category. "Their very nature involves repeated conduct." *Ibid.* "The unlawful employment practice" in hostile work environment claims, "cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Ibid.* (internal quotation marks omitted). The persistence of the discriminatory conduct both indicates that management should have known of its existence and produces a cognizable harm. *Ibid.* Because the very nature of the hostile work environment claim involves repeated conduct,

> "it does not matter, [*53] for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of

127 S. Ct. 2162; 2007 U.S. LEXIS 6295, *53;
75 U.S.L.W. 4359; 20 Fla. L. Weekly Fed. S 295

determining liability." *Id.*, at 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106.

Consequently, although the unlawful conduct began in the past, "a charge may be filed at a later date and still encompass the whole." *Ibid.*

Pay disparities, of the kind Ledbetter experienced, have a closer kinship to hostile work environment claims than to charges of a single episode of discrimination. Ledbetter's claim, resembling Morgan's, rested not on one particular paycheck, but on "the cumulative effect of individual acts." See *id.*, at 115 122 S. Ct. 2061, 153 L. Ed. 2d 106. See also Brief for Petitioner 13, 15-17, and n. 9 (analogizing Ledbetter's claim to the recurring and cumulative harm at issue in *Morgan*); Reply Brief for Petitioner 13 (distinguishing pay discrimination from "easy to identify" discrete acts (internal quotation marks omitted)). She charged insidious discrimination building up slowly but steadily. [*54] See Brief for Petitioner 5-8. Initially in line with the salaries of men performing substantially the same work, Ledbetter's salary fell 15 to 40 percent behind her male counterparts only after successive evaluations and percentage-based pay adjustments. See *supra*, at 1-2. Over time, she alleged and proved, the repetition of pay decisions undervaluing her work gave rise to the current discrimination of which she complained. Though component acts fell outside the charge-filing period, with each new paycheck, Goodyear contributed incrementally to the accumulating harm. See *Morgan*, 536 U.S., at 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106; *Bazemore*, 478 U.S., at 395-396, 106 S. Ct. 3000, 92 L. Ed. 2d 315; cf. *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U.S. 481, 502, n. 15, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968). n2

n2 *National Railroad Passenger Corporation* v. *Morgan*, 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002), the Court emphasizes, required that "an act contributing to the claim occur within the [charge-]filing period." *Ante*, at 19, and n. 7 (emphasis deleted; internal quotation marks omitted). Here, each paycheck within the filing period compounded the discrimination Ledbetter encountered, and thus contributed to the "actionable wrong," *i.e.*, the succession of acts composing the pattern of discriminatory pay, of which she complained.

[*55]

B

The realities of the workplace reveal why the discrimination with respect to compensation that Ledbetter suffered does not fit within the category of singular discrete acts "easy to identify." A worker knows immediately if she is denied a promotion or transfer, if she is fired or refused employment. And promotions, transfers, hirings, and firings are generally public events, known to co-workers. When an employer makes a decision of such open and definitive character, an employee can immediately seek out an explanation and evaluate it for pretext. Compensation disparities, in contrast, are often hidden from sight. It is not unusual, decisions in point illustrate, for management to decline to publish employee pay levels, or for employees to keep private their own salaries. See, *e.g.*, *Goodwin* v. *General Motors Corp.*, 275 F.3d 1005, 1008-1009 (CA10 2002) (plaintiff did not know what her colleagues earned until a printout listing of salaries appeared on her desk, seven years after her starting salary was set lower than her co-workers' salaries); *McMillan* v. *Massachusetts Soc. for the Prevention of Cruelty to Animals*, 140 F.3d 288, 296 (CA1 1998) [*56] (plaintiff worked for employer for years before learning of salary disparity published in a newspaper). n3 Tellingly, as the record in this case bears out, Goodyear kept salaries confidential; employees had only limited access to information regarding their colleagues' earnings. App. 56-57, 89.

n3 See also Bierman & Gely, "Love, Sex and Politics? Sure. Salary? No Way": Workplace Social Norms and the Law, 25 Berkeley J. Emp. & Lab. L. 167, 168, 171 (2004) (one-third of private sector employers have adopted specific rules prohibiting employees from discussing their wages with co-workers; only one in ten employers has adopted a pay openness policy).

The problem of concealed pay discrimination is particularly acute where the disparity arises not because the female employee is flatly denied a raise but because male counterparts are given larger raises. Having received a pay increase, the female employee is unlikely to discern at once that she has experienced an adverse employment decision. She may have [*57] little reason even to suspect discrimination until a pattern develops

incrementally and she ultimately becomes aware of the disparity. Even if an employee suspects that the reason for a comparatively low raise is not performance but sex (or another protected ground), the amount involved may seem too small, or the employer's intent too ambiguous, to make the issue immediately actionable -- or winnable.

Further separating pay claims from the discrete employment actions identified in *Morgan*, an employer gains from sex-based pay disparities in a way it does not from a discriminatory denial of promotion, hiring, or transfer. When a male employee is selected over a female for a higher level position, someone still gets the promotion and is paid a higher salary; the employer is not enriched. But when a woman is paid less than a similarly situated man, the employer reduces its costs each time the pay differential is implemented. Furthermore, decisions on promotions, like decisions installing seniority systems, often implicate the interests of third-party employees in a way that pay differentials do not. Cf. *Teamsters* v. *United States*, 431 U.S. 324, 352-353, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977) [*58] (recognizing that seniority systems involve "vested . . . rights of employees" and concluding that Title VII was not intended to "destroy or water down" those rights). Disparate pay, by contrast, can be remedied at any time solely at the expense of the employer who acts in a discriminatory fashion.

C

In light of the significant differences between pay disparities and discrete employment decisions of the type identified in *Morgan*, the cases on which the Court relies hold no sway. See *ante*, at 5-10 (discussing *United Air Lines, Inc.* v. *Evans*, 431 U.S. 553, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977), *Delaware State College* v. *Ricks*, 449 U.S. 250, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980), and *Lorance* v. *AT&T Technologies, Inc.*, 490 U.S. 900, 109 S. Ct. 2261, 104 L. Ed. 2d 961 (1989)). *Evans* and *Ricks* both involved a single, immediately identifiable act of discrimination: in *Evans*, a constructive discharge, 431 U.S., at 554, 97 S. Ct. 1885, 52 L. Ed. 2d 571; in *Ricks*, a denial of tenure, 449 U.S., at 252, 101 S. Ct. 498, 66 L. Ed. 2d 431. In each case, the employee filed charges well after the discrete discriminatory act occurred: When United Airlines forced Evans to resign because of its policy barring married female flight attendants, she filed [*59] no charge; only four years later, when Evans was rehired, did she allege that the airline's former no-marriage rule was unlawful and therefore should not

operate to deny her seniority credit for her prior service. See *Evans*, 431 U.S., at 554-557, 97 S. Ct. 1885, 52 L. Ed. 2d 571. Similarly, when Delaware State College denied Ricks tenure, he did not object until his terminal contract came to an end, one year later. *Ricks*, 449 U.S., at 253-254, 257-258, 101 S. Ct. 498, 66 L. Ed. 2d 431 . No repetitive, cumulative discriminatory employment practice was at issue in either case. See *Evans*, 431 U.S., at 557-558, 97 S. Ct. 1885, 52 L. Ed. 2d 571; *Ricks*, 449 U.S., at 258, 101 S. Ct. 498, 66 L. Ed. 2d 431. n4

n4 The Court also relies on *Machinists* v. *NLRB*, 362 U.S. 411, 80 S. Ct. 822, 4 L. Ed. 2d 832 (1960), which like *Evans* and *Ricks*, concerned a discrete act: the execution of a collective bargaining agreement containing a union security clause. 362 U.S., at 412, 417, 80 S. Ct. 822, 4 L. Ed. 2d 832. In *Machinists*, it was undisputed that under the National Labor Relations Act (NLRA), a union and an employer may not agree to a union security clause "if at the time of original execution the union does not represent a majority of the employees in the [bargaining] unit." *Id.*, at 412-414, 417, 80 S. Ct. 822, 4 L. Ed. 2d 832. The complainants, however, failed to file a charge within the NLRA's six-month charge filing period; instead, they filed charges 10 and 12 months after the execution of the agreement, objecting to its subsequent enforcement. See *id.*, at 412, 414, 80 S. Ct. 822, 4 L. Ed. 2d 832. Thus, as in *Evans* and *Ricks*, but in contrast to Ledbetter's case, the employment decision at issue was easily identifiable and occurred on a single day.

[*60]

*Lorance* is also inapposite, for, in this Court's view, it too involved a one-time discrete act: the adoption of a new seniority system that "had its genesis in sex discrimination." See 490 U.S., at 902, 905, 109 S. Ct. 2261, 104 L. Ed. 2d 961 (internal quotation marks omitted). The Court's extensive reliance on *Lorance*, *ante*, at 7-9, 14, 17-18, moreover, is perplexing for that decision is no longer effective: In the 1991 Civil Rights Act, Congress superseded *Lorance*'s holding. § 112, 105 Stat. 1079 (codified as amended at 42 U.S.C. § 2000e-5(e)(2)). Repudiating our judgment that a facially neutral seniority system adopted with discriminatory

127 S. Ct. 2162; 2007 U.S. LEXIS 6295, *60;
75 U.S.L.W. 4359; 20 Fla. L. Weekly Fed. S 295

intent must be challenged immediately, Congress provided:

> "For purposes of this section, an unlawful employment practice occurs . . . when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system." *Ibid.*

Congress thus agreed with the dissenters in *Lorance* that "the harsh reality of [that] decision," was "glaringly at odds with the purposes of Title VII. [*61] " 490 U.S., at 914, 109 S. Ct. 2261, 104 L. Ed. 2d 961 (opinion of Marshall, J.). See also § 3, 105 Stat. 1071 (1991 Civil Rights Act was designed "to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination").

True, § 112 of the 1991 Civil Rights Act directly addressed only seniority systems. See *ante*, at 8, and n. 2. But Congress made clear (1) its view that this Court had unduly *contracted* the scope of protection afforded by Title VII and other civil rights statutes, and (2) its aim to generalize the ruling in *Bazemore*. As the Senate Report accompanying the proposed Civil Rights Act of 1990, the precursor to the 1991 Act, explained:

> "Where, as was alleged in *Lorance*, an employer adopts a rule or decision with an unlawful discriminatory motive, each application of that rule or decision is a new violation of the law. In *Bazemore* . . ., for example, . . . the Supreme Court properly held that each application of the racially motivated salary structure, *i.e.*, each new paycheck, constituted a distinct violation of Title VII. Section 7(a)(2) 100 P.L. 430; 102 Stat. 1619 generalizes the [*62] result correctly reached in *Bazemore*." Civil Rights Act of 1990, S. Rep. No. 101-315, p. 54 (1990). n5

See also 137 Cong. Rec. 29046, 29047 (1991) (Sponsors' Interpretative Memorandum) ("This legislation should be interpreted as disapproving the extension of *[Lorance]* to contexts outside of seniority systems."). But cf. *ante*, at 18 (relying on *Lorance* to conclude that "when an

employer issues paychecks pursuant to a system that is facially nondiscriminatory and neutrally applied" a new Title VII violation does not occur (internal quotation marks omitted)).

> n5 No Senate Report was submitted with the Civil Rights Act of 1991, which was in all material respects identical to the proposed 1990 Act.

Until today, in the more than 15 years since Congress amended Title VII, the Court had not once relied upon *Lorance*. It is mistaken to do so now. Just as Congress'"goals in enacting Title VII . . . never included conferring absolute immunity on discriminatorily adopted seniority systems that [*63] survive their first [180] days," 490 U.S., at 914, 109 S. Ct. 2261, 104 L. Ed. 2d 961 (Marshall, J., dissenting), Congress never intended to immunize forever discriminatory pay differentials unchallenged within 180 days of their adoption. This assessment gains weight when one comprehends that even a relatively minor pay disparity will expand exponentially over an employee's working life if raises are set as a percentage of prior pay.

A clue to congressional intent can be found in Title VII's backpay provision. The statute expressly provides that backpay may be awarded for a period of up to two years before the discrimination charge is filed. 42 U.S.C. § 2000e-5(g)(1) ("Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission."). This prescription indicates that Congress contemplated challenges to pay discrimination commencing before, but continuing into, the 180-day filing period. See *Morgan*, 536 U.S., at 119, 122 S. Ct. 2061, 153 L. Ed. 2d 106 ("If Congress intended to limit liability to conduct occurring in the period within which the party must file the charge, it seems unlikely that Congress would have allowed recovery for two [*64] years of backpay."). As we recognized in *Morgan*, "the fact that Congress expressly limited the amount of recoverable damages elsewhere to a particular time period [*i.e.*, two years] indicates that the [180-day] timely filing provision was not meant to serve as a specific limitation . . . [on] the conduct that may be considered." *Ibid.*

D

127 S. Ct. 2162; 2007 U.S. LEXIS 6295, *64;
75 U.S.L.W. 4359; 20 Fla. L. Weekly Fed. S 295

In tune with the realities of wage discrimination, the Courts of Appeals have overwhelmingly judged as a present violation the payment of wages infected by discrimination: Each paycheck less than the amount payable had the employer adhered to a nondiscriminatory compensation regime, courts have held, constitutes a cognizable harm. See, *e.g.*, *Forsyth* v. *Federation Employment and Guidance Serv.*, 409 F.3d 565, 573 (CA2 2005) ("Any paycheck given within the [charge-filing] period . . . would be actionable, even if based on a discriminatory pay scale set up outside of the statutory period."); *Shea* v. *Rice*, 366 U.S. App. D.C. 178, 409 F.3d 448, 452-453 (CADC 2005) ("[An] employer commits a separate unlawful employment practice each time he pays one employee less than another for a discriminatory reason" (citing [*65] *Bazemore*, 478 U.S., at 396, 106 S. Ct. 3000, 92 L. Ed. 2d 315)); *Goodwin* v. *General Motors Corp.*, 275 F.3d 1005, 1009-1010 (CA10 2002) ("*[Bazemore]* has taught a crucial distinction with respect to discriminatory disparities in pay, establishing that a discriminatory salary is not merely a lingering effect of past discrimination -- instead it is itself a continually recurring violation . . . . Each race-based discriminatory salary payment constitutes a fresh violation of Title VII." (footnote omitted)); *Anderson* v. *Zubieta*, 336 U.S. App. D.C. 394, 180 F.3d 329, 335 (CADC 1999) ("The Courts of Appeals have repeatedly reached the . . . conclusion" that pay discrimination is "actionable upon receipt of each paycheck."); accord *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1025-1029 (CA7 2003); *Cardenas* v. *Massey*, 269 F.3d 251, 257 (CA3 2001); *Ashley* v. *Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 167-168 (CA8 1995) (en banc); *Brinkley-Obu* v. *Hughes Training, Inc.*, 36 F.3d 336, 347-349 (CA4 1994); *Gibbs* v. *Pierce County Law Enforcement Support Agency*, 785 F.2d 1396, 1399-1400 (CA9 1986). [*66]

Similarly in line with the real-world characteristics of pay discrimination, the EEOC -- the federal agency responsible for enforcing Title VII, see, *e.g.*, 42 U.S.C. §§ 2000e-5(f), 2000e-12(a) -- has interpreted the Act to permit employees to challenge disparate pay each time it is received. The EEOC's Compliance Manual provides that "repeated occurrences of the same discriminatory employment action, such as discriminatory paychecks, can be challenged as long as one discriminatory act occurred within the charge filing period." 2 EEOC Compliance Manual § 2-IV-C(1)(a), p. 605:0024, and n. 183 (2006); cf. *id.*, § 10-III, p. 633:0002 (Title VII

requires an employer to eliminate pay disparities attributable to a discriminatory system, even if that system has been discontinued).

The EEOC has given effect to its interpretation in a series of administrative decisions. See *Albritton* v. *Potter*, No. 01A44063, 2004 EEOPUB LEXIS 6972, 2004 WL 2983682, *2 (EEOC Office of Fed. Operations, Dec. 17, 2004) (although disparity arose and employee became aware of the disparity outside the charge-filing period, claim was not time barred because "each paycheck that complainant [*67] receives which is less than that of similarly situated employees outside of her protected classes could support a claim under Title VII if discrimination is found to be the reason for the pay discrepancy." (citing *Bazemore*, 478 U.S., at 396, 106 S. Ct. 3000, 92 L. Ed. 2d 315)). See also *Bynum-Doles* v. *Winter*, No. 01A53973, 2006 EEOPUB LEXIS 4738, 2006 WL 2096290 (EEOC Office of Fed. Operations, July 18, 2006); *Ward* v. *Potter*, No. 01A60047, 2006 EEOPUB LEXIS 946, 2006 WL 721992 (EEOC Office of Fed. Operations, Mar. 10, 2006). And in this very case, the EEOC urged the Eleventh Circuit to recognize that Ledbetter's failure to challenge any particular pay-setting decision when that decision was made "does not deprive her of the right to seek relief for discriminatory paychecks she received in 1997 and 1998." Brief of EEOC in Support of Petition for Rehearing and Suggestion for Rehearing En Banc, in No. 03-15264-GG (CA11), p. 14 (hereinafter EEOC Brief) (citing *Morgan*, 536 U.S., at 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106). n6

> n6 The Court dismisses the EEOC's considerable "experience and informed judgment," *Firefighters* v. *Cleveland*, 478 U.S. 501, 518, 106 S. Ct. 3063, 92 L. Ed. 2d 405 (1986) (internal quotation marks omitted), as unworthy of any deference in this case, see *ante*, at 23-24, n. 11. But the EEOC's interpretations mirror workplace realities and merit at least respectful attention. In any event, the level of deference due the EEOC here is an academic question, for the agency's conclusion that Ledbetter's claim is not time barred is the best reading of the statute even if the Court "were interpreting [Title VII] from scratch." See *Edelman* v. *Lynchburg College*, 535 U.S. 106, 114, 122 S. Ct. 1145, 152 L. Ed. 2d 188 (2002); see *supra*, at 4-14.

[*68]

II

The Court asserts that treating pay discrimination as a discrete act, limited to each particular pay-setting decision, is necessary to "protect employers from the burden of defending claims arising from employment decisions that are long past." *Ante*, at 11 (quoting *Ricks*, 449 U.S., at 256-257, 101 S. Ct. 498, 66 L. Ed. 2d 431). But the discrimination of which Ledbetter complained is *not* long past. As she alleged, and as the jury found, Goodyear continued to treat Ledbetter differently because of sex each pay period, with mounting harm. Allowing employees to challenge discrimination "that extends over long periods of time," into the charge-filing period, we have previously explained, "does not leave employers defenseless" against unreasonable or prejudicial delay. *Morgan*, 536 U.S., at 121, 122 S. Ct. 2061, 153 L. Ed. 2d 106. Employers disadvantaged by such delay may raise various defenses. *Id.*, at 122, 122 S. Ct. 2061, 153 L. Ed. 2d 106. Doctrines such as "waiver, estoppel, and equitable tolling" "allow us to honor Title VII's remedial purpose without negating the particular purpose of the filing requirement, to give prompt notice to the employer." *Id.*, at 121, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (quoting *Zipes* v. *Trans World Airlines, Inc.*, 455 U.S. 385, 398, 102 S. Ct. 1127, 71 L. Ed. 2d 234 (1982)); [*69] see 536 U.S., at 121, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (defense of laches may be invoked to block an employee's suit "if he unreasonably delays in filing [charges] and as a result harms the defendant"); EEOC Brief 15 ("If Ledbetter unreasonably delayed challenging an earlier decision, and that delay significantly impaired Goodyear's ability to defend itself . . . Goodyear can raise a defense of laches . . . ."). n7

n7 Further, as the EEOC appropriately recognized in its brief to the Eleventh Circuit, Ledbetter's failure to challenge particular pay raises within the charge-filing period "significantly limits the relief she can seek. By waiting to file a charge, Ledbetter lost her opportunity to seek relief for any discriminatory paychecks she received between 1979 and late 1997." EEOC Brief 14. See also *supra*, at 12-13.

In a last-ditch argument, the Court asserts that this dissent would allow a plaintiff to sue on a single decision made 20 years ago "even if the employee had full knowledge of all the circumstances relating [*70] to the . . . decision at the time it was made." *Ante*, at 20. It suffices to point out that the defenses just noted would make such a suit foolhardy. No sensible judge would tolerate such inexcusable neglect. See *Morgan*, 536 U.S., at 121, 122 S. Ct. 2061, 153 L. Ed. 2d 106 ("In such cases, the federal courts have the discretionary power . . . to locate a just result in light of the circumstances peculiar to the case." (internal quotation marks omitted)).

Ledbetter, the Court observes, *ante*, at 21, n. 9, dropped an alternative remedy she could have pursued: Had she persisted in pressing her claim under the Equal Pay Act of 1963 (EPA), 29 U.S.C. § 206(d), she would not have encountered a time bar. n8 See *ante*, at 21 ("If Ledbetter had pursued her EPA claim, she would not face the Title VII obstacles that she now confronts."); cf. *Corning Glass Works* v. *Brennan*, 417 U.S. 188, 208-210, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974). Notably, the EPA provides no relief when the pay discrimination charged is based on race, religion, national origin, age, or disability. Thus, in truncating the Title VII rule this Court announced in *Bazemore*, the Court does not disarm female workers from achieving [*71] redress for unequal pay, but it does impede racial and other minorities from gaining similar relief. n9

n8 Under the EPA 29 U.S.C. § 206(d), which is subject to the Fair Labor Standards Act's time prescriptions, a claim charging denial of equal pay accrues anew with each paycheck. 1 B. Lindemann & P. Grossman, Employment Discrimination Law 529 (3d ed. 1996); cf. 29 U.S.C. § 255(a) (prescribing a two-year statute of limitations for violations generally, but a three-year limitation period for willful violations).

n9 For example, under today's decision, if a black supervisor initially received the same salary as his white colleagues, but annually received smaller raises, there would be no right to sue under Title VII outside the 180-day window following each annual salary change, however strong the cumulative evidence of discrimination might be. The Court would thus force plaintiffs, in many cases, to sue too soon to prevail, while cutting them off as time barred once the pay differential is large enough to enable them to

mount a winnable case.

[*72]

Furthermore, the difference between the EPA's prohibition against paying unequal wages and Title VII's ban on discrimination with regard to compensation is not as large as the Court's opinion might suggest. See *ante*, at 21. The key distinction is that Title VII requires a showing of intent. In practical effect, "if the trier of fact is in equipoise about whether the wage differential is motivated by gender discrimination," Title VII compels a verdict for the employer, while the EPA compels a verdict for the plaintiff. 2 C. Sullivan, M. Zimmer, & R. White, Employment Discrimination: Law and Practice § 7.08[F][3], p. 532 (3d ed. 2002). In this case, Ledbetter carried the burden of persuading the jury that the pay disparity she suffered was attributable to intentional sex discrimination. See *supra*, at 1-2; *infra*, this page and 18.

III

To show how far the Court has strayed from interpretation of Title VII with fidelity to the Act's core purpose, I return to the evidence Ledbetter presented at trial. Ledbetter proved to the jury the following: She was a member of a protected class; she performed work substantially equal to work of the dominant class (men); she was compensated [*73] less for that work; and the disparity was attributable to gender-based discrimination. See *supra*, at 1-2.

Specifically, Ledbetter's evidence demonstrated that her current pay was discriminatorily low due to a long series of decisions reflecting Goodyear's pervasive discrimination against women managers in general and Ledbetter in particular. Ledbetter's former supervisor, for example, admitted to the jury that Ledbetter's pay, during a particular one-year period, fell below Goodyear's minimum threshold for her position. App. 93-97. Although Goodyear claimed the pay disparity was due to poor performance, the supervisor acknowledged that Ledbetter received a "Top Performance Award" in 1996. *Id.*, at 90-93. The jury also heard testimony that another supervisor -- who evaluated Ledbetter in 1997 and whose evaluation led to her most recent raise denial -- was openly biased against women. *Id.*, at 46, 77-82. And two women who had previously worked as managers at the plant told the jury they had been subject to pervasive discrimination and were paid less than their male counterparts. One was paid less than the men she

supervised. *Id.*, at 51-68, Ledbetter herself testified about [*74] the discriminatory animus conveyed to her by plant officials. Toward the end of her career, for instance, the plant manager told Ledbetter that the "plant did not need women, that [women] didn't help it, [and] caused problems." *Id.*, at 36, . n10 After weighing all the evidence, the jury found for Ledbetter, concluding that the pay disparity was due to intentional discrimination.

> n10 Given this abundant evidence, the Court cannot tenably maintain that Ledbetter's case "turned principally on the misconduct of a single Goodyear supervisor." See *ante*, at 12-13, n. 4.

Yet, under the Court's decision, the discrimination Ledbetter proved is not redressable under Title VII. Each and every pay decision she did not immediately challenge wiped the slate clean. Consideration may not be given to the cumulative effect of a series of decisions that, together, set her pay well below that of every male area manager. Knowingly carrying past pay discrimination forward must be treated as lawful conduct. Ledbetter may not [*75] be compensated for the lower pay she was in fact receiving when she complained to the EEOC. Nor, were she still employed by Goodyear, could she gain, on the proof she presented at trial, injunctive relief requiring, prospectively, her receipt of the same compensation men receive for substantially similar work. The Court's approbation of these consequences is totally at odds with the robust protection against workplace discrimination Congress intended Title VII to secure. See, *e.g.*, *Teamsters* v. *United States*, 431 U.S., at 348, 97 S. Ct. 1843, 52 L. Ed. 2d 396 ("The primary purpose of Title VII was to assure equality of employment opportunities and to eliminate . . . discriminatory practices and devices . . . ." (internal quotation marks omitted)); *Albemarle Paper Co.* v. *Moody*, 422 U.S. 405, 418, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975) ("It is . . . the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination.").

This is not the first time the Court has ordered a cramped interpretation of Title VII, incompatible with the statute's broad remedial purpose. See *supra*, at 10-12, 102 S. Ct. 28, 70 L. Ed. 2d 6. See also *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 109 S. Ct. 2115, 104 L. Ed. 2d 733 (1989) [*76] (superseded in part by the Civil Rights Act of 1991); *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)

127 S. Ct. 2162; 2007 U.S. LEXIS 6295, *76;
75 U.S.L.W. 4359; 20 Fla. L. Weekly Fed. S 295

(plurality opinion) (same); 1 B. Lindemann & P. Grossman, Employment Discrimination Law 2 (3d ed. 1996) ("A spate of Court decisions in the late 1980s drew congressional fire and resulted in demands for legislative change[,]" culminating in the 1991 Civil Rights Act (footnote omitted)). Once again, the ball is in Congress' court. As in 1991, the Legislature may act to correct this Court's parsimonious reading of Title VII.

* * *

For the reasons stated, I would hold that Ledbetter's claim is not time barred and would reverse the Eleventh Circuit's judgment.

**REFERENCES:**  Go To Full Text Opinion

 Go To Supreme Court Brief(s)

Go To Supreme Court Transcripts

# EXHIBIT

# 3

LEXSEE

**CLYDE MOODY, Plaintiff, v. SUSSEX CORRECTIONAL INSTITUTION, JOHN
ELLINGSWORTH, JOHN DOE COMMISSIONER, JOHN DOE CAPTAIN,
JOHN DOE LIEUTENANT, and JOHN DOE CORRECTIONAL OFFICER,
Defendants.**

**Civil Action No. 01-374-SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2002 U.S. Dist. LEXIS 4714**

**March 11, 2002, Decided**

**SUBSEQUENT HISTORY:** Motion granted by, Motion
denied by Moody v. Kearney, 2004 U.S. Dist. LEXIS
21849 (D. Del., Oct. 13, 2004)

**DISPOSITION:** [*1] Plaintiff's Eighth Amendment
claim was dismissed as frivolous pursuant to 28 U.S.C.
§§ 1915(e)(2)(B)-1915A(b)(1). Plaintiff's motion for
appointment of counsel was denied as moot.

**COUNSEL:** CLYDE MOODY, plaintiff, Pro se,
Smyrna, DE.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM ORDER

The plaintiff Clyde Moody is a pro se litigant who is
presently incarcerated at the Delaware Correctional
Center located in Smyrna, Delaware. His SBI number is
166562. He filed this action pursuant to 42 U.S.C. § 1983
and requested leave to proceed in forma pauperis
pursuant to 28 U.S.C. § 1915.

### I. STANDARD OF REVIEW

The court has jurisdiction over this matter pursuant
to 28 U.S.C. § 1331. Reviewing complaints filed
pursuant to 28 U.S.C. § 1915 is a two step process. First,
the court must determine whether the plaintiff is eligible

for pauper status. On June 6, 2001, the court granted
plaintiff leave to proceed in forma pauperis and ordered
him to pay, within thirty days, an initial partial filing fee
of $ .66. Plaintiff [*2] paid the initial partial filing fee on
June 21, 2001.

Once the pauper determination is made, the court
must then determine whether the action is frivolous,
malicious, fails to state a claim upon which relief may be
granted or seeks monetary relief from a defendant
immune from such relief pursuant to 28 U.S.C. §§
1915(e)(2)(B)-1915A(b)(1). n1 If the court finds the
plaintiff's complaint falls under any one of the exclusions
listed in the statutes, then the court must dismiss the
complaint.

> n1 These two statutes work in conjunction.
> Section 1915(e)(2)(B) authorizes the court to
> dismiss an in forma pauperis complaint at any
> time, if the court finds the complaint is frivolous,
> malicious, fails to state a claim upon which relief
> may be granted or seeks monetary relief from a
> defendant immune from such relief. Section
> 1915A(a) requires the court to screen prisoner in
> forma pauperis complaints seeking redress from
> governmental entities, officers or employees
> before docketing, if feasible and to dismiss those
> complaints falling under the categories listed in §
> 1915A(b)(1).

[*3]

When reviewing complaints pursuant to 28 U.S.C.

2002 U.S. Dist. LEXIS 4714, *3
1956 U.S. App. LEXIS 3033, **10; 5 Oil & Gas Rep. 1271

§§ 1915(e)(2)(B)-1915A(b)(1), the court must apply the Fed. R. Civ. P. 12(b)(6) standard of review. See Neal v. Pennsylvania Bd. of Probation and Parole, 1997 U.S. Dist. LEXIS 8696, No. 96-7923, 1997 WL 338838 (E.D. Pa. June 19, 1997)(applying Rule 12(b)(6) standard as appropriate standard for dismissing claim under § 1915A). Accordingly, the court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn therefrom." Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996). Pro se complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).

The standard for determining whether an action is frivolous is well established. The Supreme Court has explained that [*4] a complaint is frivolous "where it lacks an arguable basis either in law or fact." Neitzke v. Williams, 490 U.S. 319, 325, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989). n2 As discussed below, plaintiff's claims have no arguable basis in law or fact. Therefore, his complaint shall be dismissed as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b)(1).

n2 Neitzke applied § 1915(d) prior to the enactment of the Prisoner Litigation Reform Act of 1995 (PLRA). Section 1915(e)(2)(B) is the re-designation of the former § 1915(d) under the PLRA. Therefore, cases addressing the meaning of frivolousness under the prior section remain applicable. See § 804 of the PLRA, Pub.L.No. 104-134, 110 Stat. 1321-1 (April 26, 1996).

## II. DISCUSSION

The plaintiff alleges that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment. Specifically, he alleges that sometime in the summer of 1985, he was locked in a room with no windows or ventilation [*5] and "suffered in the extreme heat." (D.I. 2 at 3a) The plaintiff further alleges that he suffered heat stroke and "cannot speak,

write or communicate and [he] is paralyzed due to this stroke." (Id.) n3 The plaintiff requests compensatory damages in the amount of $ 1,000,000 and punitive damages in the amount of $ 1,000,000. The plaintiff also filed a motion for appointment of counsel (D.I. 3) along with the complaint. Because the court finds that the complaint is frivolous, the motion for appointment of counsel shall be denied as moot.

n3 The allegation that the plaintiff is unable to communicate, concerned the court because the complaint was prepared by an inmate paralegal, Robert Dahl ("Dahl"). However, the plaintiff signed the compliant and apparently provided Dahl with the facts as well as his SBI number. Furthermore, a medical unit staff member merely noted on the plaintiff's request for his trust account summary that he is unable to read or write. (Id. at 9) Therefore, the court is satisfied that the plaintiff, and not Dahl is in control of this action.

[*6]

The plaintiff's Eighth Amendment claim is time-barred by the statute of limitations. "Limitations periods in § 1983 suits are to be determined by reference to the appropriate 'state statute of limitations and the coordinate tolling rules.'" Hardin v. Straub, 490 U.S. 536, 541, 104 L. Ed. 2d 582, 109 S. Ct. 1998 (1989) (citing Board of Regents, University of New York v. Tomanio, 446 U.S. 478, 484, 64 L. Ed. 2d 440, 100 S. Ct. 1790 (1980)). However, accrual of such claims are governed by federal law. See Albright v. Oliver, 510 U.S. 266, 280 n. 6, 127 L. Ed. 2d 114, 114 S. Ct. 807 (1994)(Ginsburg, J. concurring). The relevant state statute of limitations for a personal injury action in Delaware is two years. See Del. CODE ANN. tit. 10 § 8119; Carr v. Dewey Beach, 730 F. Supp. 591 (D. Del. 1990).

Consequently, the plaintiff's Eighth Amendment claim accrued, when he knew or had reason to know of the injury that forms the basis of this action. Carr, 730 F. Supp. at 601. It is clear from the complaint that the plaintiff's claim accrued sometime in the summer of 1985, when he was locked in a hot cell [*7] with no ventilation or fresh air. Although the plaintiff alleges that he was left incapacitated as a result of this incident, incapacitation does not toll the statute of limitations. The Delaware savings statute, Del. C. Ann. tit. 10 § 8116,

does not toll the statute of limitations in personal injury actions. See Jamison v. Clark, 1999 Del. Super. LEXIS 422, No. 99 C-03-265-WTQ, 1999 WL 744428 (Del Supr. July 30, 1999)(citing Hurwitch v. Adams, 52 Del. 13, 18-19, 151 A.2d 286 (Del. Supr. 1959))("The savings statute that permits tolling during mental incompetency 10 Del. C. § 8116, however, does not apply to personal injury cases governed by Section 8119). Here, the plaintiff did not file his complaint until June 6, 2001, more than 15 years after he knew, or had reason to know of the injury that forms the basis of this action.

Because the statute of limitations is an affirmative defense ordinarily subject to waiver, sua sponte dismissal on this ground raises concerns of procedural fairness. However, prior to the enactment of the PLRA, several federal courts concluded that in forma pauperis claims which were time-barred were properly dismissed sua sponte as frivolous [*8] under 28 U.S.C. § 1915(d) . See e.g. Gartrell v. Gaylor, 981 F.2d 254, 256 (5th Cir. 1993)("Where it is clear from the face of the complaint filed in forma pauperis that the claims asserted are barred by the applicable statute of limitations, those claims are properly dismissed pursuant to § 1915(d)"); Myers v. Vogal, 960 F.2d 750, 751 (8th Cir. 1992)("Although the statute of limitation is an affirmative defense, a district court may properly dismiss an in forma pauperis complaint under 28 U.S.C. § 1915(d) when it is apparent the statute of limitations has run.") (per curiam); Street v. Vose, 936 F.2d 38, 39 (1st Cir. 1991) (per curiam); Clark v. Georgia Pardons and Paroles Board, 915 F.2d 636, 640 n.2 (11th Cir. 1990).

With the enactment of the PLRA, § 1915(e) not only retained the language of the former § 1915(d), it also added new provisions requiring the dismissal of in forma pauperis actions "at any time" if the district court finds the claims to be "frivolous, malicious, or for failure to state a claim upon which relief may be granted." 28 U.S.C. § 1915 [*9] (e)(2)(B). Thus, the court's sua sponte dismissal of clearly time-barred claims is not only appropriate, but required under the PLRA. See Johnstone v. United States, 980 F. Supp. 148, 154 (E.D. Pa. 1997)("When a complaint on its face shows that the action was filed outside of the applicable limitations period, and the court has satisfied itself that no legal rule tolls or otherwise abrogates the limitations period, sua sponte dismissal is appropriate under § 1915."). It is clear from the face of the complaint, that the plaintiff's claim was filed well outside the two year limitations period and "no legal rule tolls or otherwise abrogates the limitations period." Id. The plaintiff's claim has no arguable basis in law and shall therefore, be dismissed as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b)(1).

NOW THEREFORE, IT IS HEREBY ORDERED this 11th day of March, 2002, that:

1) The plaintiff's Eighth Amendment claim is dismissed as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b)(1).

2) The plaintiff's motion for appointment of counsel (D.I. 3) is denied as moot.

3) The clerk shall mail [*10] a copy of the court's Memorandum Order to the plaintiff.

Sue L. Robinson

United States District Judge

# EXHIBIT

# 4

LEXSEE

**CHRISTOPHER MOSLEY, PLAINTIFF, v. BAY SHIP MANAGEMENT, INC., ROBERT C. WATTAM and THE UNITED STATES OF AMERICA, DEFENDANTS.**

CIVIL ACTION NO: 00-2306 (JCL)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**174 F. Supp. 2d 192; 2000 U.S. Dist. LEXIS 20251; 85 Fair Empl. Prac. Cas. (BNA) 101**

**December 27, 2000, Decided**
**December 27, 2000, Filed**

**DISPOSITION:** [**1] Defendants' motion for summary judgment against the plaintiff on Counts One through Six, which subject to the plaintiff's release, granted; and Defendants' motion to dismiss the Seventh Count of plaintiff's complaint, alleging violations of Maryland law, granted; and Defendants' motion to dismiss the Eighth Count of plaintiff's complaint, alleging breach of contract of which he a third-party beneficiary, denied.

**COUNSEL:** For CHRISTOPHER MOSLEY, plaintiff: HENRY ALAN GLUCKSTERN, MAPLEWOOD, NJ.

For BAY SHIP MANAGEMENT, INC., ROBERT C. WATTAM, defendants: KEVIN P. KOPP, KAUFMAN, BORGEEST & RYAN, NEW YORK, NY.

**JUDGES:** John C. Lifland, United States District Judge.

**OPINION BY:** John C. Lifland

**OPINION**

[*193] **MEMORANDUM AND ORDER**

*LIFLAND, District Judge*

**INTRODUCTION**

Defendants Bay Ship Management, Inc. ("BSM") and Robert C. Wattam ("Wattam") move to dismiss plaintiff's complaint pursuant to Rule 12(b)(6). In their moving papers, the defendants base an argument for dismissal on a release signed by plaintiff [*194] on November 30, 1999. Pursuant to the Court's Order dated October 25, 2000, the defendants' motion for dismissal based on the release will be treated as a motion for [**2] summary judgment. On November 20, 2000, pursuant to the parties' stipulation, the Court ordered dismissal of this action only as to the defendant United States.

For the following reasons, defendants' motion for summary judgment will be granted.

**BACKGROUND**

BSM is a Delaware corporation which does business in New Jersey. The *Antares* is a ship owned by the United States of America. BSM operates sea vessels, including the *Antares*, on behalf of the United States for the Department of Navy's Military Sealift Command. (Complaint P 8) The *Antares* was based in Baltimore, Maryland. (Complaint P 15)

On May 27, 1997, the plaintiff was employed by BSM in the capacity of Chief Steward on the *Antares*. Plaintiff and his department were responsible for cleaning the ship and operating the laundry services. As Chief Steward, plaintiff reported to the Master of the ship. Wattam was hired as Master of the *Antares* in mid-January, 1999. The plaintiff alleges that Wattam did not act in a professional or harmonious manner towards the plaintiff based on plaintiff's skin color. Plaintiff alleges that Wattam only engaged in "the barest minimum amount [of conversation] necessary [**3] to

Case 1:06-cv-00478-JJF   Document 19-2   Filed 06/21/2007   Page 40 of 63

174 F. Supp. 2d 192, *194; 2000 U.S. Dist. LEXIS 20251, **3;
85 Fair Empl. Prac. Cas. (BNA) 101; 20 Fla. L. Weekly Fed. S 295

communicate his orders." (Complaint P 27) According to plaintiff, this lead to "an un-natural, counter-productive, and hostile work environment." (Complaint P 27)

On September 13, 1999, Wattam terminated plaintiff's employment because, according to the defendants, the plaintiff did not carry out the duties that Wattam had ordered the previous weekend. (Complaint P 31) Plaintiff claims that he was wrongfully discharged by Wattam due to racial discrimination. (Complaint P 52)

The record indicates that on September 13, 1999, the plaintiff filed a grievance report which is formally labeled the "Beef Report." In the Beef Report, plaintiff wrote that his "Beef Question" was: "being discharged under racial conditions, being discharged by unfair practice." (Defendant's Motion for Summary Judgment, Exhibit A) Dennis Metz was the official port agent who received the report. He made the following notes: "member filed beef 'report' on the above date, but had no statement or rebutte [sic] to refute the discharge. Could, at this time give me nothing to work with. Member will prepare a statement so that I may properly handle this grievance." (Defendant's Motion for Summary Judgment, Exhibit [**4] A) On September 14, 1999, the plaintiff made a subsequent statement in which he discussed the abusive attitude of Wattam and explained that "my department always seems to get jumped on about overtime and job performance. Maybe this is the time to mention that my department is all black (African Americans)." (Mosley Affidavit, Exhibit B. p. 4) Plaintiff supplemented this statement on September 17, 1999. (Mosley Affidavit, Exhibit C). In his third statement, plaintiff states: "I feel like Capt. Wattam should be trained in how to deal with Blacks. If his problem with blacks is more deeply rooted than that which can be corrected, then he should not be in the position as Captain of a vessel. Also in this particular day and age to have such prejudice openly displayed is beyond belief." (Mosley Affidavit, Exhibit C. p. 2)

A Port Committee hearing was conducted on November 30, 1999. At the hearing, two representatives of the Seafarers International Union ("SIU"). Steve Ruiz and Dennis Metz, were present. (Mosley Affidavit [*195] P 23) Plaintiff was not represented by counsel. Plaintiff prepared and signed a hand-written agreement on November 30, 1999 which states: "I Christopher Mosley ████████ have [**5] agree [sic] to drop my beef against Bayship Management--that they drop the charges and agree to have quit on mutual consent."

(Mosley Affidavit, Exhibit E) Following the hearing, Mr. Mosley received a copy of Dennis Metz's letter to BSM explaining the November 30, 1999 proceedings: "The Co. agreed to at the time of this meeting, to consider Mr. Mosley's mutual consent with reguard [sic] to his discharge for cause. As a result Bay Ship Mgt. will drop any MIB and/or pending SAB charges. This agreement should conclude the incident/issue. Mr. Mosley as a result, is dropping any and all grievances relative to this matter." (Mosley Affidavit, Exhibit F)

Plaintiff then filed a complaint with the EEOC alleging racial discrimination claims against Wattam. BSM was not specifically named in the complaint to the EEOC. The plaintiff's exact words were: "I was employed as a Merchant Seaman on May 28, 1997, as the Chief Steward on board the USNS *Antares*. I was discharged from employment on September 13, 1999. I believe I have been discharged because of my race (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended." (Mosley Affidavit, Exhibit I) The EEOC sent plaintiff [**6] a right to sue letter dated January 27, 2000.

On May 12, 2000, plaintiff filed a complaint in this Court claiming that defendants' discriminatory practices violated Title VII, 42 U.S.C. § 1981, the New Jersey Law Against Discrimination ("NJLAD") and the Maryland Commission of Human Rights Law. Specifically, the plaintiff's complaint makes the following claims:

1. Plaintiff was wrongfully discriminated against as an African American in violation of Title VII, the New Jersey Law Against Discrimination ("NJLAD") and the Maryland Commission of Human Rights Law. (Complaint P 51-66)

2. Defendants violated 42 U.S.C. § 1981 by creating and maintaining a hostile work environment. (Complaint P 67-77)

3. Plaintiff was wrongfully discharged in violation of Title VII. (Complaint P 78-84)

4. Defendants violated Title VII by creating and maintaining a hostile work environment. (Complaint P 85-89)

5. Defendants violated NJLAD by wrongfully discharging the plaintiff. (Complaint P 90-97)

174 F. Supp. 2d 192, *195; 2000 U.S. Dist. LEXIS 20251, **6;
85 Fair Empl. Prac. Cas. (BNA) 101; 20 Fla. L. Weekly Fed. S 295

6. Defendants violated NJLAD by creating and maintaining a hostile work environment. (Complaint P 98-103)

7. Defendants violated Article 49B by creating and maintaining [**7] a hostile work environment. (Complaint P 104-109)

8. Defendants interfered with the contract between the United States and BSM to which plaintiff is a third-party beneficiary. (Complaint P 110-114)

9. United States negligently delegated and entrusted the operation of the *Antares* by BSM. (Complaint P 115-117)

## STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment eliminates unfounded claims without recourse to a costly and lengthy trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). However, a court should grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material [*196] fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *See Celotex*, 477 U.S. at 323. A litigant may discharge this burden by exposing "the absence of evidence to support the nonmoving party's case." *Id.* at 325. [**8] In evaluating a summary judgment motion, a court must view all evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P.* 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The substantive law determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* No issue for trial exists unless the nonmoving party can demonstrate sufficient evidence favoring it such that a reasonable jury could return a verdict in that party's favor. *See id.* at 249.

### B. Motion to Dismiss under Rule 12(b)(6)

A motion to [**9] dismiss for failure to state a claim serves to test the sufficiency of the complaint. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In considering such a motion, all allegations in the complaint must be taken as true and viewed in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1988); *Robb v. Philadelphia*, 733 F.2d 286, 290 (3d Cir. 1984). A court should not dismiss a complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); *Hishon v. King & Spalding*, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984); *Zynn v. O'Donnell*, 688 F.2d 940, 941 (3d Cir. 1982). While a court must assume the alleged facts are true, it is not proper to assume that a plaintiff can prove facts not alleged. *See Bishop v. Okidata, Inc.*, 864 F. Supp. 416, 420 (D.N.J. 1994). [**10] A court may, however, consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. *See Pension Ben. Guar. Corp. v. White Consol. Ind.*, 998 F.2d 1192, 1196 (3d Cir. 1993), *cert. denied*, 510 U.S. 1042, 126 L. Ed. 2d 655, 114 S. Ct. 687 (1994).

## DISCUSSION

### A. Summary Judgment on Claims Subject to Release

The defendants argue that plaintiff's claims of wrongful discharge in violation of Title VII, 42 U.S.C. § 1981, and NJLAD should be dismissed because plaintiff signed a waiver of his right to bring all wrongful discharge claims by preparing and signing the release at the Port Committee Hearing on November 30, 1999.

The standard for determining the validity of a release is the "totality of circumstances," but the Court of Appeals [*197] for the Third Circuit has established the factors which a court may consider:

174 F. Supp. 2d 192, *197; 2000 U.S. Dist. LEXIS 20251, **10;
85 Fair Empl. Prac. Cas. (BNA) 101; 20 Fla. L. Weekly Fed. S 295

relevant factors in reviewing the totality of circumstances include, but are not limited to, the following considerations: (1) the clarity and specificity of the release language; [**11] (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his rights upon execution of the release: (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel: (6) whether there was an opportunity for negotiation of the terms of the Agreement: and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

*Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451 (3d Cir. 1988), *superseded by statute as stated in Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1539 (3d Cir. 1997) (holding that the factors established in Cirillo were no longer applicable to alleged waiver of ADEA rights because new legislation (the Older Workers Benefit Protection Act (OWBPA)) requires specific formalities when executing a release of liability under the ADEA).

A recent decision from the United States District Court for the District of New Jersey applied the *Cirillo* factors to a situation similar to [**12] this case. *See Riddell v. Medical Inter-Ins. Exch.*, 18 F. Supp. 2d 468 (D.N.J. 1998). The plaintiff in *Riddle* was charging her former employer with violations of the NJLAD. The Court held that "the agreement itself could have made a finding of a valid waiver more likely if the Release language: (1) was more prominent: (2) identified the rights being waived; and (3) informed Riddell that she had time to deliberate and a right to consult with an attorney." *Id*. at 474.

In this case, an application of the *Cirillo* factors demonstrates that the release signed by Plaintiff does satisfy the "totality of circumstances" standard. Plaintiff signed a handwritten statement that he would drop his "beef" against BSM. Although the word "beef" is not legalistic, it is clear. The Court of Appeals for the Third

Circuit has emphasized that clarity of the language is not as relevant as the comprehension of the terms by the person waiving their civil rights. *See Coventry v. United States Steel Corp.*, 856 F.2d 514, 522-24 (3d Cir. 1988) (acknowledging the importance of a contract law analysis regarding the ambiguity of terms but requiring a more [**13] thorough analysis of the totality of circumstances involved in signing a waiver).

Therefore, the main issue in this case is whether plaintiff knew that his "beef" against BSM included charges of discrimination. Plaintiff initiated the Port Committee Hearing by filing a grievance with the SIU. (Mosley Affidavit. Exhibits B and C) Plaintiff's initial statement in the formal Beef Report states that he was discharged due to racial discrimination and unfair practice. In his subsequent statements to the SIU, plaintiff mentions his suspicions that Wattam was treating him disparately due to plaintiff's African American heritage. Accordingly, plaintiff lodged a grievance regarding discriminatory conduct on the *Antares*. For plaintiff to claim he did not know that dropping his "beef" against BSM included dropping racial discrimination charges is disingenuous. Defendants point out that plaintiff understood the significance of a Beef Report because he filed a similar report in 1980 to lodge a grievance involving a passport. (Defendants' Memorandum of Law in Further Support of Motion for Summary Judgment, [*198] Exhibit B). Accordingly, when plaintiff agreed to drop his "beef" against the defendants, [**14] he knowingly and voluntarily waived his right to bring subsequent litigation.

The Appellate Division of the New Jersey Superior Court has adopted the totality of the circumstances test established by the Court of Appeals for the Third Circuit in *Coventry* and *Cirillo*. *See Swarts v. Sherwin-Williams Co.*, 244 N.J. Super. 170, 581 A.2d 1328 (App.Div.1990); *see also Keelan v. Bell Communications Research*, 289 N.J. Super. 531, 674 A.2d 603 (App.Div.1996). Consequently, the Court's analysis set forth above also shows that plaintiff executed a knowing and voluntary release of his claims under the NJLAD.

The plaintiff argues that he was not given the opportunity to consult with counsel. However, the record does not indicate that plaintiff was prohibited from seeking the aid of counsel. Dennis Metz and Steven Ruiz from the SIU were present to assist plaintiff. An examination of the official "Beef Report" reveals that the

174 F. Supp. 2d 192, *198; 2000 U.S. Dist. LEXIS 20251, **14;
85 Fair Empl. Prac. Cas. (BNA) 101; 20 Fla. L. Weekly Fed. S 295

SIU representatives and plaintiff understood the association of the term "beef" with formal grievances against an employer.

Plaintiff next argues that he was unaware his Title VII claims were waived. However, plaintiff's subjective belief [**15] is insufficient to sustain his complaint. In *Swarts*, the court affirmed the trial court's grant of summary judgment for the defendant employer because the plaintiff was unable to establish a genuine issue of material fact. The plaintiff in *Swarts* had submitted a letter of grievance to his employer alleging forced retirement based on age discrimination. Subsequently, the plaintiff signed a release of any claims against his employer in consideration for payment of retirement benefits. In an affidavit filed later, the plaintiff claimed that he was unaware he was waiving his right to sue his employer for age discrimination. In affirming summary judgment, the court held that

> an opponent to a summary judgment motion cannot defeat the motion by raising a misguided subjective belief, without more, to create the existence of a genuine issue of material fact. In this instance, plaintiff seeks to establish a genuine issue of material fact by asserting in an "affidavit" he did not intend to waive his age discrimination rights when he signed the release. Yet, acceptance of that representation would allow defeat of the summary judgment motion based on a misguided subjective belief. [**16] At the time he signed the release, it is undisputed he had a full awareness of his age discrimination rights as evidenced by his prior assertion of his rights in his letter to the personnel department. What his unexpressed intention was is irrelevant. To draw any conclusion other than that he was fully aware of his age discrimination rights would belie logic and undermine the appropriateness of the summary judgment process as well as undermine the voluntary settlement process.

*Swarts*, 244 N.J. Super. at 178 (citing *Cirillo*, 862 F.2d at 452-53). Under *Swarts*, the plaintiff in this case cannot defeat summary judgment based on his mistaken belief that the release did not include allegations of racial discrimination. The evidence of plaintiff's racial discrimination accusations against defendants in his initial "Beef Report" cannot be overcome by the plaintiff's alleged subjective belief that they were not what they clearly were.

The defendants next attack the plaintiff's argument that the release was signed under duress. Plaintiff contends that he was forced to execute the release [*199] because he would not be able to obtain employment if the circumstances [**17] of his termination were categorized as wrongful discharge. Both the Court of Appeals for the Third Circuit and the New Jersey Appellate Division have held that "economic pressure alone is not enough to constitute duress rendering an otherwise valid release void." *Keelan v. Bell Communications Research*, 289 N.J. Super. 531, 548, 674 A.2d 603 (App. Div. 1996) (citing *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885 (3d Cir.1975); *The Adonis*, 38 F.2d 743, 744 (3d Cir.1930); *Killian v. McCulloch*, 873 F. Supp. 938, 943 (E.D.Pa.1995); *Reed v. SmithKline Beckman Corp.*, 569 F. Supp. 672, 674 (E.D.Pa.1983)). In *Keelan*, the court rejected plaintiff's claim that he was under duress due to financial distress. *See also Swarts*, 244 N.J. Super. at 179 (rejecting plaintiff's assertion that he had to sign the release under the duress of "sign or starve"). Accordingly, plaintiff's argument that he was forced to sign the release lacks merit. In fact, plaintiff received negotiated consideration for signing the release because BSM altered the reason for termination from "with cause" to "mutual [**18] consent," and BSM agreed to drop any charges against the plaintiff.

*B. Dismissal of Claims based on Maryland Law*

The plaintiff's opposition brief admits that the mention of Maryland law in the complaint was misplaced. Therefore, the plaintiff agrees to the dismissal of Claim 7 in its entirety, as well as dismissal of Paragraph 58 of Claim 1. (Plaintiff's Brief at p. 29. P 1)

*C. Dismissal of Claims under the NJLAD*

The defendants argue that the plaintiff is not entitled to protection under the NJLAD because the plaintiff has no connection to New Jersey. The plaintiff responds that New Jersey has a governmental interest in protecting non-inhabitants from discriminatory conduct violating the NJLAD by a corporation which does business in New Jersey. According to the record. plaintiff is a citizen of

174 F. Supp. 2d 192, *199; 2000 U.S. Dist. LEXIS 20251, **18;
85 Fair Empl. Prac. Cas. (BNA) 101; 20 Fla. L. Weekly Fed. S 295

Pennsylvania and defendant BSM is a Delaware corporation. The alleged discriminatory conduct occurred in Maryland. Therefore, it seems that the facts of this case suggest little reason to apply the NJLAD. However, the Court need not address defendants' argument regarding the applicability of the NJLAD because this Court has already decided to grant defendants' motion for [**19] summary judgment.

### D. Dismissal of Title VII Claims against Wattam

Defendants next argue that plaintiff's Title VII claim should be dismissed with respect to defendant Wattam because Title VII does not contemplate liability of individual employees. Defendants properly note that the Court of Appeals for the Third Circuit, like the majority of Circuits, has held that individual employees may not be held liable under Title VII. *See Sheridan v. E.I. DuPont Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996), *cert. denied*, 521 U.S. 1129, 138 L. Ed. 2d 1031, 117 S. Ct. 2532 (1997) ("Congress did not intend to hold individual employees liable under Title VII."); *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996) (holding that individual employees cannot be held liable under Title VII). Plaintiff's argument that individuals may be held liable under Title VII when they act as "agents" of the employer is without merit. In *Kohn v. AT&T Corp.*, 58 F. Supp. 2d 393 (D.N.J. 1999), this Court vigorously rejected that very argument, and instead, citing the holdings of *Sheridan* and *Dici*, noted that the [**20] law in the [*200] Third Circuit is "settled" and "dispositive" in foreclosing any possibility of individual liability under Title VII. *Kohn* at 421; *see also Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173 (3d Cir. 1997). Thus, plaintiff's Title VII claims against individual defendant Wattam must be dismissed.

### E. Plaintiff's Failure to Exhaust Administrative Remedies

The defendants argue that the plaintiff did not exhaust all the administrative remedies available because the plaintiff omitted information when he filed his complaint with the EEOC. First, the defendants claim that the plaintiff failed to mention BSM in the EEOC complaint so the EEOC has only investigated Wattam's role in the case. Second, the defendants claim that the plaintiff's hostile work environment claim is barred because plaintiff did not mention the charge of hostile work environment in his filings with the EEOC.

In *Gooding v. Warner-Lambert*, 744 F.2d 354 (3d Cir. 1984), the Court of Appeals for the Third Circuit noted that the issuance of an EEOC right-to-sue letter is not a jurisdictional prerequisite to a Title VII claim. *Gooding*, 744 F.2d at 358. [**21] Indeed, the Court of Appeals for the Third Circuit has held that "the failure to obtain a right-to-sue letter. . . is curable at any point during the pendency of the action" because the court will not "penalize the appellants" for the EEOC's failure to follow up on discharge charges or an attorney's failure to obtain right-to-sue letters. *Anjelino v. New York Times Co.*, 200 F.3d 73, 96 (3d Cir. 1999); *see also Gooding*, 744 F.2d at 357-59 (eschewing "highly technical pleading rules, which only serve to trap the unwary practitioner." in favor of notice pleading, and reversing dismissal of Title VII action where an EEOC right-to-sue letter issued after complaint was filed); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976) (holding that "the parameters of a civil action in the District Court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charges of discrimination").

Accordingly, the holding in *Anjelino* runs contrary to the defendants' argument because the plaintiff could amend his EEOC complaint and cure the alleged failure to exhaust administrative remedies. [**22] However, the Court need not resolve this issue because it has dismissed plaintiff's claims of wrongful discharge and hostile work environment based on the plaintiff's release.

### F. Dismissal of Contract Claims

Defendants move to dismiss the Eighth Count of plaintiff's complaint on the grounds that the common law causes of action for breach of contract and tortious interference are "subsumed" by the LAD. Defendants contend that these claims, which stem from the alleged racial discrimination, are duplicative of the LAD and should be dismissed. Upon careful consideration of the statutory language and case law. the Court disagrees.

The New Jersey state courts and this Court have frequently held that the LAD bars common law discrimination claims that are duplicative of the LAD. *See. e.g., Catalane v. Gilian Instrument Corp.*, 271 N.J. Super. 476, 492, 638 A.2d 1341 (App. Div. 1994) (holding that supplementary common law causes of action may not go to the jury when a statutory remedy under the LAD exists); *DeCapua v. Bell Atlantic - New Jersey, Inc.*, 313 N.J. Super. 110, 128, 712 A.2d 725 (Law Div. 1998) ("Because plaintiff's common-law

174 F. Supp. 192, *200; 2000 U.S. Dist. LEXIS 20251, **22;
85 Fair Empl. Prac. Cas. (BNA) 101; 20 Fla. L. Weekly Fed. S 295

breach of [**23] contract claim duplicates his statutory claim under New Jersey's LAD, it is barred."); *Mardini v. Viking Freight, Inc.*, 92 F. Supp. 378, 382-385 (D.N.J. [*201] 1999) (dismissing a wrongful termination claim which involved the same elements of discrimination as the LAD claim); *DeJoy v. Comcast Communications, Inc.*, 941 F. Supp. 468, 476 (D.N.J. 1996) (finding plaintiff's common law claim preempted by the LAD where plaintiff provided no information showing his common law claim was "different or broader" than his LAD claim).

However, it is clear from the case law and a review of the LAD itself that the LAD does not necessarily bar all common law causes of action that might be implicated in an LAD action. In *Shaner v. Horizon Bancorp*, 116 N.J. 433, 454, 561 A.2d 1130 (1989), the New Jersey Supreme Court noted that "a plaintiff in appropriate circumstances could pursue an independent action. . . to vindicate particular interests in addition to or aside from those sought to be protected by a LAD action." *Shaner*, 116 N.J. at 454: *see also Dale v. Boy Scouts of America*, 308 N.J. Super. 516, 543, 706 A.2d 270 (App. Div. 1998) [**24] (internal citations omitted). *aff'd* 160 N.J. 562, 734 A.2d 1196 (1999), *rev'd on other grounds*, 530 U.S. 640, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000). In the policy declaration accompanying the act. the New Jersey Legislature made clear that it did not intend that the LAD would preempt other causes of action: [The LAD] shall be liberally construed in combination with other protections available under the laws of this State." N.J. STAT. ANN. § 10:5-3: *see also*, N.J. STAT. ANN. § 10:5-13 ("All remedies available in common law tort actions shall be available to prevailing plaintiffs."). Furthermore. § 10:5-27 of the LAD states:

> Nothing herein contained shall bar, exclude, or otherwise affect any right or action, civil or criminal, which may exist independently of any right to redress against or specific relief from any unlawful employment practice or unlawful discrimination.

N.J. STAT. ANN. § 10:5-27. Given the statutory language, this Court finds that the legislature intended that the LAD would supplement, rather than preempt, other causes of action. Therefore. plaintiff's common law claims may not be dismissed.

### 1. Breach of Contract

Because plaintiff's common law claims [**25] are not preempted, the Court next considers defendants' argument that the Eighth Count of plaintiff's complaint should be dismissed because plaintiff has failed to allege the existence of any third party protections under a valid contract. The complaint alleges that defendant BSM breached its contract with the United States by failing to adhere to its requirement that BSM observe the civil rights laws of the United States. New Jersey and Maryland and that plaintiff was a third-party beneficiary of that contract. Since it is well-known that parties contracting with the United States and its agencies are required to observe civil rights laws applicable to performance of the contract, defendants' motion to dismiss the Eighth Count will be denied. [1]

> 1   It does not appear that defendants seek summary judgment on the Eighth Count based on the release.

### 2. Tortious Interference

The defendants also move to dismiss the Eighth Count of plaintiff's complaint for tortious interference with the contract between defendants [**26] and the United States Naval Forces. Defendants argue that plaintiff cannot sustain a tortious interference with contract claim because plaintiff has failed to identify any of the [*202] defendants as third parties to the contract. Consequently, defendants contend that plaintiff has failed to state a claim for relief for the Eighth Count in plaintiff's complaint.

New Jersey courts have held that it is "'fundamental' to a cause of action for tortious interference. . . that the claim be directed against defendants who are not parties to the relationship." *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 752, 563 A.2d 31 (1989). Here, defendant BSM. as plaintiff's employer, was clearly a party to the alleged employment contract with the United States. As a result. BSM cannot be held liable for tortious interference with its own contract. *Custom Communications Eng'g v. E.F. Johnson Co.*, 269 N.J. Super. 531, 543, 636 A.2d 80 (App. Div. 1993) (stating that a tortious interference claim must be directed against persons who were not parties to a contract); *Kopp v. United Technologies, Inc.*, 223 N.J. Super. 548, 539 A.2d 309 (App. Div. 1988) [**27] ("A party cannot be guilty of inducing the breach of its own contract").

174 F. Supp. 2d 192, *202; 2000 U.S. Dist. LEXIS 20251, **27;
85 Fair Empl. Prac. Cas. (BNA) 101; 20 Fla. L. Weekly Fed. S 295

Claims for tortious interference with a contract brought by an employee against a supervisor (such as Wattam) acting in the course of his employment must be dismissed. *Horvath v. Rimtec Corporation*, 2000 U.S. Dist. LEXIS 10128, 2000 WL 1030357, *9 (D.N.J. July 19, 2000). "Only when an employee asserts that an officer or agent of corporation (sic) acted outside the scope of his employment and/or for his own personal gain may the employee go forward with his claim for tortious interference." *Id.* Under New Jersey common law, "to be within the scope of employment, the employee's behavior must be 'actuated, at least in part. by a purpose to serve the master.'" *Di Cosala v. Kay*, 91 N.J. 159, 169, 450 A.2d 508 (1982) (quoting Restatement (Second) of Agency § 228 (1957)). Accordingly, plaintiff's allegation that Wattam tortiously interfered with the contract between BSM and the United States must be dismissed. However, the Court has denied defendants' motion to dismiss the Eighth Count as to plaintiff's claim that BSM breached its contract with the United States of which he is a third-party beneficiary.

Accordingly, [**28] **IT IS** on this *27Th* day of December, 2000 **ORDERED** that the defendants' motion for summary judgment against the plaintiff on Counts One through Six. which are subject to the plaintiff's release, is granted: and it is further

**ORDERED** that the defendants' motion to dismiss the Seventh Count of plaintiff's complaint, alleging violations of Maryland law. is granted: and it is further

**ORDERED** that defendants' motion to dismiss the Eighth Count of plaintiff's complaint. alleging breach of contract of which he is a third-party beneficiary, is denied.

John C. Lifland

United States District Judge

# EXHIBIT

# 5

LEXSEE

JAMES W. RILEY, Plaintiff, v. STANLEY TAYLOR, et al., Defendants.

Civ. No. 06-01-GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2006 U.S. Dist. LEXIS 88661

December 5, 2006, Decided
December 7, 2006, Filed

**SUBSEQUENT HISTORY:** Writ of mandamus denied In re Riley, 2007 U.S. App. LEXIS 7465 (3d Cir. Del., Mar. 30, 2007)

**PRIOR HISTORY:** Riley v. Taylor, 2006 U.S. Dist. LEXIS 78450 (D. Del., Oct. 27, 2006)

**COUNSEL:** [*1] James W. Riley, Plaintiff, Pro se, Delaware Correctional Center, Smyrna, DE.

For Stanley Taylor, Thomas Carroll, David Pierce, Defendants: Ophelia Michelle Waters, LEAD ATTORNEY, Department of Justice, Wilmington, DE.

For Medical Asssistant Malaney, Correctional Medical Services, Inc., Defendants: Kevin J. Connors, Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, United States District Judge.

**OPINION BY:** Gregory M. Sleet

**OPINION:**

MEMORANDUM

I. BACKGROUND

James W. Riley, an inmate housed at the Delaware Correctional Center ("DCC"), Smyrna, Delaware, filed this civil rights action pursuant to 42 U.S.C. § 1983 alleging deliberate indifference to serious medical needs (i.e., rectal dysfunction, need for eyeglasses, orthopedic footwear, skin infection). The defendants Medical Assistant Malaney ("Malaney") and Correctional Medical Services, Inc. ("CMS") filed a motion to dismiss the complaint on July 21, 2006. (D.I. 22.) In response, Riley filed a motion for summary judgment which CMS and Malaney oppose. (D.I. 25, 26.) Next, on August 25, 2006, defendants Commissioner Stanley Taylor ("Commissioner Taylor"), Warden [*2] Thomas Carroll ("Warden Carroll"), and Deputy Warden David Pierce ("Pierce") (i.e., "State defendants") filed a motion for summary judgment. (D.I. 30, 31.) Riley did not file a response to the State defendants' motion for summary judgment.

II. STANDARD OF REVIEW

A. Motion to Dismiss

The court "accept[s] all well-pleaded allegations in the complaint as true, and view[s] them in the light most favorable to the plaintiff." *Carino v. Stefan,* 376 F.3d 156, 159 (3d Cir. 2004). *Pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)); *Carino v. Stefan,* 376 F.3d at 159.

B. Summary Judgment

The court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there [*3] is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n.10, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita,* 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995). [*4]

The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

## III. DISCUSSION

### A. The Complaint

The complaint contains four counts. Riley alleges in the first count that he filed several sick call complaints in 2002 requesting treatment for rectum dysfunction stemming from a 1998 injury. (D.I. 2, at 3.) Riley alleges he was seen by a physician on two occasions and prescribed medication, but was not examined. *Id.* at 3. Riley alleges he told the physician he needed surgery to correct the problem. *Id.* The complaint goes on to allege that in 2003 Riley wrote to Warden Carroll about the "denial of adequate medical treatment" [*5] for his rectum dysfunction, but he receive no response. *Id.* Riley

alleges that the "medical staff" never conducted an examination to determine the extent of his injury and to prescribe the correct treatment. Riley alleges that in 2004 and 2005, during his annual physical examinations, he complained to doctors about his untreated rectum dysfunction and that he might need surgery, but nothing was done. *Id.*

In his second claim, Riley alleges that at both his 2004 and 2005 medical examinations, he was prescribed eyeglasses and special orthopedic footwear (i.e., boots and sneakers) due to an ankle condition. *Id.* at 3-4. Riley alleges that the DCC medical staff is denying him the prescribed eyeglasses and footwear. *Id.* at 4. Riley alleges that he filed grievances in 2005 and also wrote letters to Warden Carroll and Deputy Warden Pierce. *Id.* Riley alleges that Warden Carroll disregarded his complaints, but that Deputy Warden Pierce sent his complaints to health services administrators Amy Munson ("Munson") n1 and Malaney to investigate. *Id.* Riley alleges that Munson and Malaney never corrected the denial of medical treatment or failure to provide footwear and eyeglasses. [*6] *Id.* Riley alleges he filed complaints with Deputy Warden Pierce regarding Munson and Malaney's failure to investigate and was told that Deputy Warden Pierce does "not direct medical care concerns." *Id.*

n1 Munson was dismissed from the case on October 3, 2006. (D.I. 37.)

Riley's third medical claim is that in April 2005 he filed several sick call complaints after noticing a "facial skin infection" similar to necrotizing fasciitis n2. *Id.* at 5. Riley alleges that as of the date of the filing of the complaint, he has not been seen by a doctor to see if he is infected with necrotizing fasciitis. *Id.* Plaintiff alleges that he notified Commissioner Taylor, Warden Carroll, Deputy Warden Pierce, Munson, and Malaney about his medical complaints and that he was being denied treatment for his skin infections. *Id.*

n2 Tissue death such as that associated with group A streptococcus infection. *Stedman's Medical Dictionary* 544 (2d ed. 2004).

[*7]

Riley's last claim is that Commissioner Taylor and Warden Carroll are responsible for the denial of medical treatment because of their policies of failing to: (1) maintain an adequate and qualified staff, (2) prevent interference with adequate medical care once prescribed by a doctor and when a medical need is serious, (3) remedy unlawful conditions when they know or should have known the conditions existed within the medical company contracted to provide adequate health care to inmates at DCC, and (4) carry out their responsibilities to provide and ensure that adequate medical care for inmates are being met by the contracting medical company. Riley further alleges that in hiring CMS and First Correctional Medical ("FCM") n3, Commissioner Taylor knew or should have known that these medical vendors used inadequate and unqualified medical staff and employees.

n3 A waiver of service for FCM was returned executed and filed on July 26, 2006. (D.I. 24.) To date, FCM has not answered or otherwise appeared.

The defendants [*8] are sued in their personal and official capacities. Riley seeks declaratory and injunctive relief, and compensatory and punitive damages.

## B. CMS and Malaney's Motion to Dismiss

Malaney and CMS move for dismissal on the bases that the allegations in the first claim are barred by the applicable two year limitation period, Riley has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") under 42 U.S.C. § 1997e(a), the complaint does not state a cognizable claim for deliberate indifference to a serious medical need, Riley cannot prove any set of facts to demonstrate that CMS had a policy or custom that led the medical staff to deprive him of necessary medical care, and CMS cannot be held responsible for the acts of its employees under a *respondeat superior* theory. Riley responded by filing a motion for summary judgment.

Malaney and CMS submitted exhibits outside the pleadings in support of their motion to dismiss. The Federal Rules of Civil Procedure provide that when a motion to dismiss is filed pursuant to Rule 12(b)(6) and matters outside the pleadings are presented to and not excluded by the court, [*9] the matter shall be treated as one for summary judgment and disposed of as provided in Fed. R. Civ. P. 56. Fed. R. Civ. P. 12(b). The court will not consider the exhibits submitted and will continue to treat the motion as a motion to dismiss pursuant to Fed. R. Civ. P. 12(b).

### 1. Statute of Limitations

CMS and Malaney argue that Riley's first claim for relief is barred by the two year limitation period inasmuch as his sick call complaints began in 2002, but he did not file his complaint until December 2005. Riley argues that he went through several years of ineffective administrative remedies, from 2002 to 2005, and the exhaustion of remedies tolled the two year limitation period.

For purposes of the statute of limitations, § 1983 claims are characterized as personal injury actions. *Wilson v. Garcia,* 471 U.S. 261, 275, 105 S. Ct. 1938, 85 L. Ed. 2d 254 (1983). In Delaware, § 1983 claims are subject to a two-year limitations period. *See* Del. Code Ann. tit. 10, § 8119; *Johnson v. Cullen,* 925 F. Supp. 244, 248 (D. Del. 1996). Section [*10] 1983 claims accrue "when plaintiff knows or has reason to know of the injury that forms the basis of his or her cause of action." *Montgomery v. De Simone,* 159 F.3d 120, 126 (3d Cir. 1998). Claims not filed within the two-year statute of limitations period are time-barred and must be dismissed. *See Smith v. Del.,* C.A. No. 99-440-JJF, 2001 U.S. Dist. LEXIS 10594, 2001 WL 845654, at *2 (D. Del. July 24, 2001). However, because the PLRA makes exhaustion of administrative remedies mandatory, the statute of limitations begins to run only when the plaintiff has exhausted his administrative remedies. *Wright v. O'Hara,* No. Civ. A. 00-1557, 2004 U.S. Dist. LEXIS 15984, 2004 WL 1793018, at *6 (E.D. Pa. Aug. 11, 2004); *Howard v. Snyder,* No. 01-376-SLR, 2002 U.S. Dist. LEXIS 9084, at *4 (D. Del. May 14, 2002).

The court must accept as true the facts as plead in Riley's complaint. *Spruill v. Gillis,* 372 F.3d 218, 223 (3d Cir. 2004) (citations omitted). However, given that exhaustion turns on the documents related to Riley's grievances, the Third Circuit has held that authentic documents may be considered without converting the motion to dismiss to a motion for summary [*11] judgment. *Spruill v. Gillis,* 372 F.3d at 223. Regarding his rectum dysfunction, Riley filed a medical grievance on October 3, 2002. (D.I. 20, Ex. A-1.) He filed a second grievance on June 15, 2003, complaining he had not

received a response to the October 3, 2002 grievance. *Id.* at Ex. A-2. Finally, on October 21, 2003, Riley wrote a letter to Warden Carroll complaining that his grievances were ignored. The complaint alleges that "to date" Warden Carroll has not responded to his complaints.

At the present time, the court cannot fully discern when Riley exhausted his administrative remedies which, as discussed above, triggers the running of the limitations period. Construing the complaint in the light most favorable to Riley as the court must do, it cannot be said that Riley did not timely file his claim for deliberate indifference to his rectum dysfunction condition. Therefore, as to this claim, the court will deny CMS and Malaney's Motion to Dismiss based upon expiration of the limitation period.

**2. Failure to Exhaust Administrative Remedies**

CMS and Malaney argue that Riley failed to exhaust his administrative remedies as is required under 42 U.S.C. § 1997e(a) [*12] and, therefore, the entire complaint should be dismissed. Riley contends that the defendants are incorrect in their assertion that he did not exhaust administrative remedies. He points to grievances he filed and letters written in 2002 and 2003, all of which, according to Riley, were ignored. He also contends that he went through several years of ineffective administrative remedies, from 2002 to 2005.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Porter v. Nussle,* 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Under § 1997e(a) "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues. [*13] " *Booth v. Churner,* 532 U.S. 731, 741 n.6, 121 S. Ct. 1819, 149 L. Ed. 2d 958 (2001). The exhaustion requirement is absolute, absent circumstances where no administrative remedy is available. *See Spruill v. Gillis,* 372 F.3d 218, 227-28 (3d. Cir. 2004); *Nyhuis v. Reno,* 204 F.3d 65, 67 (3d Cir. 2000);*but see Freeman v. Snyder,* No. 98-636-GMS, 2001 U.S. Dist. LEXIS 16634,

2001 Westlaw 515258 at *7 (D. Del. Apr. 10, 2001) (finding that if no administrative remedy is available, the exhaustion requirement need not be met). However, if prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are "available" to him. *Brown v. Croak,* 312 F.3d 109, 112-13 (3d Cir. 2002).

Delaware Department of Correction administrative procedures provide for a multi-tiered grievance and appeal process. Medical grievances are first forwarded to the medical services staff who attempt an informal resolution of the matter. If this fails, the grievance goes to the Medical Grievance Committee, which conducts a hearing. If the matter is still not resolved, the inmate may once again appeal. DOC Policy 4.4 (revised [*14] May 15, 1998).

As noted above, when considering exhaustion the court may consider the grievances without converting the motion to dismiss into a motion for summary judgment. *See Spruill v. Gillis,* 372 F.3d 218, 223 (3d Cir. 2004). In his complaint, Riley recites a number of medical ailments, notably rectal dysfunction, a skin rash, and failure to provide medically necessary tennis shoes and eyeglasses. Riley alleges that he wrote to Warden Carroll regarding the rectum dysfunction and submitted grievances and wrote letters to Warden Carroll and Deputy Warden Pierce on the tennis shoe and eyeglasses issues. The complaint also alleges that Riley notified prison officials complaining of lack of medical care for a skin infection.

As discussed above, the court cannot determine when Riley exhausted his administrative claims as to his rectum dysfunction claim. Riley filed a grievance seeking medically necessary boots and sneakers on March 2, 2005. (D.I. 20, Ex. A-4.) The matter was investigated and sneakers were to be ordered. *Id.* at Ex. A-5. The matter was forwarded to the medical grievance committee on June 17, 2005, and Riley signed off on the grievance on August 29, 2005. [*15] *Id.* at Ex. A-6. No other documents regarding resolution of the grievance were submitted to the court.

At the present time, the court cannot fully discern whether Riley exhausted his administrative remedies, although in his complaint, he alleges that the medical grievances were resolved unfairly, lending the inference that the grievances were exhausted. Construing the complaint in the light most favorable to Riley, at this

juncture, the court will assume that Riley exhausted his administrative remedies. Accordingly, the court will deny CMS and Malaney's Motion to Dismiss on the issue of failure to exhaust administrative remedies.

### 3. Medical Needs Claim

CMS and Malaney argue that the complaint fails to state a cognizable claim for violation of civil rights in connection with medical treatment. More specifically, they argue that the allegations in the complaint do not constitute deliberate indifference to a serious medical need, and that Riley received medical treatment, although he may disagree with the type of treatment received. CMS and Malaney rely upon medical records submitted by them. As previously discussed, the court does not consider matters outside the pleadings [*16] when ruling on a motion to dismiss pursuant to Rule 12(b)(6).

The complaint alleges that Riley's rectum dysfunction causes excruciating painful swelling and that this condition has continued for a lengthy period of time without Riley receiving appropriate medical treatment. Riley argues that he was seen only once for his skin rash, and that he was never seen or examined by a qualified doctor for necrotizing fasciitis, but instead the responsibility was delegated to non-qualified nursing staff. With regard to footwear, Riley argues that he is entitled to new footwear once a year. He contends he was never given footwear that was approved in 2004 and 2005 physician's orders, and argues that the defendants offer no proof that the footwear ordered in 2005 was ever provided to him. With regard to eyeglasses, Riley argues that the defendants falsely indicate the medical records do not indicate a need for eyeglasses.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *Estelle v. Gamble,* 429 U.S. 97, 103-105, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). In order to set forth a cognizable claim, an inmate must allege [*17] (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble,* 429 U.S. at 104; *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). Additionally, "a prisoner has no right to choose a specific form of medical treatment,"

so long as the treatment provided is reasonable. *Harrison v. Barkley,* 219 F.3d 132, 138-140 (2d Cir. 2000). Finally, an inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains that options available to medical personnel were not pursued on the inmate's behalf. *Estelle v. Gamble,* 429 U.S. 97, 107, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The complaint alleges a medical condition of rectum dysfunction, including painful swelling to the point that Riley is unable to [*18] perform daily activities, and that Riley received treatment for that condition in 2002. The complaint further alleges that despite his requests, he has received no further treatment for the condition. The complaint also alleges that Riley was prescribed eyeglasses and special orthopedic footwear due to an ankle injury, but was denied these medically necessary items. Finally, the complaint alleges that Riley has a skin rash "similar to necrotizing fasciitis," that he has not been permitted to see a doctor, and that he is denied treatment for the skin infection. CMS and Malaney point to the medical records of Riley to support their position. As noted above, however, the court does not consider matters outside the pleadings on a motion to dismiss.

Construing the complaint in the light most favorable to Riley, and keeping in mind his *pro se* status, the court concludes that the complaint adequately alleges medical indifference claims. Therefore, the court will deny CMS and Malaney's motion to dismiss on the basis that the complaint fails to adequately allege a medical needs constitutional violation.

### 4. Claims against CMS

CMS argues that there is no indication that it had a [*19] policy or custom that encouraged or otherwise led the medical staff to deprive Riley of medical care. CMS further argues that Riley cannot provide any set of facts that would demonstrate the same. CMS correctly argues that it cannot be held responsible for the acts of its employees under a *respondeat superior* theory. CMS asks the court to dismiss the claims against it for failure to state a claim upon which relief may be granted. Riley did not respond to this portion of the motion to dismiss.

As discussed above, in order to state an inadequate medical treatment claim under the Eighth Amendment, an

inmate must allege deliberate indifference to serious medical needs constituting "unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. at 104. When a plaintiff relies on the theory of *respondeat superior* to hold a corporation liable, he must allege a policy or custom that demonstrates such deliberate indifference. *Miller v. Correctional Medical Systems, Inc.,* 802 F.Supp. 1126, 1132 (D. Del. 1992). The complaint contains no such allegations. Hence, CMS cannot be held liable and therefore the court will grant the motion to dismiss [*20] CMS as a defendant. Riley, however, will be given leave to amend the complaint.

**C. Riley's Motion for Summary Judgment**

**1. Facts**

Riley provided only one medical record with his motion for summary judgment. He mainly relies upon exhibits he filed in support of his motion for injunctive relief (D.I. 20) and exhibits filed by CMS and Malaney in support of their motion to dismiss (D.I. 22).

The exhibits reveal that Riley filed a grievance on October 3, 2002, regarding his rectal dysfunction complaining that he had seen a doctor several weeks earlier, that the doctor had prescribed medication without conducting a physical examination, and that the medication did not alleviate painful swelling (D.I. 20, Ex. A-1.) Riley was prescribed Colace n4 and a hemorrhoidal creme for a one month period from September to October 2002. (D.I. 22, Ex. 4.) Riley opined in his grievance, "I think surgery is necessary to correct the problem." (D.I. 20, Ex. A-1.) He sought an "adequate examination to diagnose the injury rectum and schedule [him] for surgery if needed." Riley filed a second grievance on June 16, 2003, complaining that he had not received a response to his first grievance. [*21] *Id.* at Ex. A-2. He wrote a letter to Warden Carroll on October 21, 2003, complaining that he had filed two medical grievances for his rectal condition, but both were ignored. *Id.* at Ex. A-3.

n4     A     stool     softener, http://www.colacecapsules.com.

On June 15, 2003, Riley requested a pair of boots or sneakers with adequate ankle support due to problems with his ankle. (D.I. 22, Ex. 4.) Medical records indicate that FCM requested high top sneakers for Riley on June

27, 2003, because of his history of right ankle internal fixation with screws. *Id.* He was prescribed the high top sneakers on August 7, 2003. *Id.* Riley received sneakers from FCM on November 12, 2003. *Id.* In early January 2004, Riley was scheduled to see a medical provider for an evaluation for boots. *Id.* Progress notes dated January 22, 2004, indicate that Riley requested orthopedic boots and had also requested sneakers, but that his request for boots was denied. *Id.*

A physician's order sheet dated January 21, 2005, ordered that [*22] Riley be provided high top boots and an "opth" eye doctor consult. *Id.* The right eye was 20/200 and the left eye was 20/30. n5 Riley also wrote to Deputy Warden Pierce on May 9, 2005, advising him that during his annual physical examination the doctor approved eyeglasses after discovering Riley had severely impaired vision. *Id.* at Ex. A-16.

n5 20/20 vision is considered normal vision, and 20/30 is considered to be within the range of normal,
http://www.agingeye.net/visionbasics/healthyvision.php.
A person is considered legally blind with 20/200 or worse in the better eye with the best possible correction.
http://www.sparkle.usu.edu/glossary/index.

FCM requested high top boots on the same date as the physician's January 21, 2005 order. (D.I. 22, Ex. 4.) Riley requested boots and sneakers on February 20, 2005, and medical records indicate they were ordered. *Id.* On March 2, 2005, Riley filed a grievance seeking special footwear for medical reasons. (D.I. 20, Ex. A-4.) The grievance states that several [*23] months earlier, on two different occasions, two doctors approved Riley for high-top boots and sneakers. *Id.* The grievance indicates that in 1995 a doctor had ordered Riley special footwear. *Id.* Riley asked for a memo to permit him two pairs of sneakers, one for walking and one for exercise. *Id.* Riley wrote to Deputy Warden Pierce on May 7, 2005, complaining that special sneakers were approved during his annual exam and that he also needed special boots. (D.I. 20, Ex. A-16-17.) A letter to Deputy Warden Pierce dated July 9, 2005, indicates that Riley was given a choice between sneakers or boots, but that he believed he was entitled to both. *Id.* at Ex. A-20-21. Deputy Warden Pierce responded to Riley on July 22, 2005, that he was forwarding his footwear concerns to Health Services

Administrator Malaney. *Id.* at Ex. A-19.

Exhibits submitted by Riley indicate that sneakers were to be ordered, that the grievance was withdrawn, and that Riley signed off on the grievance on August 29, 2005. *Id.* at Exs. A-4, A-5, A-6. Riley's exhibits indicate that as of March 27, 2006, he had not received the sneakers. *Id.* at Ex. A-33-34.

Riley complained of a skin rash on March 24, 2005, was [*24] examined, and no rash was noted. (D.I. 22, Ex. 4.) On Riley April 7, 2005, Riley sought treatment for shortness of breath, heart pain, and face rash. *Id.* He was scheduled for a nurse sick call. *Id.* Riley filed a grievance on April 10, 2005, complaining of a strep skin infection contracted from new inmates and aggravated by microbe contamination in the water. *Id.* at Ex. A-8. Riley requested the medical department be ordered to treat his infection. The grievance states that Riley requested treatment on three other occasions and that hydrocortisone and antibiotic creams were not killing the infection. *Id.* at Ex. A-10. A response from Munson, dated April 11, 2005, states that Riley's concerns were noted and refers to a sick call slip dated April 7, 2005. (D.I. 22, Ex. 4.) Riley also wrote a letter to Warden Carroll on April 12, 2005, regarding the skin infection. (D.I. 20, Ex. A-12.) Deputy Warden Pierce received the letter and on April 21, 2005, advised Riley that he forwarded it to the Health Services Administrator Munson for investigation and action. *Id.* at Ex. A-11. On July 11, 2005, Riley was seen for a face rash. He also requested his sneakers.

**2. Analysis** [*25]

It is Riley's position that he should be granted summary judgment as a matter of law. He argues that it is undisputed that a fellow prisoner was hospitalized for necrotizing fasciitis infection and required surgery. (D.I. 25, at 6.) He contends he "possibly contracted this infection" from that inmate when they were confined in the same building, on the same tier. *Id.* Riley also contends it is undisputed that he was not seen by qualified doctors with regard to necrotizing fasciitis or rectum dysfunction. He contends it is undisputed that the defendants have not provided him with footwear and eyeglasses as ordered by physicians. *Id.* at 7.

CMS and Malaney argue that Riley is not entitled to summary judgment inasmuch as the complaint fails to state a claim for a constitutional violation, Riley fails to allege any personal involvement on behalf of CMS or Malaney, and Riley fails to allege deliberate indifference to a serious medical need.

Riley, as the moving party, has the burden of proving that no genuine issue of material fact exists. He has failed to meet this burden. In reviewing the records, it is clear there remain genuine issues of material fact. The medical records indicate [*26] that Riley received medication for a one month period, apparently to treat his rectum dysfunction, but there are no other medical records referencing this condition. As to the tennis shoe issue, the records reflect an ongoing effort to provide Riley with the shoes. In dispute is whether the shoes were ever received in 2005. Riley contends that a physician ordered him eyeglasses, but the medical records merely reflect that he be seen by an opthamologist for a consultation, not that glasses be ordered. Finally, Riley contends that he has not received sufficient medical care for his skin rash he self-diagnosed as necrotizing faciitis. It is apparent, however, that his complaint is that rather than being seen by a physician, he received medical treatment from a nurse.

As the moving party, Riley has the burden to prove he is entitled to judgment as a matter of law. He has failed to meed that burden. Therefore, the court will deny Riley's motion for summary judgment.

**D. State Defendants' Motion for Summary Judgment**

Riley alleges that the State defendants are responsible for his lack of treatment and the nonresponsiveness to his complaints of denial of medical treatment. The State [*27] defendants move for summary judgment on the basis that no facts are alleged to support Riley's conclusions that the State defendants were deliberately indifferent or intentionally cruel with respect to his medical condition. (D.I. 30, 31.) The State defendants also argue that Riley does not allege facts demonstrating that the State defendants were aware of the alleged inadequacies to Riley's medical treatment. Finally, the State defendants argue that Riley's disagreement with his course of treatment does not rise to the level of an actionable constitutional violation. Riley did not respond to the State defendants' motion for summary judgment.

The State defendants did not submit any exhibits or other documentation in support of their motion for

summary judgment but instead rely upon those previously submitted by Riley, CMS, and Malaney. The facts in this case are set forth above in Section III.C.1.

### 1. Eighth Amendment Violation

The State defendants argue that the complaint fails to state a cognizable constitutional claim based upon the Eighth Amendment. The State defendants contend that the evidence shows that Riley's requests for medical care were submitted to the providers [*28] and that he has received ongoing medical treatment throughout his incarceration. The State defendants also argue that any failure by them to respond does not implicate the deliberate indifference requisite of an Eighth Amendment claim. The State defendants contend that Riley failed to establish any evidence to support the conclusion that the State defendants knew or had reason to know that prison doctors or their assistants were mistreating or not treating him. The State defendants argue that there is no evidence produced by Riley to suggest that they knew or had the medical background to know that Riley faced a substantial risk of serious harm and disregarded that risk. The burden, however, is upon the State defendants, not Riley, to show there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

The record reflects that Riley unsuccessfully sought treatment for his rectum dysfunction, by filing medical grievances that were not responded to, and writing to Warden Carroll, advising him that medical was not responding to his complaints, explaining his medical condition in detail, and asking Warden Carroll to assist him in obtaining treatment. [*29] The record reflects that Riley has received ongoing medical treatment for his ankle and that the medical staff was diligent in the pursuit of medically necessary shoes for Riley. *See Estelle v. Gamble,* 429 U.S. 97, 107, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). It seems that the real issue is, that while the shoes have been ordered, Riley either has not yet received them or he did not receive them as quickly as he desired. Regardless, it is undisputed that the shoes are required for Riley's medical condition of a right ankle internal fixation with screws and that a physician ordered the shoes, but for reasons unexplained, the shoes were not provided. Riley filed grievances and wrote to Deputy Warden Pierce on two occasions that he was approved for the footwear, but that it was not provided. On both occasions Deputy Warden Pierce forwarded the complaint to Munson, the Health Services Administrator. After

receiving the second letter, Deputy Warden Pierce advised Riley that he did "not direct medical care concerns." (D.I. 20, Ex. A-19.)

Riley acknowledges that he received treatment for his skin rash, which he speculates is necrotizing faciitis, yet not the type of treatment he desired. Riley seeks treatment [*30] from a "qualified doctor." He acknowledges he received treatment for the skin rash, but the task was "delegated to non-qualified nursing staff." (D.I. 25, at 4.) It is undisputed that Riley received medical treatment, albeit not to his liking. As previously noted, however, disagreement with medical treatment does not rise to the level of a constitutional violation.

Riley's last medical complaint is that he did not receive eyeglasses as ordered by physicians. Eyeglasses can be considered a serious medical need. *See, e.g., Newman v. Alabama,* 503 F.2d 1320, 1331 (5th Cir. 1974) (failure to provide inmate with eyeglasses and prosthetic devices can constitute deliberate indifference). Contrary to Riley's position, the medical records submitted do not indicate his physicians ordered him eyeglasses. Nonetheless, a physician ordered a referral for Riley to have an opthamologist consultation. There is no indication in the medical records that Riley had the consultation or that he received any eyeglasses. The record also reflects that Riley made written complaints to Deputy Warden Pierce that he was being denied eyeglasses, to no avail.

"Where prison authorities deny reasonable [*31] requests for medical treatment. . .and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest. Similarly, where 'knowledge of the need for medical care [is accompanied by the]. . .intentional refusal to provide that care,' the deliberate indifference standard has been met. . . .Finally, deliberate indifference is demonstrated '[w]hen. . .prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment." *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir. 1987) (citations omitted). "Short of absolute denial, 'if necessary medical treatment [i]s. . . delayed for non-medical reasons, a case of deliberate indifference has been made out." *Id.* (citations omitted). "Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that 'result[] in

interminable delays and outright denials of medical care to suffering inmates.'" *Id.* at 347 (citation omitted). *See Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004) [*32] (a non-physician supervisor may be liable under § 1983 if he knew or had reason to know of inadequate medical care).

The State defendants argue that Riley received ongoing medical treatment throughout his incarceration and rely upon *Durmer v. O'Carroll,* 991 F.2d 64, 69 (3d Cir. 1993) to support their motion for summary judgment. *Durmer v. O'Carroll* held that "[t]he only allegation against either of these two [prison official] defendants was that they failed to respond to letters [the plaintiff] sent to them explaining his predicament. Neither of these defendants, however, is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." (footnoted omitted). The holding in *Durmer* was clarified in *Spruill v. Gillis,* 372 F.3d 218 (3d Cir. 2004). *Spruill* holds that absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement [*33] of deliberate indifference. *Spruill,* 372 F.3d at 236.

In this case, the evidence before the court is that due Riley's letters, Warden Carroll had actual knowledge that Riley was not receiving treatment for his rectum dysfunction, and Deputy Warden Piece had actual knowledge that despite a physician's orders, Riley did not receive medically necessary shoes or ophthalmology treatment. Based upon the exhibits in the record, it is evident that as to the skin rash issue, there is not a cognizable constitutional claim for deliberate indifference to a serious medical need inasmuch as Riley's complaint is his disagreement with the type of treatment he received.

Accordingly, the court will grant the State defendants' motion for summary judgment as to the skin rash issue as it fails to state a claim upon which relief may be granted and deny the motion for summary judgment as to the remaining claims.

## 2. Eleventh Amendment Sovereign Immunity

The State defendants argue that the Eleventh Amendment bars suits brought against them. The doctrine of sovereign immunity bars suits for monetary damages against state employees in their "official capacities," absent waiver or Congressional [*34] override. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985). There is no evidence that § 1983 intended to effect a Congressional override of state sovereign immunity. The statute has been held not to "provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 66, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989). Section 1983 authorizes suits against "persons," and a suit against a state official is "no different than a suit against a state itself." *Id.* at 71. "The state itself [is not] a person that Congress intended to be subject to liability." *Id.* at 68. Also, there is no indication that the State of Delaware has waived or abrogated its sovereign immunity with respect to § 1983 claims. Therefore, the court will grant the motion for summary judgment as to the official capacity claims seeking monetary damages raised against the State defendants.

## 3. Personal Involvement

The State defendants argue that Riley fails to allege the personal involvement of either Taylor, Carroll, or Pierce. More particularly, the State defendants argue that Riley [*35] failed to identify how the State defendants participated in, intentionally delayed, or in any other way, interfered with the medical treatment Riley claims deprived him of a constitutional right. The State defendants argue that Riley's claims are without merit and must be dismissed.

When bringing a § 1983 claim, a plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). Personal involvement can be shown through allegations that a defendant directed, had actual knowledge of, or acquiesced in, the deprivation of a plaintiff's constitutional rights. *Evancho v. Fisher,* 423 F.3d 347, 353 (3d Cir. 2005); *see Monell v. Dep't of Soc. Servs.* 436 U.S. 658, 694-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Supervisory liability may attach if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff. *Sample v. Diecks,* 885 F.2d

1099, 1117-118 (3d Cir. 1989); *see also* [*36] *City of Canton v. Harris,* 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989); *Heggenmiller v. Edna Mahan Corr. Inst. for Women,* No. 04-1786, 128 Fed. Appx. 240 (3d. Cir. 2005).

Contrary to the State defendants' position the complaint adequately alleges that the State defendants had personal involvement in the denial of medical treatment. Indeed, the complaint alleges that the policies of Commissioner Taylor and Warden Carroll were the driving force behind Riley's alleged denial of medical care. Also, the complaint contains specific allegations against Deputy Warden Pierce. Therefore, the court will deny the motion for summary judgment on the basis of personal involvement.

### 4. Damages

The State defendants argue that Riley has not shown proof of actual injury and has failed to allege and prove a cognizable injury at the hands of the individual defendants. The State defendants conclude that Riley is not entitled to monetary damages, either compensatory or punitive. Similarly, the State defendants argue that Riley has failed to show that he is entitled to injunctive relief.

At this stage of the litigation claims remain viable against the State defendants. Contrary to the State [*37] defendants' position that there is no proof of actual injury, Riley alleges that he experiences excruciating painful swelling because of lack of treatment for his rectum dysfunction, that because he is being denied eyeglasses he suffers from frequent headaches due to his untreated, impaired vision, and that the tennis shoes are crucial to daily activities, protects his skin and provide support when walking and exercising. The court determines that the motion for summary judgment on the issue of damages is premature.

Also, at this time, the court sees no need to address the issue of injunctive relief inasmuch an order was recently entered denying preliminary injunctive relief. *See* D.I. 41. The issue of permanent injunctive relief, again is not ripe for adjudication, and is a matter to be addressed should the case be resolved in favor of Riley. Therefore, the court will deny the motion for summary

judgment as to the issue of damages.

### IV. CONCLUSION

The court will grant in part and deny in part the motion to dismiss filed by CMS and Malaney. Riley will be given leave to amend his claims against CMS. The court will deny Riley's motion for summary judgment. The court will [*38] grant in part and deny in part the State Defendants' motion for summary judgment. An appropriate order will be entered.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dec. 5, 2006
Wilmington, Delaware

### ORDER

At Wilmington this 5th day of Dec., 2006, for the reasons set forth in the Memorandum issued this date

1. The motion to dismiss filed by Correctional Medical Services, Inc. and Medical Assistant Malaney (D.I. 22) is GRANTED in part and DENIED in part. CMS is dismissed as a defendant.

2. Riley is given leave to amend his allegations against defendant CMS. The amendment shall be filed within 30 days from the date of this order.

3. The motion for summary judgment filed by James R. Riley (D.I. 25) is DENIED.

4. The motion for summary judgment filed by Commissioner Stanley Taylor, Warden Thomas Carroll, and Deputy Warden David Pierce (D.I. 30) is GRANTED in part and DENIED in part. All claims for monetary damages against the state defendants in their official capacities are dismissed. The skin care issue is dismissed as the record does not support the medical needs claim. The remaining claims are viable and will proceed.

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT

# 6

LEXSEE

**VALERIE SMITH, Plaintiff, v. STATE OF DELAWARE, et al., Defendants.**

**Civil Action No. 99-440-JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2001 U.S. Dist. LEXIS 10594**

**July 24, 2001, Decided**

**DISPOSITION:** [*1] Motion to Dismiss filed by Defendants Glenda E. Houston and Jerome E. Houston (D.I. 20) GRANTED. Motion to Dismiss filed by the State Defendant (D.I. 21) GRANTED.

**COUNSEL:** Valerie Smith, Plaintiff, Pro se, New Castle, Delaware.

Adam R. Elgart, Esquire, MATTLEMAN, WEINROTH & MILLER, Newark, Delaware, for Glenda E. Houston and Jerome E. Houston, Defendants.

Ophelia M. Waters, Esquire, Deputy Attorney General, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, for State Defendant.

**JUDGES:** Farnan, District Judge.

**OPINION BY:** Farnan

**OPINION:**

### MEMORANDUM OPINION

July 24, 2001
Wilmington, Delaware.

**Farnan, District Judge.**

Presently before the Court are two Motions To Dismiss, one filed by Defendants Glenda E. Houston and Jerome E. Houston ("Individual Defendants") (D.I. 20) and one filed by the Defendant State of Delaware ("State Defendant") (D.I. 21). Both Motions to Dismiss are filed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons set forth below, the Motion To Dismiss filed by the Individual Defendants (D.I. 20) and the Motion To Dismiss filed by the State Defendant (D.I. 21) will both be granted.

### BACKGROUND

Valerie Smith ("Plaintiff") [*2] is an inmate currently incarcerated in the Delaware Department of Correction ("DOC") at the Baylor Women's Correctional Institute ("WCI"). Plaintiff filed her Complaint (D.I. 2) on July 9, 1999. Plaintiff's Complaint is characterized as a 42 U.S.C. § 1983 claim for alleged constitutional violations.

In the Complaint, Plaintiff alleges that Defendants Glenda and Jerome Houston, the foster care parents, abused her mentally, physically and verbally while she was in their custody when Plaintiff was sixteen years of age. (D.I. 2, at 3). Plaintiff further claims that by placing her in the foster parents' care, the State is responsible for the foster parents' action. Id. at 5. It appears from the papers submitted to the Court that Plaintiff's placement in the home of the Individual Defendants occurred over fifteen (15) years ago (i.e., from 1984 to 1985).

### STANDARD OF REVIEW

Pursuant to Rule 12(b)(6), a party may move to dismiss a pleading for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits [*3] of the case. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). As such, when considering a motion to dismiss, a court must accept as true all allegations in the complaint and must draw all reasonable factual inferences in the light most favorable to the plaintiff.

Page 1

2001 U.S. Dist. LEXIS 10594, *3
39 Fair Empl. Prac. Cas. (BNA) 1295; 5 Oil & Gas Rep. 1271

Neitzke v. Williams, 490 U.S. 319, 326, 104 L. Ed. 2d 338, 109 S. Ct. 1827 (1989); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255 (3d Cir. 1994). However, the court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." Kost, 1 F.3d at 183. Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957); In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 368-69 (3d Cir. 1993). Thus, the court may dismiss a complaint when the facts pleaded and the reasonable inferences drawn therefrom are legally insufficient to support the relief sought. See Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc., 836 F.2d 173, 179 (3d Cir. 1988). [*4]

### DISCUSSION

In lieu of an Answer to the Complaint, the Individual Defendants and the State Defendant filed Motions To Dismiss. Both the Individual Defendants and the State Defendant seek dismissal based on (1) the statute of limitations codified in 10 Del. C. § 8119, and (2) the failure to state a claim upon which relief may be granted.

In Wilson v. Garcia, 471 U.S. 261, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985), the United States Supreme Court held that actions pursuant to 42 U.S.C. § 1983 should be characterized as personal injury actions, and therefore, the statute of limitations for such actions should be determined by each state. It is well-established in Delaware that the statute of limitations for Section 1983 actions is the two-year limitations period set forth in 10 Del. C. § 8119. McDowell v. Delaware State Police, 88 F.3d 188, 190 (3d Cir. 1996); Carr v. Town of Dewey Beach, 730 F. Supp. 591 (D. Del. 1990).

In pertinent part, 10 Del. C. § 8119 provides:

> No action for the recovery of damages upon a claim for alleged personal injuries shall be brought after the expiration of 2 years [*5] from the date upon which it is claimed that such alleged injuries were sustained . . .

Applying the two-year limitations period to Section 1983 claims, this Court has further recognized that a Section 1983 claim accrues when the Plaintiff knows or has reason to know of the injury that forms the basis of his or her complaint. Johnson v. Cullen, 925 F. Supp. 244, 248 (D. Del. 1996).

In this case, Plaintiff alleges that she was sexually assaulted and otherwise abused when she was in the foster care of the Individual Defendants when she was sixteen years old (i.e., from 1984 to 1985). (D.I. 2, at 3, 5). Plaintiff alleges no other factual information beyond this time period. The Court concludes that Plaintiff knew or should have known of the torts allegedly committed against her well in advance of her July 9, 1999 filing of the instant Complaint. Thus, regardless of whether Plaintiff's allegations are construed as a state law claim or a constitutional tort (assuming that the Individual Defendants are state actors), the Court concludes that Plaintiff's action against the Individual Defendants and the State Defendant is barred by the applicable statute of limitations. [*6]

Having concluded that Plaintiff's claims against all Defendants are clearly time-barred, the Court need not address the remaining arguments offered by the Individual Defendants and the State Defendant.

### CONCLUSION

For the reasons discussed, the Motion To Dismiss filed by the Individual Defendants (D.I. 20) and the Motion To Dismiss filed by the State Defendant (D.I. 21) will both be granted.

An appropriate Order will be entered.

### ORDER

WHEREAS, presently before the Court is a Motion to Dismiss filed by Defendants Glenda E. Houston and Jerome E. Houston (D.I. 20) and a Motion to Dismiss filed by the State Defendants (D.I. 21);

NOW THEREFORE, for the reasons set forth in the Memorandum Opinion issued this date, IT IS HEREBY ORDERED this 24 day of July 2001 that:

1. The Motion to Dismiss filed by Defendants Glenda E. Houston and Jerome E. Houston (D.I. 20) is **GRANTED**.

2. The Motion to Dismiss filed by the State Defendant (D.I. 21) is **GRANTED**.

2001 U.S. Dist. LEXIS 10594, *6
39 Fair Empl. Prac. Cas. (BNA) 1295; 5 Oil & Gas Rep. 1271

UNITED STATES DISTRICT JUDGE

LEXSEE 2005 US APP LEXIS 14058

**JIM TATREAU; RICHARD BONNEAU; RICHARD WEEMER, Plaintiffs-Appellants v. CITY OF LOS ANGELES; LOS ANGELES POLICE DEPARTMENT; BERNARD PARKS, in his individual capacity and official capacity as Chief of Police, Defendants-Appellees**

**No. 03-56638**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*138 Fed. Appx. 959; 2005 U.S. App. LEXIS 14058*

**June 8, 2005, Argued and Submitted, Pasadena, California
July 11, 2005, Filed**

**NOTICE:** [**1] RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Central District of California. D.C. No. CV-02-06436-ER. Edward Rafeedie, District Judge, Presiding.

**DISPOSITION:** REVERSED AND REMANDED.

**COUNSEL:** For JIM TATREAU, Plaintiff-Appellant: Marco Simons, Esq., Cornelia Dai, Esq., HADSELL & STORMER, Pasadena, CA; Sandra C. Munoz, HADSELL & STORMER, Pasadena, CA; Paul L. Hoffman, Esq., SCHONBRUN DeSIMONE SEPLOW HARRIS & HOFFMAN, LLP, Venice, CA

For RICHARD BONNEAU, Plaintiff-Appellant: Marco Simons, Esq., Cornelia Dai, Esq., HADSELL & STORMER, Pasadena, CA; Sandra C. Munoz, HADSELL & STORMER, Pasadena, CA; Paul L. Hoffman, Esq., SCHONBRUN DeSIMONE SEPLOW HARRIS & HOFFMAN, LLP, Venice, CA

For RICHARD WEEMER, Plaintiff-Appellant: Marco Simons, Esq., Cornelia Dai, Esq., HADSELL & STORMER, Pasadena, CA; Sandra C. Munoz, HADSELL & STORMER, Pasadena, CA; Paul L.

Hoffman, Esq., SCHONBRUN DeSIMONE SEPLOW HARRIS & HOFFMAN, LLP, Venice, CA

For CITY OF LOS ANGELES, Defendant-Appellee: Katherine J. Hamilton, Esq., Janis Levart Barquist, [**2] Esq., Rockard J. Delgadillo, Esq., LOS ANGELES CITY ATTORNEY'S OFFICE, Los Angeles, CA

For LOS ANGELES POLICE DEPARTMENT, Defendant-Appellee: Katherine J. Hamilton, Esq., Janis Levart Barquist, Esq., Rockard J. Delgadillo, Esq., LOS ANGELES CITY ATTORNEY'S OFFICE, Los Angeles, CA

For BERNARD PARKS, in his individual cand official capacity as Chief of Police, Defendant-Appellee: Katherine J. Hamilton, Esq., Janis Levart Barquist, Esq., Rockard J. Delgadillo, Esq., LOS ANGELES CITY ATTORNEY'S OFFICE, Los Angeles, CA

**JUDGES:** Before: LAY **, KOZINSKI, and THOMAS, Circuit Judges.

** The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

**OPINION:**

[*960] MEMORANDUM *

138 Fed. Appx. 959, *960; 2005 U.S. App. LEXIS 14058, **2

\* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by *Ninth Circuit Rule 36-3*.

The district court erred in granting summary judgment. There remain genuine issues of material fact as to whether the positions the plaintiffs [**3] sought within the LAPD were "confidential or policymaking," which would exempt the defendants from liability for alleged *First Amendment* retaliation. *Walker v. City of Lakewood, 272 F.3d 1114, 1131-32 (9th Cir. 2001)*. Contrary to the district court's findings, the job of a Los Angeles Police Department Commander is not a policymaking position. It is undisputed that Commanders do not make policy; they implement policy. Thus, the position lacks the delegated discretionary power that marks policymaking positions. *See id. at 1132-33*.

However, genuine issues of material fact exist as to whether the position is "confidential." The defendants assert that Commanders are "considered" members of the personal staff of the Chief of Police and who advise him on policy matters. Plaintiffs point out that Commanders are not staff, but civil service line employees, two positions removed from the Chief, and housed in different geographic locations. Thus, the record is not developed sufficiently to permit us to determine as a matter of law whether the Commander is a "confidential" position. *See DiRuzza v. County of Tehama, 206 F.3d 1304, 1311* [*961] *(9th Cir. 2000)* [**4] (reversing summary judgment because genuine issues of material fact existed as to whether deputy sheriff was a confidential or policymaking position).

The district court also erred in concluding that plaintiffs Bonneau and Wemmer's claims were barred by the statute of limitations. Actions brought pursuant to *42 U.S.C. § 1983* are governed by analogous personal injury state law statutes of limitations. *Wilson v. Garcia, 471 U.S. 261, 269, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985)*. At all times relevant to this action, the analogous California statute of limitation was one year. *Cal. Code Civ. Proc. § 340(3)* (2001); *Usher v. City of Los Angeles, 828 F.2d 556, 558 (9th Cir. 1987)*; *but see Cal. Code Civ. Proc. § 335.1* (setting two-year statute of limitations for personal injury actions, effective January 1, 2003). Although the state limitations period controls, federal law governs when a cause of action accrues and the statutory period begins to run. *Bagley v. CMC Real Estate Corp., 923 F.2d 758, 760 (9th Cir. 1991)*. Under federal law, a *§ 1983* claim accrues when a plaintiff knows or has reason to know of the injury which is the basis of the [**5] action. *Id. at 761-62*.

The district court concluded that the plaintiffs' claims accrued from the date of the last promotions from the 1999 list, which would put their claims outside the statute of limitations. However, under almost identical circumstances, we have held that such claims accrue when the eligibility for promotion expires. *Bouman v. Block, 940 F.2d 1211, 1221 (9th Cir. 1991)*. In this case, there was an open Commander position that remained unfilled until June 23, 2001, when the plaintiffs' eligibility expired. At that time, as in *Bouman*, the injury became certain and the statute of limitations commenced running. *Id.* Because the action was filed within a year of that date, the claims were timely.

**REVERSED AND REMANDED.**